# EXHIBIT A

# MASTER SERVICE AGREEMENT

This Master Service Agreement ("**Agreement**") is made effective as of May 1, 2020 (the "**Effective Date**") by and between DGCI Corporation, a company duly established in the Commonwealth of Virginia and having its principal place of business at 7950 Jones Branch Dr. 601N, McLean, VA 22102, ("**DGCI**") and Triple Arrow Company for General Trading Co Ltd, a company duly established under the laws of Iraq, with registration number 11721/Kurdistan Region, and having its principal place of business at MRF, Building C,40-meters Road, Erbil, Kurdistan Region, Republic of Iraq ("**Supplier**"). DGCI and Supplier are sometimes referred to individually as a "**Party**" and together as the "**Parties**".

## W I T N E S S E T H:

**WHEREAS,** DGCI desires to engage Supplier as an independent commercial contractor to provide certain goods and/or services (the "**Deliverables**"), and Supplier is willing to provide those Deliverables, all on the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1.     RELATIONSHIP OF THE PARTIES.

**1.1**     Scope of Agreement. This Agreement shall govern the provision of the Deliverables by Supplier to DGCI in the Territory during the Term. "**Territory**" refers to any geographical location specified in a PO. "**Term**" has the meaning set forth further below in this Agreement. All Deliverables shall be implemented only through one or more purchase orders duly executed by an authorized representative of each Party (each, a "**PO**"). The Parties agree that the PO's in existence at the time of signing this Agreement that shall be subject to this Agreement are specified in Appendix A hereto. New PO's entered into by the Parties during the Term shall be subject to this Agreement. In the event of any conflict between this Agreement and a particular PO, the terms of this Agreement shall govern. Supplier acknowledges and agrees that any additional or different terms contained in any purchase order confirmation, invoice, acknowledgement, release, acceptance or other written correspondence, irrespective of the timing, shall be of no force or effect against DGCI.

**1.2**     Independent Service Provider. Supplier acknowledges and agrees that Supplier is an independent contractor and nothing in this Agreement shall be deemed to constitute, create, give effect to or otherwise recognize a joint venture, employment, principal or agency relationship or other joint relationship. Supplier is doing business hereunder at Supplier's own risk and for Supplier's own profit. Supplier is not authorized to make any binding commitments on behalf of DGCI, and acknowledges and agrees that Supplier will not (i) make representations, warranties, guarantees or covenants, or execute agreements, on DGCI's behalf or (ii) represent that DGCI is responsible for Supplier's acts or omissions.

**1.3**     Exclusivity. Subject to the next sentence, this is an exclusive relationship and the Supplier may not enter into agreements with third parties for the marketing and sale of the same or similar products within the territories specified in any PO. Supplier will refrain from any activity and will not enter into any agreement or make any commitment that is inconsistent, incompatible, or otherwise in conflict with Supplier's obligations under this Agreement, including Supplier's ability to perform each PO and Supplier's obligations hereunder to comply with all applicable laws and to maintain the confidentiality of DGCI and procurement-related proprietary information. Except if Supplier is in violation of this Agreement or any PO issued hereunder, Supplier is subject to any of the conditions in paragraph 11.4(c) hereof, or Supplier is in DGCI's sole discretion deemed unlikely to be able to successfully perform the work, DGCI agrees to exclusively work with the Supplier to provide the Deliverables identified in any PO's to be performed within the Territory.

**1.4**     Mutual Representations and Warranties. Each Party represents and warrants to the other that: (a) it has the full power to enter into this Agreement and to perform its obligations hereunder, (b) this Agreement constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, and (c) this Agreement does not contravene, violate or conflict with any other agreement of such Party. Except as expressly set forth in this Agreement or a particular PO, neither Party makes, and each expressly disclaims, any representations or warranties in connection with this Agreement, whether express, implied, statutory or otherwise**.**

## 2.  DELIVERABLES.

**2.1**     Delivery; Acceptance**.** Any shipment of goods, performance of services, or commencement of work on supplies by Supplier shall be deemed to be only upon the terms and conditions contained in this Agreement and the corresponding PO, except to the extent that DGCI may otherwise expressly consent in writing.  Supplier agrees that DGCI's acceptance or payment for any shipment of goods or similar act of DGCI shall not be claimed or construed to constitute such consent. Deliverables shall be made by Supplier at such times and places and of such items and quantities as may from time to time be specified in the PO.  Supplier acknowledges and agrees that time is of the essence with respect to Supplier's performance of its obligations. Supplier shall be liable for handling charges and return shipment costs for excess quantities. Title and risk of loss shall remain with Supplier until goods are delivered and accepted to the F.O.B. point specified by DGCI. Notwithstanding such delivery, Supplier shall bear risk of loss or damage to goods purchased hereunder from the time that DGCI gives notice of rejection of goods pursuant to the inspection provisions of this Agreement.

**2.2**     Packaging and Shipping**.**  Packaging and packing of items to be delivered by Supplier shall insure safe arrival at their destination, conform to requirements of common carriers and, in any event, comply with DGCI's minimum specifications set forth in a PO. Supplier shall be responsible for any additional charges resulting from deviation from DGCI's delivery instructions.

**2.3**     Inspection**.** DGCI shall have the right to inspect Deliverables supplied

hereunder at any time at Supplier's facilities or elsewhere. Final inspection and acceptance shall be after delivery to the delivery point designated by DGCI. If any inspection or test is made by DGCI at Supplier's facility or elsewhere, Supplier shall provide reasonable facilities and assistance for the inspection personnel. DGCI may reject all Deliverables which are found to be defective. No inspection, examination or test, regardless of extensiveness or type, and no approval given in connection with any such inspection, examination or test, shall relieve Supplier, or be claimed by Supplier to relieve it, of any obligation to comply fully with this Agreement and the corresponding PO. Payment for Deliverables or the failure to inspect goods or to discover defects shall not constitute acceptance or limit any of DGCI's rights.

3.    **PERFORMANCE.**

      **3.1** <u>Warranties</u>. Supplier represents and warrants that:

    (a)   All work hereunder will be performed in a good, workmanlike manner satisfying at least generally accepted industry standards, and all work hereunder and Deliverables shall conform to the applicable requirements of this Agreement and the corresponding PO;

    (b)   Supplier has, or prior to the period of performance under a PO will have, and shall maintain and renew, at no additional cost to DGCI, all permits, licenses, agreements, tax clearances, and authorizations necessary or appropriate to enable performance of Supplier's duties in the Territory, and shall provide DGCI with original and certified English copies thereof;

    (c)   Supplier is, or prior to the period of performance under a PO will be, and shall remain, at no additional cost to DGCI, registered and approved in the Joint Contingency Contracting System (JCCS) and shall require that its subcontractors or any tier also be so timely registered and approved in JCCS;

    (d)   Personnel provided to perform services are suitable, competent and appropriately trained for the tasks to be performed and have all necessary licenses, certifications and other authorizations to perform the services in the Territory; and

    (e)   No Deliverable or other work performed or provided hereunder will infringe any copyright, trade secret, patent, or other proprietary rights of a third party, and Supplier is the sole owner of, or otherwise has (or, prior to time of performance, will have) obtained all rights necessary for its performance hereunder.

      **3.2** <u>Survival and Remedies</u>. The preceding warranties, together with Supplier's service warranties and guarantees, if applicable, shall survive inspection, test, acceptance of, and payment for the Deliverables. In the event of defective or nonconforming Deliverables,

and in addition to other remedies available hereunder or at law, DGCI may, at its option, (i) require prompt correction or replacement by Supplier, (ii) return them to Supplier for credit, (iii) have them corrected or replaced by a third party at Supplier's expense and deduct the cost thereof from any monies due Supplier, or (iv) exercise as to Supplier any remedy that is legally exercised by the U.S. Government or Prime Contractor as to DGCI. The return to Supplier of any defective or nonconforming Deliverables and delivery to DGCI of any corrected or replaced Deliverables shall be at Supplier's expense. Deliverables required to be corrected or replaced shall be subject to the provisions of this paragraph and to the inspection provisions of this Agreement in the same manner and to the same extent as Deliverables originally delivered hereunder. In addition to correcting or replacing any defective or nonconforming Deliverables, Supplier shall also reimburse DGCI for all costs and expenses incurred by DGCI in connection with inspection and discovery of the defects, identifying and correcting the cause of such defects and all other activities reasonably undertaken by DGCI to obtain conforming Deliverables.

## 4.  FUNDING; PAYMENT TERMS.

**4.1**    <u>Contract Value</u>.  This Agreement, in and of itself, is unfunded and has no dollar value. The total dollar value of this Agreement shall be determined by the sum of all POs issued hereunder. Each PO will specify its own funded value. DGCI will not pay Supplier, and Supplier shall not claim, any amount greater than the limitations specified in the individual PO, unless DGCI has issued a modification to the PO increasing the funded value.

**4.2**    <u>Pricing</u>. To the extent DGCI is required to provide the U.S. Government with certified cost or pricing data, then, absent a valid exemption, Supplier agrees to provide its certified cost or pricing data in a timely manner and in the requested format, either to DGCI in a sealed package for submission to the U.S. Government or directly to the U.S. Government.

**4.3**    <u>Taxes</u>. Unless otherwise specified in a PO, the price for Deliverables includes, and Supplier is liable for and shall pay, all taxes, impositions, charges and exactions imposed on or measured by the corresponding PO and this Agreement, except for applicable value added or sales and use taxes that are separately stated on Supplier's invoice. Prices shall not include any taxes, impositions, charges or exactions for which a valid exemption exists, as evidenced by suitable documentation.  DGCI may withhold from any amounts payable under this Agreement such federal, state, local or foreign taxes as shall be required to be withheld by the cognizant taxing authority.  In that case, the Parties will cooperate reasonably to seek relief under any applicable double taxation agreement or treaty, but if there is no such agreement or treaty in effect, or if an applicable double taxation agreement or treaty reduces but does not eliminate such withholding or similar tax, DGCI shall make the required withholdings from amounts otherwise payable hereunder and remit them to the cognizant tax authority as and when directed. DGCI will cooperate with Supplier to provide available documentation, such as payment receipts, made available by the taxing authority.  Similarly, the Parties shall cooperate with one another in providing information which may be reasonably required to fulfill each Party's tax filing requirements or any audit information request or to mitigate the tax obligations of either Party. Such requested information may include, for example, applicable tax clearance/non-objection letters, payroll tax receipts and other data requests from

the cognizant tax authority relating to the Agreement and PO activities.

    **4.4**   <u>Invoicing</u>. Invoices must comply with all applicable provisions of this Agreement and each PO, and shall be submitted to DGCI in accordance with the following general instructions:

    (a)    Unless otherwise specified in each PO, supplier shall invoice DGCI in arrears and shall submit all invoices by the 15th day of the month for Deliverables provided during the preceding month.

    (b)    Invoices must be submitted electronically to accounting@dgci.com and shall reference this Agreement and include the PO number, any relevant PO line item number corresponding to a Deliverable, the period of performance for the Deliverables being invoiced, the remittance name and address, the Supplier's Taxpayer Identification Number and such other information as may be reasonably requested by DGCI.

    (c)    Invoices shall be submitted on official company letterhead with costs sufficiently detailed and accompanied by all required supporting documentation. All invoices must be certified as true and accurate and contain the following statement dated and signed by an authorized Supplier representative:

    *"This is to certify that to the best of my knowledge: (i) the above invoice is accurate, complete and conforms to the specifications and terms set forth in the Master Purchase Agreement and the corresponding PO, (ii) the invoiced Deliverables were accepted by DGCI during the period stated, (iii) payment for the Deliverables has not been previously received, and (iv) Supplier has in its possession records for all direct and indirect costs expended to substantiate the invoice."*

    Additional required certifications may be specified in the PO.

    (d)    Invoices shall be in U.S. dollars and, unless otherwise specified in a PO, payable net forty-five (45) days after receipt of a proper invoice.

    (e)    DGCI may, at any time, set-off any amounts Supplier owes DGCI against any amounts DGCI owes to Supplier or any of its affiliated companies. Any adjustments in Supplier's invoice due to Supplier's failure to comply with this Agreement may be made by DGCI before payment.

    **4.5**   <u>Alternate Payment to Ultimate Solutions.</u> In the event DGCI has attempted to pay Supplier for work performed under this MSA and subsequent PO's but the payment process has not been successfully completed for any reason other than DGCI's own fault, DGCI shall be entitled but not required to make such payment to Ultimate Solutions upon

written notice to Supplier. Supplier hereby acknowledges and agrees that such payment to Ultimate Solutions shall be deemed to be a payment to Supplier pursuant to this Agreement or any PO issued hereunder.  Nothing in this paragraph shall give Ultimate Solutions any rights to any payment under this Agreement or any PO issued hereunder, and Supplier agrees to indemnify, hold harmless, and defend DGCI against any claim brought by Ultimate Solutions pursuant to any such payment of any claim for payment under this paragraph. Supplier shall provide DGCI with the necessary bank transfer information for Ultimate Solutions.

     **4.6**   <u>Alternate Payment Instructions.</u> Separate and apart from DGCI's right under paragraph 4.5, Supplier may request DGCI to pay a Third Party (such as a sub-supplier) in lieu of paying Supplier.  Such payments shall be subject to the following terms:

(a)    Supplier shall provide written instructions in a formal notification letter, stating that the proceeds of the outstanding invoice shall be paid to the designated Third Party.

(b)    The notification letter must be sent in writing at least 30 days prior to issuing an invoice.

(c)    The invoice itself should state: "Please remit to: "ABC" company" and shall be signed by Supplier.

(d)    Supplier hereby acknowledges and agrees that payment to a Third Party pursuant to this paragraph shall be deemed to be a payment to Supplier pursuant to this Agreement or any PO issued hereunder.

(e)    Nothing in this paragraph shall give such Third Party any rights to any payment under this Agreement or any PO issued hereunder, and Supplier agrees to indemnify, hold harmless, and defend DGCI against any claim brought by such Third Party pursuant to any such payment of any claim for payment under this paragraph.

(f)    DGCI shall not be obligated to pay any Third Party who is not eligible to receive funds under a U.S. Government contract or to pay any Third Party in violation of any other law, regulation, or treaty.

     **4.7**   <u>Closeout</u>. Supplier shall cooperate with DGCI's customary closeout procedures for an agreement of this type, including, as required, executing a supplier release form in connection with payment of the final invoice following the end of the Term.

## 5.    COMPLIANCE WITH LAWS.

     **5.1**   <u>Competitive Advantage</u>. DGCI does not seek by this Agreement to secure an unauthorized competitive advantage, and Supplier acknowledges that it is not authorized to take any action on behalf of DGCI that would confer such an advantage. In particular, Supplier shall not, directly or indirectly, wrongfully solicit, obtain, use or disclose any information of any other person, association, corporation, government or other entity, including information which is a trade secret, confidential, company proprietary, government security classified, or government procurement sensitive, including but not limited to documents or information that are source selection sensitive and any other information that offers or may offer the Parties an illegal or improper competitive advantage.

**5.2** <u>Limitation on the Use of Agents</u>. Supplier agrees that all services to be performed in connection with this Agreement will be conducted exclusively by Supplier and/or one of the approved subcontractors listed below, subject to revision at DGCI's sole discretion. Notwithstanding the below list, the Supplier will not retain any agents, subcontractors, or other third parties to perform any of the Deliverables without DGCI's prior written consent, such consent not to be unreasonably withheld. Any such agent, subcontractor or other third party shall be subject to DGCI's customary vetting process for new vendors.

**AL MUASHIRAT CO. FOR GENERAL TRADING. CO. LTD**
Bashar Naseer Tawfeeq
JCCS: 89918
+964 770 005 5579 NA 89918
Arasat Al Hindya-Karada Kharig, Near BBAC Bank. Baghdad-Iraq
POC Email: info@almuashirat.com

**ALFADHIL CO. FOR GENERAL TRADING, LTD**
Fadhl Jameel Juma'a
JCCS: 89921
+964 750 460 8759
Italian Village, House 275, Erbil, Iraq
POC Email: fjjcompany@gmail.com

DGCI understands that Supplier may enter into commercial agreements with the following fuel suppliers and traders:

**RONIN CO. FOR GENERAL TRADING & SALES OF PETROLEUM PRODUCTS LTD**
Hawre Riwandizi
Villa #186, Italian Village #1,100-meters Road, Erbil, Kurdistan Region, Republic of Iraq
POC Email: hriwandizi@roninpet.com

Any new fuel sub-suppliers must be approved in writing by DGCI prior to use on any PO. Supplier shall allow DGCI to review the wire transfers to its subcontractors and suppliers to ensure compliance with this paragraph.

**5.3** <u>Compliance of Agents.</u> Supplier shall enable DGCI to confirm that Supplier's agents and subcontractors of every tier are in compliance with local and U.S. legal requirements by ensuring that the following requirements are flowed down in all subcontracts:

    (a)    Subcontractor shall provide DGCI, prior to the period of performance under a PO and upon any renewals during performance of a PO, original and certified English copies of all permits, licenses, agreements, tax clearances, and authorizations necessary or appropriate to enable performance of subcontractor's duties in the Territory;

(b)     Subcontractor shall permit DGCI to audit the subcontractor's supply chain to ensure that no portion of a PO has been performed, and no portion of any PO funds have been received, by a contractor or supplier that is not authorized to perform U.S. Government contracts or permitted to receive funds from a U.S. Government contract.

(c)     To enable each subcontractor or supplier who obtains or transports fuel for performance of a PO issued under this Agreement to obtain PMNOC approval, Supplier shall provide the subcontractor or supplier with either (a) an generic Basic Ordering Agreement (BOA) and generic PO issued by DGCI to the subcontractor or supplier, or (b) an effective, fully defined PO issued by DGCI jointly to Supplier and the subcontractor or supplier. Subcontractor or supplier shall agree not to use the BOA or PO for any purpose other than to obtain PMNOC approval for performance of a PO issued under this Agreement.

**5.4**     <u>Ethical Business Practices</u>. Supplier shall use only legitimate and ethical business practices in connection with the activities contemplated by this Agreement. During the Term, Supplier will conduct its business in a manner consistent with, and no less strict than, DGCI's Supplier Code of Ethics. Supplier shall not violate any applicable laws and regulations of the United States or any other applicable jurisdiction, including but not limited to laws relating to anti-bribery and the offering of inducements (in any form to include entertainment, gifts or otherwise), such as the U.S. Foreign Corrupt Practices Act, the U.S. Anti-Kickback Act and comparable legal requirements relating to its performance of its obligations under this Agreement. Supplier shall not disclose any information, or transfer any services or goods, furnished hereunder in any manner contrary to U.S. export control requirements. Supplier shall not engage in any transaction or activity that would violate any economic sanctions laws applicable to the Parties, including those administered by the U.S. Office of Foreign Assets Control, or employ, use, or do business with any person or entity identified in the U.S. Specially Designated Nationals List in connection with the performance of this Agreement. Consistent with the Supplier Code of Conduct, from time to time DGCI may require training to be conducted at the Supplier's expense for contract compliance purposes and Supplier will be notified accordingly.

**5.5**     <u>No Inducements</u>. Supplier shall not unlawfully offer, promise, or make any payments, loans, gifts, or anything of value that are not legally required to or for the benefit of: (a) a Government Official; (b) any relative of any Government Official; or (c) any other person if Supplier knows or has reason to believe that any part of the payment, loan or gift will be given directly, indirectly, or through a third party to or for the benefit of any of the persons or entities listed in clauses (a) or (b). "**Government Official**" means (a) an official or employee of any U.S or non-U.S. government agency; (b) an official or employee of an entity that Supplier knows or has reason to know is government-owned or controlled; (c) an official or employee of any political party; (d) a political candidate; or (e) an official or employee of a public international organization such as the United Nations, World Bank, or World Health Organization.

**5.6**   <u>Conflicts of Interest</u>. Supplier confirms that it is not aware of any perceived, potential or actual conflict of interest related to its performance of its obligations hereunder. Supplier acknowledges a continuing obligation to report to DGCI in a timely manner any perceived, potential or actual conflict of interest that may arise during the course of Supplier's performance of its obligations under this Agreement. In the event of any such perceived, potential or actual conflict of interest, DGCI may, at its discretion, require that Supplier execute an acceptable mitigation plan or terminate this Agreement.

**5.7**   <u>Compliance Representations</u>. Supplier represents and warrants that:

(a)    None of Supplier's agents, partners or employees, nor any immediate family members of Supplier's agents, partners or employees, is a Government Official, and Supplier is not aware of any current or prior violations of any applicable laws (including anti-corruption, anti-bribery, and anti-solicitation laws, and export controls and sanctions laws and regulations) in which Supplier has participated. Supplier further represents that neither Supplier nor any entity owned or controlled by Supplier is now, or has ever been, subject to an investigation by any government authority regarding alleged violations of any anti- corruption, anti-bribery or anti-solicitation laws, or export controls or sanctions laws and regulations, regardless of the outcome or findings of the investigation.

(b)    Neither Supplier nor any entity owned or controlled by Supplier is the target of any applicable sanction laws (e.g., designated on OFAC's Specially Designated Nationals and Blocked Persons list).

(c)    Supplier has established procedures and controls which Supplier reasonably believes are adequate (and otherwise comply with applicable law) to ensure that Supplier and any entity owned or controlled by Supplier is and will remain in compliance with all applicable laws (including anti-corruption, anti-bribery, and anti-solicitation laws, and export controls and sanctions laws and regulations).

(d)    Neither Supplier nor any of Supplier's principals (as defined in the Federal Acquisition Regulation to mean an officer, director, owner, partner, or a person having primary management or supervisory responsibilities within a business entity (e.g., general manager; plant manager; head of a division or business segment; and similar positions)) are debarred, suspended or proposed for debarment by the U.S. Government. Supplier agrees to notify DGCI immediately in writing upon discovery that Supplier or any of Supplier's principals may be subject to any such debarment or suspension proceedings.

**5.8**   <u>Notice Requirement</u>. The representations and warranties made in this Section 5 shall continue throughout the term of this Agreement.  If, during the term of this Agreement, there is a change in these representations and warranties, Supplier agrees to immediately disclose the change in writing to DGCI in accordance with the notice provisions in this

Agreement.

**5.9** <u>Certification</u>. Supplier agrees to complete, upon request, a certification in a form acceptable to DGCI representing that Supplier is in compliance with all applicable laws (including anti- corruption, anti-bribery, and anti-solicitation laws, as well as export controls and sanctions laws and regulations).

**5.10** <u>Suspension Right</u>. DGCI may suspend or withhold any payments to Supplier if, in good faith, DGCI believes that the payments may cause a violation of any applicable laws or may be related to illegal conduct, unethical business practices or violations of any applicable laws.

**5.11** <u>Termination Right</u>. Notwithstanding any other termination provisions in this Agreement, DGCI may terminate this Agreement immediately by written notice for the following: (a) fraud or misrepresentation with respect to the entering into or performance of this Agreement; (b) violation of any provision of this Section 5; or (c) circumstances causing DGCI to believe, in good faith, that Supplier or anyone acting on Supplier's behalf has violated any applicable laws or regulations.

**5.12** <u>Records; Audits</u>. During the Term and for a period of three years thereafter (or such longer period of time required by applicable law or Supplier's own documentation retention policies), Supplier shall maintain accurate records relating to Supplier's performance of its obligations under this Agreement. Without limiting the generality of the foregoing, DGCI shall have the right, from time to time, at its own expense and upon reasonable notice to Supplier, to have an examination and audit conducted of those records to determine compliance with the terms of this Agreement. Such audit shall be conducted during regular business hours and in such manner as not to interfere unreasonably with Supplier's normal business activities.

# 6.   CONFIDENTIALITY.

**6.1** <u>Proprietary Information</u>. As used herein, "**Proprietary Information**" means any information disclosed pursuant to this Agreement, whether in written, oral or visual form, which is identified by the disclosing Party at the time of disclosure as being proprietary or confidential or that due to its character and nature, or the circumstances of its disclosure, a reasonable person would recognize as being confidential or competitively sensitive. Proprietary Information shall not include any information that: (a) is already in the possession of the receiving Party without obligation of confidentiality at the time of receipt from the disclosing Party; (b) is independently developed by the receiving Party, as evidenced by appropriate documents; (c) is or becomes publicly available without breach of the Agreement by the receiving Party; (d) is rightfully received, free of restrictions and without breach of the Agreement, by the receiving Party from a third party; or (e) is approved for release by the prior written approval of the disclosing Party.

**6.2** <u>Legal Proceedings</u>. In the event the receiving Party reasonably believes that disclosure of Proprietary Information of the other Party is required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil

investigative demand, or similar process), the receiving Party shall notify the other Party promptly of the requirement so that such other Party may seek an appropriate protective agreement. If disclosure is still required thereafter, the receiving Party shall limit its disclosure to the information that it is legally obligated to disclose.

**6.3**   <u>Restricted Usage</u>. The receiving Party agrees that any Proprietary Information disclosed hereunder: (a) shall be used by it solely in furtherance of this Agreement, (b) shall only be disclosed to the receiving Party's personnel on a need-to-know basis, (c) shall not be distributed, disclosed or disseminated to any third party without the disclosing Party's prior written consent; and (d) shall be subjected by the receiving Party to the same care that the receiving Party uses to protect the confidentiality of its own proprietary information, but not less than reasonable care. Either Party shall be allowed to make copies of any Proprietary Information disclosed by the other Party provided that the markings on the original Proprietary Information are affixed to all copies (including partial copies).  The receiving Party shall return to the disclosing Party, or provide written certification of the destruction of, any Proprietary Information it has received hereunder, immediately upon request made at any time by disclosing Party in its sole and absolute discretion, and in any event upon the termination of this Agreement; provided that the receiving Party may retain copies of the Confidential Information as required by any (A) applicable law or regulation or bona fide policies and procedures established for legal, compliance or regulatory purposes, or (B) automatic data back-up system in accordance with the receiving Party's security and/or disaster recovery procedures in the ordinary course of business; provided further that any such retained copies of the Proprietary Information shall be kept confidential in accordance with, and shall otherwise remain subject to, the provisions hereof and shall not be accessed or used for any purpose other than the purposes for which retention is hereby permitted, in each case for as long as they are retained (notwithstanding any prior termination hereof). The receiving Party shall notify the disclosing Party in writing immediately upon the occurrence of any unauthorized release of Proprietary Information, whether inadvertent or otherwise, and shall use reasonable efforts to prevent or limit any further dissemination of such Proprietary Information.

**6.4**   <u>Duration</u>. Proprietary Information hereunder shall be protected by the receiving Party during the Term and for a period of three (3) years thereafter, except that non-disclosure obligations relating to trade secrets shall survive until such information ceases to be a trade secret as a matter of law.

**6.5**   <u>Facility Access</u>. To the extent a Supplier may be required to have onsite or remote access to any DGCI (or DGCI customer) work facility or computer network, Supplier shall limit such access to the extent strictly necessary for performance thereunder. Supplier personnel shall observe all policies and procedures governing physical or remote access, including those relating to safety, security and general standards of conduct. Supplier shall cooperate fully with DGCI in investigating any alleged breach of any of those requirements.

**6.6**   <u>No IP Rights</u>. Supplier acknowledges that it is not being granted any license, right, or title in or to any patent, copyright, trademark or other proprietary rights under this Agreement. All information and property furnished by DGCI shall remain the exclusive property of DGCI. Supplier agrees that such information and property will be used for no

purpose other than in connection with the performance of its obligations under this Agreement, and shall be returned promptly to DGCI upon its request. Supplier assigns, and will require its personnel to assign, to DGCI copyright ownership for original written material originated and prepared for DGCI under this Agreement. Supplier, at DGCI's direction and expense, will take reasonable steps necessary to preserve and enforce these copyrights.

**7.   NON-SOLICITATION**. During the term of this Agreement and for a period of six months thereafter, neither Party shall, directly or indirectly, recruit, solicit, or hire, or assist in the recruitment, solicitation or hiring, for employment or engagement as a consultant, any employee of the other Party who participated in the performance of the other Party's obligations under this Agreement or who otherwise became known to the hiring Party as a result of such performance.  The foregoing shall not prohibit a hiring Party from (a) placing mass media advertisements, utilizing non-targeted third party recruiting efforts, or conducting job fairs for the purpose of recruiting employees generally or from otherwise hiring any person who independently seeks employment without solicitation by the hiring Party or (b) soliciting any employee whose employment has been terminated by the other Party prior to the commencement of discussions regarding employment.

**8.   CUSTOMER CONTACT**. Unless approved in advance by DGCI, Supplier shall not communicate with, or take any direction from, any DGCI customer relating to this Agreement or any PO, and any customer-initiated contact shall be referred by Supplier to DGCI for resolution. This paragraph shall not apply to any disclosure required by applicable law.

**9.   FAR CLAUSES.**  For the benefit of DGCI's Government customers, a PO may expressly incorporate by reference applicable "flow down" clauses required by the customer's procurement regulations such as the Federal Acquisition Regulation (FAR) and the Defense Federal Acquisition Regulation Supplement (DFARS), including applicable flow down clauses for commercial item acquisitions for which an exemption is not available.

**10.   INSURANCE.** Except as otherwise specified in a PO or as otherwise agreed in writing between the Parties, Supplier and its suppliers shall carry the following types of insurance and shall maintain them in the minimum amounts shown during the term of this Agreement:

| Insurance Type | Minimum Insurance Coverage |
|---|---|
| Commercial General Liability Insurance | $5,000,000 combined single limit per occurrence (including products/completed operations and contractual liability coverage). |
| Automobile Insurance | $2,000,000 combined single limit for bodily injury and/or property damage per person per occurrence; policy shall apply to all owned, leased, hired and non-owned vehicles used in connection with the work under this Agreement. |

| Workers' Compensation Insurance (including DBA insurance for personnel performing services overseas) | Insurance for statutory obligations imposed by law including, where applicable: (i) coverage under United States Longshoremen's and Harbor Workers' Act and Jones Act, (ii) Defense Base Act (DBA) workers' compensation insurance as specified under FAR Clause 52.228-3 for personnel performing services overseas and (iii) foreign voluntary workers' compensation insurance (if not covered by DBA workers' compensation insurance) based on the benefits of the state of hire. |
|---|---|
| Foreign Liability Insurance | $1,000,000 foreign general liability insurance (if not included in Commercial General Liability Insurance above), including products/completed operations, contractual liability and personal injury, bodily injury and property damage liability; and $1,000,000 foreign auto liability insurance to include coverage for all owned, leased, hired and non-owned vehicles used in connection with the work under this Agreement. |
| Employer's Liability Insurance | $1,000,000 per occurrence, unless higher amounts are required by applicable law including, if applicable, maritime coverage endorsement. This coverage requirement applies to all workers' compensation policies to include domestic workers' compensation, DBA workers' compensation, foreign voluntary workers' compensation and locally placed workers' compensation coverage outside of the United States. |
| Umbrella or Excess Insurance | Umbrella and/or excess liability insurance covering all domestic and foreign general liability, automobile liability, and employer's liability policies, to include coverage for bodily injury and property damage. The insurance provided under this section must be in the amount of not less than $5,000,000 per occurrence and be excess over all underlying insurance policies listed above. |
| Professional Liability Insurance | Reserved. |

Supplier shall have all policies, except Workers' Compensation and Employer's Liability, endorsed to name DGCI as an additional insured with respect to the work to be performed by Supplier. All such insurance must be primary and non-contributory and required to respond and pay prior to any other insurance or self-insurance available. Any other coverage available to DGCI shall apply on an excess basis. Supplier shall promptly deliver to DGCI a Certificate of Insurance attesting to the above coverage. The certificate shall state that all policies have been endorsed to waive subrogation in favor of DGCI. The certificate shall indicate that DGCI will be notified thirty (30) days prior to the modification or cancellation of any such insurance policies. Supplier shall comply with any federal, state, foreign, local and any other applicable law and local and/or site specific insurance requirements even if not stated herein or in a PO.

## 11. TERM AND TERMINATION.

**11.1**   Term. This Agreement shall commence on the Effective Date and remain in effect through 1st of May 2022, the base period (the '**Term**"), or the termination of the term of any PO issued hereunder, whichever is later, unless earlier terminated in accordance with this Agreement. Each PO may specify a term applicable to it.

**11.2**   Stop Work. DGCI reserves the right to issue a written stop work notice at any time during the performance of this Agreement in the event that Supplier's Deliverables are no longer needed due to a change in DGCI's requirements. In the event of a stop work notice, Supplier shall be entitled to compensation to the same extent as DGCI is entitled to compensation from the U.S. Government.  Upon receipt of any such stop work notice Supplier shall immediately stop work and incur no further costs during the period of time such stop work notice remains in effect, until and unless either the stop work notice is lifted or a termination of this Agreement occurs.

**11.3**   Excusable Delays. Supplier shall not be in default under this Agreement for the failure to timely deliver Deliverables if the failure arises from unforeseen causes beyond the control and without the fault or negligence of the Supplier or its approved subcontractors. Supplier shall give prompt written notice to DGCI stating the period of time the occurrence is expected to continue and use commercially reasonable efforts to end the failure or delay and minimize the effects of such event, including seeking alternative available sourcing for Deliverable items. Excusable delays shall only serve to prevent Supplier's default under this Agreement and then to the same extent as they prevent DGCI's default under DGCI's contract with the U.S. Government. DGCI may terminate this Agreement on written notice to Supplier if the excusable delay is reasonably likely to extend for a continuous period in excess of one calendar month or such other time period as may be mutually agreed upon by the Parties. In no event shall DGCI be responsible to pay for Deliverables that are unable to be provided due to excusable delays.

**11.4**   Termination. In addition to any other express termination right set forth elsewhere in this Agreement:

(a)     DGCI may terminate this Agreement and/or any PO without cause by providing at least thirty (30) calendar days' written notice to Supplier, in which case DGCI will only be liable to Supplier for unpaid compensation owed to Supplier for work performed by Supplier in accordance with the PO requirements and accepted by DGCI prior to the effective date of termination.

(b)     Either Party may terminate this Agreement immediately upon giving notice of a material breach of this Agreement or a PO to the other Party if the breach cannot be remedied or, if capable of remedy, the breaching party fails to do so within five (5) business days following written notice (or such other period of time as may be mutually agreed upon by the Parties). The non-breaching Party shall reasonably cooperate with the breaching Party to facilitate a remedy of a material breach within the applicable cure period. In the event DGCI terminates

this Agreement in whole or in part due to Supplier's default, DGCI may procure, upon such terms and in such manner as DGCI may deem appropriate, supplies or services similar to those so terminated, and Supplier shall be liable to DGCI for any excess costs and for any damages for which DGCI may be liable to the U.S. Government if Supplier's default causes DGCI to default on its contract.

(c)     Either Party may terminate this Agreement effective immediately upon written notice to the other Party, if the other Party: (i) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (ii) files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency Law; (iii) makes or seeks to make a general assignment for the benefit of its creditors; or (iv) applies for or has a receiver, trustee, custodian or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

**11.5** Effect of Expiration or Termination. Termination of this Agreement and any PO does not release either Party from any liability which, at the time of termination, has accrued to the other Party, or which may accrue in respect of any act or omission before termination or expiration, or from any obligation which is expressly stated to survive the termination or expiration.

## 12. INDEMNIFICATION.

**12.1.** Indemnity. Each Party (as an "**Indemnifying Party**") shall indemnify and hold harmless the other Party and its applicable affiliates (as an "**Indemnified Party**") against any liability, loss, damage, cost, claim or expense (collectively, "**Damages**") the Indemnified Party suffers or incurs as a result of any claim, suit, action or other proceeding (a "**Claim**") brought against the Indemnified Party by a third party arising under or relating to the Indemnifying Party's performance (or non-performance) of its obligations under this Agreement; provided, however, that this indemnity obligation shall not apply to the extent that such Damages are attributable to the fraud, gross negligence or willful misconduct of an Indemnified Party. In the event the Damages are found to be caused by the joint or concurrent fault of the Parties, the Damages shall be borne by each Party in proportion to such Party's degree of fault.

**12.2.** Procedures. The Parties agree that the preceding indemnification obligations shall be conditioned upon the Indemnified Party (i) promptly notifying the Indemnifying Party of such Claim, (ii) providing the Indemnifying Party with the sole right to defend or settle such Claim, including selection of defense counsel, and (iii) providing the Indemnifying Party with good faith assistance in the defense or settlement of such Claim, at the Indemnifying Party's expense. The Indemnifying Party shall not settle or compromise any such Claim in any manner which would impose an injunction or other equitable relief on the Indemnified Party or that does not include a full release of the Indemnified Party with respect to such Claim, without the prior written consent of the Indemnified Party. If (i) the Indemnifying Party does not promptly assume the defense of any Claim following notice of its election to do so, or (ii) the Indemnified

Party reasonably concludes that there may be defenses available to it which are different from or additional to those available to the Indemnifying Party and which could reasonably be expected to result in a conflict of interest or prejudice to the Indemnified Party if both Parties were represented by the same counsel, then the Indemnified Party will have the right to undertake the defense of such Claim with counsel of its own choosing, with the reasonable costs thereof for the account of the Indemnifying Party.

**12.3.** Damages. Except with respect to indemnification obligations hereunder, neither Party will be liable to the other for any incidental, special, consequential, indirect, punitive or exemplary damages (including lost revenues, lost profits, lost data or business interruption losses) arising from or related to this Agreement, regardless of the type of claim, whether in contract, tort, negligence, strict liability or otherwise, and regardless of the cause of such damages even if such damages were foreseeable.

## 13.    GOVERNING LAW AND JURISDICTION.

**13.1.** Governing Law. This Agreement, the rights and obligations of the Parties and any claims or disputes relating to this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without giving effect to its principles of conflict of laws. The U.N. Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

**13.2.** Specific Performance. In the event of a breach of this Agreement, in addition to any other remedies the non-breaching Party may have at law or in equity, the non-breaching Party shall be entitled to seek enforcement of this Agreement in a court of competent jurisdiction by means of a decree of specific performance, an injunction without the posting of a bond or the requirement of any other guarantee, and any other form of equitable relief.

**13.3.** Disputes. The Parties shall make a good faith effort to settle amicably any claim, controversy or dispute arising under or relating to this Agreement. Absent a mutual resolution, any such claim, controversy or dispute shall be resolved exclusively at the U.S. Federal District Court for the Eastern District of Virginia, or if such court does not have subject matter jurisdiction over the dispute, any other federal or state court of competent subject matter jurisdiction located in the Commonwealth of Virginia. Each Party irrevocably and unconditionally consents to such personal jurisdiction and to waive its right to a jury trial in any action arising under this Agreement. The prevailing Party in any action to enforce this Agreement shall be entitled to reimbursement of reasonable, documented costs and attorneys' fees incurred in connection with such enforcement.

## 14.    MISCELLANEOUS.

**14.1.** Prior Agreements; Modifications and Waivers. This Agreement and the executed POs constitute the final, complete and integrated understanding of the Parties with respect to the subject matter hereof and supersede all prior understandings and agreements, whether written or oral, with respect to the same subject matter. Any changes to this Agreement

or a PO must be approved in writing by both Parties. The failure of a Party to exercise any right or remedy will not be deemed or constitute a waiver of such right or remedy in the future. No waiver of any of the provisions of this Agreement will be deemed or will constitute a waiver of any other provision hereof, nor will any such waiver constitute a continuing waiver unless otherwise expressly provided.

**14.2.**   Publicity. No news release, public announcement, denial or confirmation of any part of the subject matter of this Agreement shall be made without the prior written consent of DGCI, such consent not to be unreasonably withheld.

**14.3.**   Notices. All notices required or permitted to be given hereunder shall be deemed properly given if delivered by email or by personal delivery to the authorized individuals listed on the signature page to this Agreement or as otherwise specified in writing by the Parties.

**14.4.**   Assignment. Supplier shall not assign or transfer its rights relating to this Agreement or any PO in whole or in part or, consistent with Section 5.2, delegate any of Supplier's obligations under this Agreement or any PO, without DGCI's prior written consent, such consent not to be unreasonably withheld.

**14.5.**   Severability. Should any provision of this Agreement be held to be invalid, void, or otherwise unenforceable by a court of competent jurisdiction, the remaining provisions contained herein shall continue to remain in full force and effect, and shall not be impaired or otherwise invalidated in any way. To the extent permitted and possible, the invalid or unenforceable term shall be deemed replaced by a term that is valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable term.

**14.6.**   Advice of Counsel and Construction. Each Party acknowledges that it has had the opportunity to be represented by counsel.  Accordingly the rule of construction of contract language against the drafting party is hereby waived. Unless the context otherwise requires, (i) each reference in this Agreement to a designated "Section" or "Exhibit" is to the corresponding Section or Exhibit of or to this Agreement; (ii) the word "or" shall not be applied in its exclusive sense; (iii) "including" shall mean "including, without limitation"; and (iv) "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section or other subdivision.

**14.7.**   Survival. This Section 14 and Sections 6, 7, 11.5, 12 and 13 of this Agreement, and any other provision whose survival is necessary to give this Agreement its intended effect, shall survive the expiration or termination of this Agreement.

**14.8.**   Further Assurances. Supplier shall provide such further documents or instruments as may be reasonably necessary or desirable to give effect to this Agreement and to carry out Supplier's obligations hereunder and under each PO.

**14.9.**   Third Party Beneficiaries. There are no third-party beneficiaries to this Agreement.

**14.10.** <u>Counterparts; Headings</u>. This Agreement may be executed in counterparts, all of which together shall constitute one and the same document. Further, this Agreement may be executed by transfer of an originally signed document, including by electronic signature, by e-mail in PDF format, each of which will be as fully binding as an original document. Headings are inserted for convenience of reference only.

*[Signatures appear on the next page.]*

**IN WITNESS WHEREOF,** the duly authorized representatives of the Parties have signed this Agreement as of the Effective Date.

**DGCI Corporation**                         **SUPPLIER**

Mohammed Faisal bradosti (Jun 27, 2020 20:02 GMT+2)

Ian Galloway                                 Mohammed Faisal bradosti

Jun 28, 2020                                 Jun 27, 2020

**Address for Notices:**                     **Address for Notices:**

7950 Jones Branch Dr. 601N                   MRF, Building C,40-meters Road, Erbil,
McLean, VA 22102                             Kurdistan Region, Republic of Iraq
USA

Attention: Ian Galloway                      Attention: Mohammed Faisal
Telephone: 240-461-8074                      Telephone: +964 770 445 5980
Email: Igalloway@dgci.com                    Email: mohammedbradosti@gmail.com

## APPENDIX A – FLOWDOWN PROVISIONS AND CLAUSES INCORPORATED BELOW AND ATTACHED
### 130 - SPE607-20-D-0026 - Iraq Into-Plane
### 131 - SPE605-20-D-9518 - Iraq & Syria DDF
### 105 - Iraq and Syria OTBs
### 114 - SOSI SubK Camp Taji Fuel

52.203-13, Contractor Code of Business Ethics and Conduct (Oct 2015) (41 U.S.C. 3509).

52.203-19, Prohibition on Requiring Certain Internal Confidentiality Agreements or Statements (Jan 2017) (section 743 of Division E, Title VII, of the Consolidated and Further Continuing Appropriations Act, 2015 (Pub. L. 113-235) and its successor provisions in subsequent appropriations acts (and as extended in continuing resolutions)).

52.204-23, Prohibition on Contracting for Hardware, Software, and Services Developed or Provided by Kaspersky Lab and Other Covered Entities (Jul 2018) (Section 1634 of Pub. L. 115-91).

52.203-6, Restrictions on Subcontractor Sales to the Government (Sep 2016) (if Vendor engages sub-tier vendors in the performance of this Agreement)

52.204-25 Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment (Aug 2019) (if Vendor provides telecommunications and video surveillance services under this Agreement)

52.209-10 Prohibition on Contracting with Inverted Domestic Corporations (Nov 2015) (if Vendor meets definition under 6 U.S.C. 395(b)or plans to engage sub-tier vendors meeting definition under 6 U.S.C. 395(b))

52.222-17 Nondisplacement of Qualified Workers (May 2014) (if this Agreement exceeds $250,000)

52.222-50 Combating Trafficking in Persons (Dec 2018) (if at least $500,000 of the value of this Agreement may be performed outside the United States and items supplied are not commercially available off-the-shelf items)

52.224-3 Privacy Training (Jan 2017) (if Vendor employees will have access to DGC International systems of records containing personally identifiable information))

52.225-26 Contractors Performing Private Security Functions Outside the United States (Oct 2016) (if vendor will be performing security functions under this Agreement)

52.233-3 Protest After Award (Aug 1996) (if this Agreement value exceeds $250,000)

252.225-7975 ADDITIONAL ACCESS TO CONTRACTOR AND SUBCONTRACTOR RECORDS (DEVIATION 2020-O0001) (NOV 2019)

(a) In addition to any other existing examination-of-records authority, the Government is authorized to examine any records of the Contractor and its subcontractors to the extent necessary to ensure that funds, including supplies and services, available under this contract are not provided, directly or indirectly, to a person or entity that is actively opposing United States or coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities.

(b) The substance of this clause, including this paragraph (b), is required to be included in subcontracts, including subcontracts for commercial items, under this contract that have an estimated value over $50,000 and will be performed outside the United States and its outlying areas.

252.225-7993 Prohibition on Providing Funds to the Enemy (DEVIATION 2020-O0001) (NOV 2019)

(a) The Contractor shall—
(1) Exercise due diligence to ensure that none of the funds, including supplies and services, received under this contract are provided directly or indirectly (including through subcontracts) to a person or entity who is actively opposing United States or Coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities;

(2) Check the list of prohibited/restricted sources in the System for Award Management (SAM) at www.sam.gov—
(i) Prior to subcontract award; and
(ii) At least on a monthly basis; and prohibited or restricted source pursuant to section 841 of the National Defense Authorization Act for Fiscal Year 2015 (Pub. L. 113-291), as amended, unless the Contracting Officer provides to the Contractor written approval of the head of the contracting activity to continue the subcontract.

(b) The Head of the Contracting Activity has the authority to—
(1) Terminate this contract for default, in whole or in part, if the Head of the Contracting Activity determines in writing that the contractor failed to exercise due diligence, as required by paragraph (a) of this clause; or

(2)(i) Void this contract, in whole or in part, if the Head of the Contracting Activity determines in writing that any funds received under this contract have been provided directly or indirectly to a person or entity who is actively opposing United States or Coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities.
(ii) When voided in whole or in part, a contract is unenforceable as contrary to public policy, either in its entirety or with regard to a segregable task or effort under the contract, respectively.
(c) The Contractor shall include the substance of this clause, including this paragraph (c), in subcontracts, including subcontracts for commercial items, under this contract that have an estimated value over $50,000 and will be performed outside the United States and its outlying areas.

# DGCI TA MSA - Final

**Final Audit Report**                                                2020-06-28

| | |
|---|---|
| Created: | 2020-06-16 |
| By: | Ian Galloway (contracts@dgci.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAmYPLMM07dwJHOWYb8-U0IPfu1ejHcFVo |

## "DGCI TA MSA - Final" History

Document created by Ian Galloway (contracts@dgci.com)
2020-06-16 - 1:24:42 PM GMT- IP address: 108.18.229.178

Document emailed to Mohammed Faisal bradosti (mohammedbradosti@gmail.com) for signature
2020-06-16 - 1:27:12 PM GMT

Email viewed by Mohammed Faisal bradosti (mohammedbradosti@gmail.com)
2020-06-16 - 7:32:30 PM GMT- IP address: 66.102.9.154

Document e-signed by Mohammed Faisal bradosti (mohammedbradosti@gmail.com)
Signature Date: 2020-06-27 - 6:02:03 PM GMT - Time Source: server- IP address: 85.228.155.235

Document emailed to Ian Galloway (igalloway@dgci.com) for signature
2020-06-27 - 6:02:04 PM GMT

Email viewed by Ian Galloway (igalloway@dgci.com)
2020-06-28 - 12:39:22 PM GMT- IP address: 66.102.8.210

Document e-signed by Ian Galloway (igalloway@dgci.com)
Signature Date: 2020-06-28 - 12:39:41 PM GMT - Time Source: server- IP address: 173.66.191.43

Signed document emailed to Mohammed Faisal bradosti (mohammedbradosti@gmail.com), Ian Galloway (igalloway@dgci.com) and Ian Galloway (contracts@dgci.com)
2020-06-28 - 12:39:41 PM GMT



POWERED BY
Adobe Sign