UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| **DGCI CORPORATION,** | |
| **Plaintiff,** | |
| **v.** | No.:  1:21-cv-1174 |
| **TRIPLE ARROW COMPANY FOR GENERAL TRADING CO. LTD.,** | |
| **Defendant.** | |

### MEMORANDUM OF LAW IN SUPPORT OF DGCI CORPORATION'S MOTION FOR AN ANTI-SUIT INJUNCTION

Michael A. Branca (VSB No. 36108)
Michael C. Zisa (VSB No. 76397)
Joseph N. Frost (VSB No. 92239)
PECKAR & ABRAMSON, P.C.
2055 L Street, N.W., Suite 750
Washington, DC 20036
Telephone:  (202) 293-8815
Facsimile:   (202) 293-7994
mbranca@pecklaw.com
mzisa@pecklaw.com
jfrost@pecklaw.com

Thomas J. Curran (*pro hac vice*)
tcurran@pecklaw.com
Doris D. Short (*pro hac vice*)
dshort@pecklaw.com
Robert H. Bell (*pro hac vice*)
rbell@pecklaw.com
PECKAR & ABRAMSON, P.C.
1325 Avenue of the Americas, 10th Floor
New York, NY 10019
Telephone:  (212) 382-0909
Facsimile:   (212) 382-3456

October 19, 2021                                      *Attorneys for DGCI Corporation*

## TABLE OF CONTENTS

**PAGE**

**PRELIMINARY STATEMENT** ................................................................................... **1**

**FACTUAL BACKGROUND** ........................................................................................ **2**

1. **DGCI Engages Triple Arrow as a Subcontractor for DGCI's Business in Iraq** ................................................................................................................. **2**

2. **DGCI and Triple Arrow Enter Into the MSA, Which Contains a Mandatory Forum Selection Clause for the Eastern District of Virginia** ................... **4**

3. **The U.S. Department of Defense Deems Triple Arrow a Force Protection Threat in October 2020 Resulting in Termination of the MSA** ................................... **5**

4. **DGCI Obtains Approval from the U.S. Government to Purchase Triple Arrow's Remaining Fuel Inventory** ........................................................... **6**

5. **The Dispute Under the MSA Between DGCI and Triple Arrow Arises** .................... **7**

6. **Triple Arrow Initiates Legal Proceedings in Iraq** ........................................ **9**

**ARGUMENT** ............................................................................................................. **10**

  I. **A FOREIGN ANTI-SUIT INJUNCTION IS NECESSARY TO PROTECT THIS COURT'S JURISDICTION**……..…………..……………………………**10**

    A. **The Parties and Issues Are the Same in This Litigation and the Iraqi Litigation**……………………………………………………**11**

    B. **The Other Relevant Considerations Support the Grant of the Anti-Suit Injunction**…………………………………………….……..**11**

      1. **The Iraqi Litigation Frustrates a Clear Public Policy in this District** .......... **12**

      2. **The Iraqi Litigation is Vexatious** ................................................ **13**

      3. **The Iraqi Litigation Threatens This Court's Jurisdiction** ........................... **14**

      4. **The Iraqi Litigation is Prejudicial to Other Equitable Considerations** ........ **14**

  II. **AN ANTI-SUIT INJUNCTION IS CONSISTENT WITH INTERNATIONAL COMITY CONCERNS**…………………………...…………………………**15**

**CONCLUSION** ......................................................................................................... **16**

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Applied Medical Distribution Corp. v. Surgical Company BV*,
    587 F.3d 909 (9th Cir. 2009) ....................................................................................13

*BAE Systems Tech. Solution & Services, Inc. v. Republic of Korea's Defense*
    *Acquisition Program Administration*,
    195 F. Supp. 3d 776 (D. Md. 2016) ..................................................................... 10, 11

*BAE Systems Tech. Solution & Services, Inc. v. Republic of Korea's Defense*
    *Acquisition Program Administration*,
    884 F.3d 463 (4th Cir. 2018) ............................................................................. *passim*

*Centro Tepeyac v. Montgomery County*,
    722 F.3d 184 (4th Cir. 2013) (*en banc*) .................................................................10

*Custom Polymers Pet, LLC v. Gamma Meccanica SpA*,
    185 F. Supp. 3d 741 (D. S.C. 2016)........................................................................13

*E&J Gallo Winery v. Andina Licores S.A.*
    446 F.3d 984 (9th Cir. 2006) ............................................................................. *passim*

*Georgia Vocational Rehabilitation Agency Business Enterprise Program v.*
    *United States*,
    354 F. Supp. 3d 690 (E.D. Va. 2018) .....................................................................10

*Gilbane Federal v. United Infrastructure Projects FZCO*,
    No. 14-cv-03254, 2014 WL 4950011 (N.D. Cal. Sept. 24, 2014)..........................16

*International Safety Access Corp. v. Integrity Worldwide, Inc.*,
    C.A. No. 0:09-cv-00315, 2009 WL 10684864 (D. S.C. May 27, 2009)...............11, 14, 15

*Kaepa, Inc. v. Achilles Corp.*,
    76 F.3d 624 (5th Cir. 1996) ...................................................................................15

*M/S Bremen v. Zapata Off-Shore Co.*,
    107 U.S. 1 (1972)....................................................................................................12

*Microsoft Corp. v. Motorola, Inc.*,
    696 F.3d 872 (9th Cir. 2012) .................................................................................15

*Paramedics Electromedicina Comercial, Ltda. v. GE Medical Systems*
    *Information Technologies, Inc.*,
    369 F.3 645 (2d Cir. 2004)......................................................................................13

*Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*,
    361 F.3d 11 (1st Cir. 2004) .................................................................................................. 14

*The Hipage Company, Inc. v. Access2Go, Inc.*,
    589 F. Supp. 2d 602 (E.D. Va. 2008) ..................................................................................12

*U.S. Bank National Assoc. v. Jefferson At Laurel Highlands, L.P.*,
    No. C.A. 1:15-cv-00306, 2016 WL 4534027 (E.D. Va. July 11, 2016) .................................12

*Umbro International, Inc. v. Japan Professional Football League*,
    No. C.A. 6:97-2366-13, 1997 WL 33378853 (D. S.C. Oct. 2, 1997) .............................. 10, 15

**Other Authorities**

Federal Rule of Civil Procedure 65 ........................................................................*passim*

## PRELIMINARY STATEMENT

Plaintiff DGCI Corporation ("DGCI") respectfully seeks a temporary restraining order and a preliminary foreign anti-suit injunction under Federal Rule of Civil Procedure 65, prohibiting Defendant Triple Arrow Company for General Trading Co. Ltd. ("Triple Arrow") from proceeding with its foreign lawsuit or other legal proceedings against DGCI in Iraq.  This foreign lawsuit brought by Triple Arrow against DGCI in Iraq is in direct contravention of the clear terms of its contract with DGCI and presents a real risk of immediate and irreparable harm to DGCI.

The Virginia-law governed Master Service Agreement ("MSA") between DGCI and Triple Arrow contains a mandatory forum selection clause which governs any disputes between the parties.  This provision requires that any dispute "shall be resolved exclusively at the U.S. Federal District Court for the Eastern District of Virginia, or if such court does not have subject matter jurisdiction over the dispute, any other federal or state court of competent jurisdiction located in the Commonwealth of Virginia."  (Declaration of Robert Bell, dated October 19, 2021 ("Bell Decl."), Ex. A, at 13.3).  Triple Arrow is brazenly violating this contractual agreement through initiating legal proceedings against DGCI in Iraq.  DGCI understands that a status conference in that Iraqi litigation has been scheduled for November 8, 2021.

DGCI meets all requirements for the issuance of an anti-suit injunction.  *First*, the parties and the issues are the same in this litigation and in the Iraqi litigation.  *Second*, the factors considered by courts all favor the grant of the injunction.  In particular, anti-suit injunctions are necessary to protect this Court's jurisdiction over contractual disputes with valid and enforceable forum selection clauses providing for mandatory jurisdiction in this Court, where one party seeks to sidestep those provisions through initiating improper proceedings in a foreign country. Allowing Triple Arrow to continue the Iraqi lawsuit would render the forum selection clause in the MSA a nullity.  More broadly, allowing parties to evade agreed-upon contractual forum

1

selection clauses through such conduct would have harmful effects on international commerce, as numerous courts have recognized.  And *third*, notions of international comity do not prevent the issuance of an anti-suit injunction where, as here, this is a private contractual dispute between two private parties who contractually agreed to litigate any disputes in this District.  Accordingly, DGCI's motion for an anti-suit injunction should be granted.

## FACTUAL BACKGROUND

### 1.    DGCI Engages Triple Arrow as a Subcontractor for DGCI's Business in Iraq

Plaintiff DGCI is a premier provider of global defense solutions to the U.S. Government and its partners worldwide.  (Bell Decl., Ex. B (Complaint, Dkt. No. 1), ¶ 6).  DGCI is incorporated in Virginia and headquartered in McLean, Virginia.  (*Id.*, ¶ 5).  DGCI has a long history of operating in Iraq, and is one of the few U.S. fuel providers with strong relationships in the region. (*Id.*, ¶ 7).

DGCI has been awarded multiple contracts to deliver fuels in Iraq for the U.S. Armed Forces by the Defense Logistics Agency-Energy ("DLA-E"), which is the nation's combat logistics support agency headquartered at Ft. Belvoir in Virginia.  (*Id.*, ¶¶ 12-13).  As one example, DGCI entered into Contract No. SPE600-16-D-9518 with DLA-E to provide fuel to DLA-E in Iraq (the "DLA-E Contract").  This contract was awarded on or about July 29, 2016.  (*Id.*, ¶ 14).  In order to fulfil this contract, DGCI, as a U.S. company and a responsible government contractor, needed to enter into agreements with local Iraq companies to assist with, among other things, logistics for the transport of fuel in-country to Erbil International Airport ("EIA") in Iraq, where the fuel was delivered to DLA-E for use by the U.S. Armed Forces.  (*Id.*, ¶ 15).

DGCI has worked with a number of local Iraq subcontractors, including with an Iraqi company called the Zozik Group, which is generally engaged in the business of transportation and

fuel supply in Iraq, among other things.  (*Id.*, ¶ 16).  At relevant times, the Zozik Group's Managing Director in the U.S. was a U.S. resident, Ghalib Bradosti.  (*Id.*, ¶ 17).  Through this relationship, DGCI was introduced to Defendant Triple Arrow, which, upon information and belief, is affiliated with the Zozik Group and Mr. Bradosti.  (*Id.*, ¶ 18).

DGCI and Mr. Bradosti, on behalf of Triple Arrow, negotiated terms for fuel purchases, discussed logistics for the delivery of the fuel, discussed additional business opportunities, and addressed issues with the ongoing operations on-ground in Iraq, among other things.[1]  These actions in furtherance of DGCI's commercial relationship with Triple Arrow took place in both Virginia and Iraq.  (*Id.*, ¶ 19).

Among other things, Triple Arrow provided the following services to DGCI in furtherance of DGCI's contract with DLA-E: managing tier-two subcontractors for fuel supply, storage, and transport; truck registrations and leasing at Erbil International Airport; base access support; local staffing support; and obtaining local licenses.  (*Id.*, ¶ 20).

For a number of years, DGCI and Triple Arrow engaged in business dealings related to the DLA-E Contract under various agreements between the parties, for which Triple Arrow issued invoices to DGCI that DGCI paid.  (*Id.*, ¶ 21).  DGCI initially made payments for Triple Arrow on its fuel invoices to DGCI to a U.S. bank account in the name of Ghalib Bradosti, although later, DGCI wired funds for these invoices to a Triple Arrow account abroad.  (*Id.*, ¶ 22).  Mr. Bradosti attended in-person meetings with DGCI personnel at DGCI's offices in Virginia regarding Triple

---

[1] DGCI and Mr. Bradosti considered other business ventures in Virginia.  For example, in or around 2014, DGCI and the Zozik Group, acting through Mr. Bradosti, created a joint venture that was registered in Virginia called Triple Arrow LLC.  Triple Arrow LLC was created for the purpose of bidding on government contracts to provide construction services, logistics, procurement, and base support operations.  This joint venture did not perform work on the DLA-E Contract at issue in this litigation, and became inactive in 2020.  (Bell Decl., Ex. B, ¶¶ 24-25).

Arrow's performance on behalf of DGCI for the DLA-E Contract and other contracts for the provision of fuels in Iraq.  (*Id.*, ¶ 23).

> ### 2.      DGCI and Triple Arrow Enter Into the MSA, Which Contains a Mandatory Forum Selection Clause for the Eastern District of Virginia

DGCI and Triple Arrow formalized their contractual relationship under a Master Services Agreement ("MSA"), effective as of May 1, 2020, to govern the terms by which Triple Arrow would supply goods to DGCI in Iraq.  (Bell Decl., Ex. A & Ex. B, ¶ 26).  This MSA was negotiated in good faith and at arms-length between two sophisticated contracting parties with access to legal counsel and who had a long-standing business relationship.  (Bell Decl., Ex. B, ¶ 27).

The MSA contains the following choice of law and forum selection clauses:

> 13.1 <u>Governing Law</u>  This Agreement, the rights and obligations of the Parties and any claims or disputes relating to this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without giving effect to its principles of conflicts of laws.  The U.N. Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.
> . . . .
>
> 13.3. <u>Disputes</u>. The Parties shall make a good faith effort to settle amicably any claim, controversy or dispute arising under or relating to this Agreement. Absent a mutual resolution, any such claim, controversy or dispute shall be resolved exclusively at the U.S. Federal District Court for the Eastern District of Virginia, or if such court does not have subject matter jurisdiction over the dispute, any other federal or state court of competent subject matter jurisdiction located in the Commonwealth of Virginia. Each Party irrevocably and unconditionally consents to such personal jurisdiction and to waive its right to a jury trial in any action arising under this Agreement. The prevailing Party in any action to enforce this Agreement shall be entitled to reimbursement of reasonable, documented costs and attorneys' fees incurred in connection with such enforcement.

(Bell Decl., Ex. A, at 13.1, 13.3).  The above provisions explicitly survive the termination of the MSA.  (*Id*., at 14.7).

The MSA provides that all Notices under the MSA shall be "deemed properly given if delivered by email or by personal delivery to the authorized individuals" on the signature page.  (*Id.*, at 14.3).  For Triple Arrow, the authorized individual is Mohammed Faisal Bradosti at

mohammedbradosti@gmail.com, who is believed to be the nephew of Ghalib Bradosti.  (Bell Decl., Ex. B, ¶ 30).

### 3. The U.S. Department of Defense Deems Triple Arrow a Force Protection Threat in October 2020 Resulting in Termination of the MSA

On October 12, 2020, the U.S. Department of Defense ("DOD") issued an unclassified directive to deny Triple Arrow access ("Barment") to all United States Forces installations and property in Iraq because DOD assessed that Triple Arrow "poses an unacceptable risk to U.S. national interests, missions, personnel, and facilities."  (Bell Decl., Ex. C).  Triple Arrow was deemed by the DOD to be a force protection threat and, as a result, received a negative force protection rating from the U.S. Government via the Joint Contingency Contracting System ("JCCS").  (Bell Decl., Ex. B ¶¶ 31-32).  On October 19, 2020, DLA-E notified DGCI by email that "Triple Arrow has been denied Installation Base Access from All United States Forces Installations and Property in Iraq."  (Bell Decl., Ex. B, ¶ 33 & Ex. D).

On October 20, 2020, DGCI notified Triple Arrow that the MSA was terminated effectively immediately due to Triple Arrow's breach of Paragraph 3.1(c) of the MSA.  (Bell Decl., Ex. B, ¶ 34, Ex. C).  Paragraph 3.1(c) provides as follows:

3.1 Warranties. Supplier represents and warrants that:

. . . .

(c)  Supplier is, or prior to the period of performance under a PO will be, and shall remain, at no additional cost to DGCI, registered and approved in the Joint Contingency Contracting System (JCCS) and shall require that its subcontractors or any tier also be so timely registered and approved in JCCS;

(Bell Decl., Ex. A, at 3.1(c)).  Triple Arrow failed to satisfactorily maintain its force protection rating, which was a material condition precedent for it to be a vendor for DGCI in DGCI's performance on behalf of the DOD.  (Bell Decl., Ex. B, ¶ 35).

Following this force protection determination and the resulting termination, DGCI initiated an audit of Triple Arrow's invoices and conduct under the MSA to determine whether the monies invoiced were actually owed.  (*Id.*, ¶ 37).  Under the MSA, Triple Arrow was obligated to use only legitimate and ethical business practices in connection with the activities contemplated by the MSA (Bell Decl., Ex. A, at 5.4).  Further, DGCI has the right under the MSA to conduct audits of Triple Arrow's records related to its performance of its obligations to DGCI (which Triple Arrow are required to keep for at least three years from termination).  (*Id.*, at 5.12).

DGCI's audit of pre-October 2020 invoices continues, notwithstanding the complete lack of cooperation by Triple Arrow.  (Bell Decl., Ex. B, ¶ 38).

### 4.    DGCI Obtains Approval from the U.S. Government to Purchase Triple Arrow's Remaining Fuel Inventory

Following the termination of the MSA, DGCI received DLA-E approval to purchase Triple Arrow's remaining jet fuel and diesel fuel inventory to offset any financial burden associated with the excess stocks occurring as a result of the negative JCCS rating.  (*Id.*, ¶ 39).  By the end of August 2021, DGCI completed the purchase and drawdown of all remaining fuel stocks owned by Triple Arrow in Iraq associated with DGCI's DLA-E contracts.  (*Id.*, ¶ 40).

DGCI notified Triple Arrow via a letter sent by email on August 27, 2021 (as authorized by the MSA for notices) that DGCI would pay Triple Arrow for all invoices associated with those remaining fuel stock purchases since October 21, 2020.  Further, DGCI informed Triple Arrow that DGCI was attempting to audit all transactions between DGCI and Triple Arrow between July 29, 2016 and October 20, 2020 in light of Triple Arrow's negative force protecting rating.  (Bell Decl., Ex. B, ¶ 41 & Ex. E).

5.      **The Dispute Under the MSA Between DGCI and Triple Arrow Arises**

Since August 2021, Triple Arrow and its Iraqi counsel have been engaged in active email correspondence with DGCI and DGCI's U.S. counsel regarding Triple Arrow's disputed claims for monies still owed under the MSA.  (Bell Decl., Ex. B ¶ 42).

On September 1, 2021, Triple Arrow emailed a letter to DGCI which alleged that Triple Arrow had issued invoices prior to the termination of the MSA in October 2020 that had not yet been settled.  Triple Arrow further indicated that it disagrees with DGCI's audit to the extent that the audit may reduce any amounts allegedly owed to Triple Arrow by DGCI.  Triple Arrow concluded its letter by demanding all payments allegedly owed by DGCI, including for the period prior to termination.  (Bell Decl., Ex. B ¶ 43 & Ex. F).  DGCI believes that contemporaneously with this letter, Triple Arrow initiated a campaign of interference with DGCI property and engaged in threats to DGCI personnel in Iraq.  (Bell Decl., Ex. B ¶ 43).

On September 8, 2021, DGCI emailed Triple Arrow in response, stating that DGCI "simply cannot tolerate interference or threats of interference in performing our mission for the US Government."  DGCI specifically advised Triple Arrow that it will not capitulate to demands for payment of disputed amounts of money made in conjunction with illegal and improper threats of duress.  (Bell Decl., Ex. B ¶¶ 44-45 & Ex. G).  DGCI's September 8, 2021 email attached a letter from DGCI's U.S. counsel to Triple Arrow which demanded on behalf of DGCI that Triple Arrow cease and desist from taking any unlawful and improper actions directed at DGCI personnel or property wheresoever located.  The letter further reminded Triple Arrow of its obligation to litigate any disputes against DGCI in the United States under the MSA.  (*Id.*).

On September 15, 2021, Triple Arrow's Iraqi counsel emailed a letter to DGCI and its U.S. counsel, in which Triple Arrow rejected its clear obligation under the MSA to pursue any litigation in this Court and, indeed, acknowledged that it intended to pursue claims under the MSA in Iraq.

(Bell Decl., Ex. B, ¶¶ 46-47 & Ex. H).  In that letter, Triple Arrow further alleged that DGCI owes Triple Arrow USD 9,443,111.24 pursuant to an alleged "oral agreement" between Triple Arrow and DGCI under which Triple Arrow could and would seek "enforcement" in the Iraqi courts. (*Id.*).  There is no such oral agreement between Triple Arrow and DGCI.  Under the MSA, any changes to the MSA "must be approved in writing by both Parties."  (Bell Decl., Ex. A, at 14.1). There is no such required writing.  In addition, Triple Arrow's Iraqi counsel appeared in person at DGCI's office at EIA in Iraq and threatened to seize four refueler trucks owned by DGCI.  (Bell Decl., Ex. B, ¶ 49).

On September 22, 2021, DGCI's U.S. counsel emailed a letter to Triple Arrow's Iraq counsel, in which DGCI rejected Triple Arrow's erroneous analysis of the terms of the MSA.  (Bell Decl., Ex. B, ¶¶ 50-52 & Ex. I).  This letter also provided Triple Arrow with DGCI's analysis of the amounts invoiced by Triple Arrow and paid by DGCI for the post-October 2020 time frame. In that time, Triple Arrow issued invoices to DGCI in the amount of USD 10,692,882, and DGCI made payments to Triple Arrow in the amount of USD 11,885,241, resulting in a surplus in favor of Triple Arrow of USD 1,192,359.  (*Id.*).  In light of the ongoing questions raised by Triple Arrow's force protection rating, DGCI's letter of September 22, 2021 reiterated that not only were the audits authorized by the MSA, but that they were required in this situation "because DGCI cannot – and will not – remit payment to Triple Arrow of monies from the United States Government absent assurance that those monies are properly owed."  (*Id.*).  DGCI's audits continue, albeit without cooperation from Triple Arrow, as also required by the MSA.  (*Id.*).

### 6.      Triple Arrow Initiates Legal Proceedings in Iraq

On or about September 23, 2021, Triple Arrow served DGCI's representative in Iraq with a "Legal Notification." (Bell Decl., Ex. B, ¶¶ 53-54 & Ex. J). An English translation states, in pertinent part:

> Through this notification, you will have to refund the aforementioned amount [USD 11,093,076] to my client (the company) [Triple Arrow]; otherwise, the legal measures will be taken against your company, such as (registering a law case at the competent courts, banning travel, stopping all services, putting a seizure sign on all your properties, and withdrawing the vehicles of filling aircraft gasoline) (If someone notifies you, don't blame him – an adage).

(*Id*.). This Legal Notification, which threatens both DGCI assets and personnel, was issued by Triple Arrow's Iraqi counsel and served upon a DGCI representative in Iraq. (Bell Dec., Ex. B., ¶ 55).

On September 27, 2021, Triple Arrow's Iraqi counsel emailed a letter to DGCI and DGCI's U.S. counsel which, among other things, stated that "there is nothing preventing Triple Arrow from protecting its rights by seeking conservatory and/or provisional measures before the competent Iraqi courts." (*Id*., ¶ 56 & Ex. K).

Triple Arrow has initiated legal proceedings against DGCI in Iraq seeking USD 11,093,076 in damages related to the purchase of fuel from Triple Arrow, together with Triple Arrow's legal fees. (Bell Decl., Ex. B, ¶ 57). On September 21, 2021, Judge Qubad Sh. Noori of the Erbil Court of First Instance issued a Legal Notification setting a court hearing in this Iraqi litigation at 9:00 a.m. on November 8, 2021. (*Id*., ¶ 58 & Ex L).

DGCI was threatened by a Triple Arrow representative in Iraq that the "Asayish" would come to EIA prior to this hearing to remove all DGCI equipment and vehicles from the site. DGCI understands the "Asayish" to be the Kurdish security organization and intelligence service for the Kurdistan Regional Government, which has control over EIA. (Bell Decl., Ex. B, ¶ 59).

## ARGUMENT

### I.   A FOREIGN ANTI-SUIT INJUNCTION IS NECESSARY TO PROTECT THIS COURT'S JURISDICTION

"It is well settled that federal courts possess the power to enjoin persons subject to their jurisdiction from prosecuting a foreign suit." *Umbro International, Inc. v. Japan Professional Football League*, No. C.A. 6:97-2366-13, 1997 WL 33378853, at *1 (D. S.C. Oct. 2, 1997); *see also BAE Systems Tech. Solution & Services, Inc. v. Republic of Korea's Defense Acquisition Program Administration*, 884 F.3d 463, 479 (4th Cir. 2018) ("a district court with jurisdiction over the parties may prohibit them from proceeding with a lawsuit in a foreign country"); *E&J Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006) ("Such injunctions allow the court to restrain a party subject to its jurisdiction from proceeding in a foreign court in circumstances that are unjust.").

While the Fourth Circuit has not yet explicitly outlined the standard for issuing an anti-suit injunction, it has looked to the decisions of sister circuits which have split between a more "conservative" and "liberal" approach to evaluating "factors favoring an injunction against the effect of an injunction on international comity." *BAE Systems*, 884 F.3d at 479. The "principal difference" between the two approaches is that the "liberal approach accords less weight to international comity concerns." *Id*. Under either approach, however, the analysis for an anti-suit injunction[2] is a "three-step process":

---

[2] Under this analysis, the "suitability of an anti-suit injunction involves different considerations from the suitability of other preliminary injunctions." *BAE Systems Tech. Solution & Services, Inc. v. Republic of Korea's Defense Acquisition Program Administration*, 195 F. Supp. 3d 776, 784 (D. Md. 2016); *see also Gallo*, 446 F.3d at 990-91 (holding that a significant likelihood of success on the merits refers to the "factors specific to an anti-suit injunction"). DGCI also meets the other traditional Rule 65 requirements for a temporary restraining order and preliminary injunction, were they to apply, for all the reasons set forth in this memorandum of law. *See generally Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 188 (4th Cir. 2013) (*en banc*) (citing standard); *see also* Fed. R. Civ. Proc. 65; *Georgia Vocational Rehabilitation Agency*

First, the court resolves the threshold considerations of whether the parties and issues are the same. Second, the court considers four factors to determine the effect the foreign suit would have if it were to continue. Third, the court considers principles of comity.

*BAE Systems Tech. Solution & Services, Inc. v. Republic of Korea's Defense Acquisition Program Administration*, 195 F. Supp. 3d 776, 786 (D. Md. 2016).  DGCI meets the required standards under this three-step process.

### A.      The Parties and Issues Are the Same in This Litigation and the Iraqi Litigation

The initial inquiry is "whether parallel suits involve the same parties and issues." *BAE Systems*, 195 F. Supp. 3d at 786-787.  This litigation concerns contractual disputes between DGCI and Triple Arrow regarding performance (and alleged breach) under the MSA.  The Iraqi action initiated by Triple Arrow concerns the same two parties and the same issues under the MSA.  The threshold matter is clearly met.  *See International Safety Access Corp. v. Integrity Worldwide, Inc.*, C.A. No. 0:09-cv-00315, 2009 WL 10684864, at *2 (D. S.C. May 27, 2009) (granting injunction where "the parties to both actions are identical and the issues in both cases revolve around the purported distributor agreement.").

### B.      The Other Relevant Considerations Support the Grant of the Anti-Suit Injunction

Next, a movant must establish "whether the parallel litigation would (1) frustrate a policy in the enjoining forum; (2) be vexatious; (3) threaten the issuing court's *in rem* or quasi *in rem* jurisdiction; or (4) prejudice other equitable considerations." *BAE Systems*, 195 F. Supp. 3d at

---

*Business Enterprise Program v. United States*, 354 F. Supp. 3d 690, 693 (E.D. Va. 2018) (standard for a temporary restraining order is the same as that for a permanent injunction).  For example, under the clear terms of the MSA, DGCI has a substantial likelihood of prevailing upon its cause of action for declaratory judgment in this lawsuit.

787.  These elements are "disjunctive" in that if any are present, "an anti-suit injunction may be proper."  *Id*.  Each are discussed in turn, and each support the grant of the injunction.

### 1.     **The Iraqi Litigation Frustrates a Clear Public Policy in this District**

Forum selection clauses are "presumptively valid and enforceable" in this District.  *See The Hipage Company, Inc. v. Access2Go, Inc.*, 589 F. Supp. 2d 602, 612 (E.D. Va. 2008); *U.S. Bank National Assoc. v. Jefferson At Laurel Highlands, L.P.*, No. C.A. 1:15-cv-00306, 2016 WL 4534027, at *1 (E.D. Va. July 11, 2016) ("Forum selection clauses are *prima facie* valid. . . . Similarly, forum selection clauses are generally enforced as to selection of venue."); *see generally M/S Bremen v. Zapata Off-Shore Co.*, 107 U.S. 1, 15 (1972) ("in the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside.").

This "presumption of enforceability" applies if, as here, there is a mandatory forum selection clause that "requires litigation to occur in a specified forum."  *BAE Systems*, 884 F.3d at 470.  "A forum selection clause is permissive unless it contains 'specific language of exclusion.'"  *Id.* at 472 & n.7  (observing that "where venue is specified with mandatory or obligatory language, the clause will be enforced. . . ").  The forum selection clause in the MSA is mandatory because it contains language of exclusion: "any such claim, controversy or dispute **shall be resolved exclusively** at the U.S. Federal District Court for the Eastern District of Virginia."  (Bell Decl., Ex. A, at 13.3) (emphasis added).

Having entering into a contract explicitly and exclusively calling for litigation of "any" disputes in this District, Triple Arrow's conduct in seeking an end-run around this obligation through resort to Iraqi legal proceedings is both invalid and an affront to the jurisdiction of this Court.  Indeed, courts have been clear that anti-suit injunctions may be appropriate in precisely these circumstances.  *See, e.g., Gallo*, 446 F.3d at 993 ("Protecting contractual devices that provide

such indispensable, essential functions within international trade justifies the imposition of an anti-suit injunction."); *Applied Medical Distribution Corp. v. Surgical Company BV*, 587 F.3d 909, 919 (9th Cir. 2009) ("But without the availability of anti-suit injunctions, the vitality of forum selection clauses would be impermissibly and improvidently jeopardized."); *see also Paramedics Electromedicina Comercial, Ltda. v. GE Medical Systems Information Technologies, Inc.*, 369 F.3 645, 653, 658-59 (2d Cir. 2004) (upholding anti-suit injunction where party sought to evade contractual arbitration clause by initiating foreign litigation).

As the Ninth Circuit explained, "[w]ithout an anti-suit injunction in this case, the forum selection clause effectively becomes a nullity. The potential implications for international commerce are considerable." *Gallo*, 446 F.3d at 992. For this reason alone, the anti-suit injunction should be issued.

### 2. The Iraqi Litigation is Vexatious

An anti-suit injunction is proper where policy considerations of judicial economy disfavor having litigants before a U.S. court forced to "participate in concurrent, competing lawsuits thousands of miles apart." *Custom Polymers Pet, LLC v. Gamma Meccanica SpA*, 185 F. Supp. 3d 741, 758-59 (D. S.C. 2016) (granting anti-suit injunction and holding that "'allowing simultaneous prosecution of the same action in a foreign forum thousands of miles away would result in inequitable hardship and tend to frustrate and delay the speedy and efficient determination of the cause.'").

This hardship is all the more evident where the two parties already contracted to resolve any disputes in this District, yet one litigant is now seeking to undermine that agreement through an improperly-brought foreign lawsuit. *See, e.g., Gallo*, 446 F.3d at 989 (anti-suit injunctions "restrain a party subject to its jurisdiction from proceeding in a foreign court in circumstances that are unjust.") Triple Arrow is clearly seeking to manipulate the Iraqi courts to obtain an unjust

13

result and to obtain "judicial cover" for actions they are taking in Iraq against DGCI that are improper under the MSA.  Only an anti-suit injunction will stop these wrongful actions by Triple Arrow.

### 3.      The Iraqi Litigation Threatens This Court's Jurisdiction

A district court "may, in certain circumstances, impose an anti-suit injunction to protect its own jurisdiction." *BAE Systems*, 884 F.3d at 479.  The First Circuit observed that "a court has a right – indeed, a duty – to preserve its ability to do justice between the parties in cases that are legitimately before it." *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 20 (1st Cir. 2004).

This litigation is properly before this Court pursuant to the explicit terms of the MSA. Triple Arrow rushed to the courthouse in Iraq to preempt and vitiate any potential relief that DGCI might obtain in this Court under the MSA.  "Where, as here, a party institutes a foreign action in a blatant attempt to evade the rightful authority of the forum court, the need for an antisuit injunction crests." *Id*.  This factor supports granting the injunction.

### 4.      The Iraqi Litigation is Prejudicial to Other Equitable Considerations

DGCI acknowledges that the power to grant anti-suit injunctions should be used "sparingly." *BAE Systems*, 884 F.3d at 479.  However, for all of the reasons set forth in this memorandum, this situation lines up with others in sister districts where courts have enjoined foreign proceedings.  *See, e.g., International Safety*, 2009 WL 10684864, at *2 (granting motion to enjoin Canadian litigation); *Umbro*, 1997 WL 33378853, at *4 (granting motion to enjoin Japanese litigation).

For example, in *International Safety*, the court found that an anti-suit injunction was warranted where, as here, allowing the foreign court action to proceed "could leave the parties in the impossible position of trying to abide by contradictory rulings by this Court and the Canadian

courts."  2009 WL 10684864, at *2.  In addition, in *Umbro*, the court found that an anti-suit injunction should issue where it "would be a waste of judicial resources, inconvenient to the parties involved, and cause frustration to the efficient determination of this cause to proceed in two separate forums."  1997 WL 33378853, at *3.

Triple Arrow's intentional conduct by initiating improper proceedings in Iraq must be restrained for justice to be done in this case.  *See Gallo*, 446 F.3d at 995 ("Andina has involved Gallo in messy, protracted, and potentially fraudulent litigation in Ecuador in direct contravention of a valid and enforceable forum selection clause. This is a paradigmatic case for a preliminary anti-suit injunction.").  The requested injunction should be granted.

## II.  AN ANTI-SUIT INJUNCTION IS CONSISTENT WITH INTERNATIONAL COMITY CONCERNS

Notions of international comity and respect for the legal processes of foreign countries are less likely to be threatened in the context of a purely private contractual disputes, as is the case in this litigation between DGCI and Triple Arrow under the terms of the MSA.  *See Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 887 (9th Cir. 2012) ("where two parties have made a prior contractual commitment to litigate disputes in a particular forum, upholding that commitment by enjoining litigation in some other forum is unlikely to implicate comity concerns at all."); *see also Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 627 (5th Cir. 1996) ("We decline . . . to require a district court to genuflect before a vague and omnipotent notion of comity every time that it must decide whether to enjoin a foreign action.").

Here, DGCI and Triple Arrow are private parties who agreed to litigate "any" disputes between them in this District through the explicit terms of the MSA.  In violation of this, Triple Arrow filed first in Iraq in an effort that can only be described as Triple Arrow seeking to leverage the security situation in Iraq for U.S. companies by threatening DGCI personnel and assets still in-

country.  This conduct threatens international comity.  *See, e.g., Gallo*, 446 F.3d at 994 (noting that without the injunction, "any party seeking to evade the enforcement of an otherwise-valid forum selection clause need only rush to another forum and file suit. Not only would this approach vitiate United States policy favoring the enforcement of forum selection clauses, but it could also have serious deleterious effects for international comity.").

This anti-suit injunction is proper as it is "merely about giving effect to the substantive rights of a contract." *Gilbane Federal v. United Infrastructure Projects FZCO*, No. 14-cv-03254, 2014 WL 4950011, at *4 (N.D. Cal. Sept. 24, 2014) (enjoining lawsuits in Lebanese and Djiboutian courts).  It does not otherwise offend any considerations of international comity.

## CONCLUSION

For the foregoing reasons, DGCI respectfully requests that the Court grant its motion for a temporary restraining order and a preliminary foreign anti-suit injunction under Federal Rule of Civil Procedure 65, prohibiting Triple Arrow from proceeding with any lawsuits or other legal proceedings against DGCI in Iraq, and for such other relief as the Court deems just and proper.

Dated: October 19, 2021                    Respectfully submitted,

                                           */s/ Joseph N. Frost*
                                           _____
                                           Michael A. Branca (VSB No. 36108)
                                           Michael C. Zisa (VSB No. 76397)
                                           Joseph N. Frost (VSB No. 92239)
                                           PECKAR & ABRAMSON, P.C.
                                           2055 L Street, N.W., Suite 750
                                           Washington, DC 20036
                                           Telephone:  (202) 293-8815
                                           Facsimile:   (202) 293-7994
                                           mbranca@pecklaw.com
                                           mzisa@pecklaw.com
                                           jfrost@pecklaw.com

                                           Thomas J. Curran (*pro hac vice*)
                                           tcurran@pecklaw.com
                                           Doris D. Short (*pro hac vice*)
                                           dshort@pecklaw.com
                                           Robert H. Bell (*pro hac vice*)
                                           rbell@pecklaw.com
                                           PECKAR & ABRAMSON, P.C.
                                           1325 Avenue of the Americas
                                           10th Floor
                                           New York, NY 10019
                                           Telephone:  (212) 382-0909
                                           Facsimile:   (212) 382-3456

                                           *Attorneys for DGCI Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 20, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and further will serve the foregoing upon the Defendant concurrently with the Summons and Complaint.

*/s/ Joseph N. Frost*
Joseph N. Frost