UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

**DGCI CORPORATION,**

**Plaintiff,**

**v.**

No.:  1:21-cv-1174

**TRIPLE ARROW COMPANY FOR
GENERAL TRADING CO. LTD.,**

**Defendant.**

## <u>DECLARATION OF ROBERT H. BELL IN SUPPORT OF
DGCI'S MOTION FOR AN ANTI-SUIT INJUNCTION</u>

ROBERT H. BELL, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as

follows:

1.      I am an attorney with Peckar & Abramson, P.C., attorneys for DGCI

Corporation ("DGCI") in the above-captioned case.

2.      I am a member in good standing of the New York Bar.  My application for

admission *pro hac vice* in this Court is pending.

3.      I submit this Declaration in support of DGCI's Motion for an Anti-Suit

Injunction.

4.      Unless stated otherwise, I have personal knowledge of the facts stated

herein.

5.      Attached hereto as Exhibit A is a true and correct copy of the Master

Services Agreement ("MSA"), effective as of May 1, 2020, between DGCI and Triple Arrow

Company for General Trading Co. Ltd. ("Triple Arrow").

6.      Attached hereto as Exhibit B is a true and correct copy of the Complaint filed by DGCI in this District on October 19, 2021.

7.      Attached hereto as Exhibit C is a true and correct copy of the letter, dated October 20, 2020, by which DGCI notified Triple Arrow that the MSA was terminated due to Triple Arrow's breach of the MSA, attaching the unclassified directive by the U.S. Department of Defense ("DOD"), dated October 12, 2020, denying Triple Arrow access to all United States Forces installations and property in Iraq.

8.      Attached here to as Exhibit D is a true and correct copy of the email, dated October 19, 2020, by which DLA-E notified DGCI that "Triple Arrow has been denied Installation Base Access from All United States Forces Installations and Property in Iraq."

9.      Attached hereto as Exhibit E is a true and correct copy of the letter sent by email on August 27, 2021 from DGCI to Triple Arrow.

10.     Attached hereto as Exhibit F is a true and correct copy of the letter sent by email on September 1, 2021 from Triple Arrow to DGCI.

11.     Attached hereto as Exhibit G is a true and correct copy of the email sent on September 8, 2021 from DGCI to Triple Arrow, attaching a letter from DGCI's counsel to Triple Arrow.

12.     Attached hereto as Exhibit H is a true and correct copy of the letter sent by email on September 15, 2021 from Triple Arrow's counsel to DGCI and DGCI's counsel.

13.     Attached hereto as Exhibit I is a true and correct copy of the letter sent by email on September 22, 2021 from DGCI's counsel to Triple Arrow's counsel.

14.     Attached hereto as Exhibit J is a true and correct copy of the "Legal Notification" that Triple Arrow served on DGCI's representative in Iraq on or about September 23, 2021, and an English translation of same.

15.     Attached hereto as Exhibit K is a true and correct copy of the letter sent by email on September 27, 2021 from Triple Arrow's counsel to DGCI and DGCI's counsel.

16.     Attached hereto as Exhibit L is a true and correct copy of an English translation of a "Legal Notification" by an Iraqi judge setting a hearing for November 8, 2021.

Dated: October 19, 2021

_____
Robert H. Bell

# EXHIBIT A

# MASTER SERVICE AGREEMENT

This Master Service Agreement (“**Agreement**”) is made effective as of May 1, 2020 (the “**Effective Date**”) by and between DGCI Corporation, a company duly established in the Commonwealth of Virginia and having its principal place of business at 7950 Jones Branch Dr. 601N, McLean, VA 22102, (“**DGCI**”) and Triple Arrow Company for General Trading Co Ltd, a company duly established under the laws of Iraq, with registration number 11721/Kurdistan Region, and having its principal place of business at MRF, Building C,40-meters Road, Erbil, Kurdistan Region, Republic of Iraq (“**Supplier**”). DGCI and Supplier are sometimes referred to individually as a “**Party**” and together as the “**Parties**”.

## W I T N E S S E T H:

**WHEREAS**, DGCI desires to engage Supplier as an independent commercial contractor to provide certain goods and/or services (the “**Deliverables**”), and Supplier is willing to provide those Deliverables, all on the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1.      RELATIONSHIP OF THE PARTIES.

**1.1**      <u>Scope of Agreement</u>. This Agreement shall govern the provision of the Deliverables by Supplier to DGCI in the Territory during the Term. “**Territory**” refers to any geographical location specified in a PO. “**Term**” has the meaning set forth further below in this Agreement. All Deliverables shall be implemented only through one or more purchase orders duly executed by an authorized representative of each Party (each, a “**PO**”). The Parties agree that the PO’s in existence at the time of signing this Agreement that shall be subject to this Agreement are specified in Appendix A hereto. New PO’s entered into by the Parties during the Term shall be subject to this Agreement. In the event of any conflict between this Agreement and a particular PO, the terms of this Agreement shall govern. Supplier acknowledges and agrees that any additional or different terms contained in any purchase order confirmation, invoice, acknowledgement, release, acceptance or other written correspondence, irrespective of the timing, shall be of no force or effect against DGCI.

**1.2**      <u>Independent Service Provider</u>. Supplier acknowledges and agrees that Supplier is an independent contractor and nothing in this Agreement shall be deemed to constitute, create, give effect to or otherwise recognize a joint venture, employment, principal or agency relationship or other joint relationship. Supplier is doing business hereunder at Supplier’s own risk and for Supplier’s own profit. Supplier is not authorized to make any binding commitments on behalf of DGCI, and acknowledges and agrees that Supplier will not (i) make representations, warranties, guarantees or covenants, or execute agreements, on DGCI’s behalf or (ii) represent that DGCI is responsible for Supplier’s acts or omissions.

**1.3**     Exclusivity. Subject to the next sentence, this is an exclusive relationship and the Supplier may not enter into agreements with third parties for the marketing and sale of the same or similar products within the territories specified in any PO. Supplier will refrain from any activity and will not enter into any agreement or make any commitment that is inconsistent, incompatible, or otherwise in conflict with Supplier's obligations under this Agreement, including Supplier's ability to perform each PO and Supplier's obligations hereunder to comply with all applicable laws and to maintain the confidentiality of DGCI and procurement-related proprietary information. Except if Supplier is in violation of this Agreement or any PO issued hereunder, Supplier is subject to any of the conditions in paragraph 11.4(c) hereof, or Supplier is in DGCI's sole discretion deemed unlikely to be able to successfully perform the work, DGCI agrees to exclusively work with the Supplier to provide the Deliverables identified in any PO's to be performed within the Territory.

**1.4**     Mutual Representations and Warranties. Each Party represents and warrants to the other that: (a) it has the full power to enter into this Agreement and to perform its obligations hereunder, (b) this Agreement constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, and (c) this Agreement does not contravene, violate or conflict with any other agreement of such Party. Except as expressly set forth in this Agreement or a particular PO, neither Party makes, and each expressly disclaims, any representations or warranties in connection with this Agreement, whether express, implied, statutory or otherwise**.**

## 2.  DELIVERABLES.

**2.1**     Delivery; Acceptance**.** Any shipment of goods, performance of services, or commencement of work on supplies by Supplier shall be deemed to be only upon the terms and conditions contained in this Agreement and the corresponding PO, except to the extent that DGCI may otherwise expressly consent in writing. Supplier agrees that DGCI's acceptance or payment for any shipment of goods or similar act of DGCI shall not be claimed or construed to constitute such consent. Deliverables shall be made by Supplier at such times and places and of such items and quantities as may from time to time be specified in the PO. Supplier acknowledges and agrees that time is of the essence with respect to Supplier's performance of its obligations. Supplier shall be liable for handling charges and return shipment costs for excess quantities. Title and risk of loss shall remain with Supplier until goods are delivered and accepted to the F.O.B. point specified by DGCI. Notwithstanding such delivery, Supplier shall bear risk of loss or damage to goods purchased hereunder from the time that DGCI gives notice of rejection of goods pursuant to the inspection provisions of this Agreement.

**2.2**     Packaging and Shipping**.** Packaging and packing of items to be delivered by Supplier shall insure safe arrival at their destination, conform to requirements of common carriers and, in any event, comply with DGCI's minimum specifications set forth in a PO. Supplier shall be responsible for any additional charges resulting from deviation from DGCI's delivery instructions.

**2.3**     Inspection**.** DGCI shall have the right to inspect Deliverables supplied

hereunder at any time at Supplier's facilities or elsewhere. Final inspection and acceptance shall be after delivery to the delivery point designated by DGCI. If any inspection or test is made by DGCI at Supplier's facility or elsewhere, Supplier shall provide reasonable facilities and assistance for the inspection personnel. DGCI may reject all Deliverables which are found to be defective. No inspection, examination or test, regardless of extensiveness or type, and no approval given in connection with any such inspection, examination or test, shall relieve Supplier, or be claimed by Supplier to relieve it, of any obligation to comply fully with this Agreement and the corresponding PO. Payment for Deliverables or the failure to inspect goods or to discover defects shall not constitute acceptance or limit any of DGCI's rights.

3.    **PERFORMANCE.**

    **3.1** <u>Warranties</u>. Supplier represents and warrants that:

    (a)   All work hereunder will be performed in a good, workmanlike manner satisfying at least generally accepted industry standards, and all work hereunder and Deliverables shall conform to the applicable requirements of this Agreement and the corresponding PO;

    (b)   Supplier has, or prior to the period of performance under a PO will have, and shall maintain and renew, at no additional cost to DGCI, all permits, licenses, agreements, tax clearances, and authorizations necessary or appropriate to enable performance of Supplier's duties in the Territory, and shall provide DGCI with original and certified English copies thereof;

    (c)   Supplier is, or prior to the period of performance under a PO will be, and shall remain, at no additional cost to DGCI, registered and approved in the Joint Contingency Contracting System (JCCS) and shall require that its subcontractors or any tier also be so timely registered and approved in JCCS;

    (d)   Personnel provided to perform services are suitable, competent and appropriately trained for the tasks to be performed and have all necessary licenses, certifications and other authorizations to perform the services in the Territory; and

    (e)   No Deliverable or other work performed or provided hereunder will infringe any copyright, trade secret, patent, or other proprietary rights of a third party, and Supplier is the sole owner of, or otherwise has (or, prior to time of performance, will have) obtained all rights necessary for its performance hereunder.

    **3.2**   <u>Survival and Remedies</u>. The preceding warranties, together with Supplier's service warranties and guarantees, if applicable, shall survive inspection, test, acceptance of, and payment for the Deliverables. In the event of defective or nonconforming Deliverables,

and in addition to other remedies available hereunder or at law, DGCI may, at its option, (i) require prompt correction or replacement by Supplier, (ii) return them to Supplier for credit, (iii) have them corrected or replaced by a third party at Supplier's expense and deduct the cost thereof from any monies due Supplier, or (iv) exercise as to Supplier any remedy that is legally exercised by the U.S. Government or Prime Contractor as to DGCI. The return to Supplier of any defective or nonconforming Deliverables and delivery to DGCI of any corrected or replaced Deliverables shall be at Supplier's expense. Deliverables required to be corrected or replaced shall be subject to the provisions of this paragraph and to the inspection provisions of this Agreement in the same manner and to the same extent as Deliverables originally delivered hereunder. In addition to correcting or replacing any defective or nonconforming Deliverables, Supplier shall also reimburse DGCI for all costs and expenses incurred by DGCI in connection with inspection and discovery of the defects, identifying and correcting the cause of such defects and all other activities reasonably undertaken by DGCI to obtain conforming Deliverables.

## 4.  FUNDING; PAYMENT TERMS.

**4.1**    <u>Contract Value</u>.  This Agreement, in and of itself, is unfunded and has no dollar value. The total dollar value of this Agreement shall be determined by the sum of all POs issued hereunder. Each PO will specify its own funded value. DGCI will not pay Supplier, and Supplier shall not claim, any amount greater than the limitations specified in the individual PO, unless DGCI has issued a modification to the PO increasing the funded value.

**4.2**    <u>Pricing</u>. To the extent DGCI is required to provide the U.S. Government with certified cost or pricing data, then, absent a valid exemption, Supplier agrees to provide its certified cost or pricing data in a timely manner and in the requested format, either to DGCI in a sealed package for submission to the U.S. Government or directly to the U.S. Government.

**4.3**    <u>Taxes</u>. Unless otherwise specified in a PO, the price for Deliverables includes, and Supplier is liable for and shall pay, all taxes, impositions, charges and exactions imposed on or measured by the corresponding PO and this Agreement, except for applicable value added or sales and use taxes that are separately stated on Supplier's invoice. Prices shall not include any taxes, impositions, charges or exactions for which a valid exemption exists, as evidenced by suitable documentation.  DGCI may withhold from any amounts payable under this Agreement such federal, state, local or foreign taxes as shall be required to be withheld by the cognizant taxing authority.  In that case, the Parties will cooperate reasonably to seek relief under any applicable double taxation agreement or treaty, but if there is no such agreement or treaty in effect, or if an applicable double taxation agreement or treaty reduces but does not eliminate such withholding or similar tax, DGCI shall make the required withholdings from amounts otherwise payable hereunder and remit them to the cognizant tax authority as and when directed. DGCI will cooperate with Supplier to provide available documentation, such as payment receipts, made available by the taxing authority.  Similarly, the Parties shall cooperate with one another in providing information which may be reasonably required to fulfill each Party's tax filing requirements or any audit information request or to mitigate the tax obligations of either Party. Such requested information may include, for example, applicable tax clearance/non-objection letters, payroll tax receipts and other data requests from

the cognizant tax authority relating to the Agreement and PO activities.

**4.4** <u>Invoicing</u>. Invoices must comply with all applicable provisions of this Agreement and each PO, and shall be submitted to DGCI in accordance with the following general instructions:

(a) Unless otherwise specified in each PO, supplier shall invoice DGCI in arrears and shall submit all invoices by the 15th day of the month for Deliverables provided during the preceding month.

(b) Invoices must be submitted electronically to accounting@dgci.com and shall reference this Agreement and include the PO number, any relevant PO line item number corresponding to a Deliverable, the period of performance for the Deliverables being invoiced, the remittance name and address, the Supplier's Taxpayer Identification Number and such other information as may be reasonably requested by DGCI.

(c) Invoices shall be submitted on official company letterhead with costs sufficiently detailed and accompanied by all required supporting documentation. All invoices must be certified as true and accurate and contain the following statement dated and signed by an authorized Supplier representative:

*"This is to certify that to the best of my knowledge: (i) the above invoice is accurate, complete and conforms to the specifications and terms set forth in the Master Purchase Agreement and the corresponding PO, (ii) the invoiced Deliverables were accepted by DGCI during the period stated, (iii) payment for the Deliverables has not been previously received, and (iv) Supplier has in its possession records for all direct and indirect costs expended to substantiate the invoice."*

Additional required certifications may be specified in the PO.

(d) Invoices shall be in U.S. dollars and, unless otherwise specified in a PO, payable net forty-five (45) days after receipt of a proper invoice.

(e) DGCI may, at any time, set-off any amounts Supplier owes DGCI against any amounts DGCI owes to Supplier or any of its affiliated companies. Any adjustments in Supplier's invoice due to Supplier's failure to comply with this Agreement may be made by DGCI before payment.

**4.5** <u>Alternate Payment to Ultimate Solutions.</u> In the event DGCI has attempted to pay Supplier for work performed under this MSA and subsequent PO's but the payment process has not been successfully completed for any reason other than DGCI's own fault, DGCI shall be entitled but not required to make such payment to Ultimate Solutions upon

written notice to Supplier. Supplier hereby acknowledges and agrees that such payment to Ultimate Solutions shall be deemed to be a payment to Supplier pursuant to this Agreement or any PO issued hereunder.  Nothing in this paragraph shall give Ultimate Solutions any rights to any payment under this Agreement or any PO issued hereunder, and Supplier agrees to indemnify, hold harmless, and defend DGCI against any claim brought by Ultimate Solutions pursuant to any such payment of any claim for payment under this paragraph. Supplier shall provide DGCI with the necessary bank transfer information for Ultimate Solutions.

    **4.6**   <u>Alternate Payment Instructions.</u> Separate and apart from DGCI's right under paragraph 4.5, Supplier may request DGCI to pay a Third Party (such as a sub-supplier) in lieu of paying Supplier.  Such payments shall be subject to the following terms:

    (a)    Supplier shall provide written instructions in a formal notification letter, stating that the proceeds of the outstanding invoice shall be paid to the designated Third Party.

    (b)    The notification letter must be sent in writing at least 30 days prior to issuing an invoice.

    (c)    The invoice itself should state: "Please remit to: "ABC" company" and shall be signed by Supplier.

    (d)    Supplier hereby acknowledges and agrees that payment to a Third Party pursuant to this paragraph shall be deemed to be a payment to Supplier pursuant to this Agreement or any PO issued hereunder.

    (e)    Nothing in this paragraph shall give such Third Party any rights to any payment under this Agreement or any PO issued hereunder, and Supplier agrees to indemnify, hold harmless, and defend DGCI against any claim brought by such Third Party pursuant to any such payment of any claim for payment under this paragraph.

    (f)    DGCI shall not be obligated to pay any Third Party who is not eligible to receive funds under a U.S. Government contract or to pay any Third Party in violation of any other law, regulation, or treaty.

    **4.7**   <u>Closeout</u>. Supplier shall cooperate with DGCI's customary closeout procedures for an agreement of this type, including, as required, executing a supplier release form in connection with payment of the final invoice following the end of the Term.

**5.**    **COMPLIANCE WITH LAWS.**

    **5.1**   <u>Competitive Advantage</u>. DGCI does not seek by this Agreement to secure an unauthorized competitive advantage, and Supplier acknowledges that it is not authorized to take any action on behalf of DGCI that would confer such an advantage. In particular, Supplier shall not, directly or indirectly, wrongfully solicit, obtain, use or disclose any information of any other person, association, corporation, government or other entity, including information which is a trade secret, confidential, company proprietary, government security classified, or government procurement sensitive, including but not limited to documents or information that are source selection sensitive and any other information that offers or may offer the Parties an illegal or improper competitive advantage.

**5.2**   Limitation on the Use of Agents. Supplier agrees that all services to be performed in connection with this Agreement will be conducted exclusively by Supplier and/or one of the approved subcontractors listed below, subject to revision at DGCI's sole discretion. Notwithstanding the below list, the Supplier will not retain any agents, subcontractors, or other third parties to perform any of the Deliverables without DGCI's prior written consent, such consent not to be unreasonably withheld. Any such agent, subcontractor or other third party shall be subject to DGCI's customary vetting process for new vendors.

**AL MUASHIRAT CO. FOR GENERAL TRADING. CO. LTD**
Bashar Naseer Tawfeeq
JCCS: 89918
+964 770 005 5579 NA 89918
Arasat Al Hindya-Karada Kharig, Near BBAC Bank. Baghdad-Iraq
POC Email: info@almuashirat.com

**ALFADHIL CO. FOR GENERAL TRADING, LTD**
Fadhl Jameel Juma'a
JCCS: 89921
+964 750 460 8759
Italian Village, House 275, Erbil, Iraq
POC Email: fjjcompany@gmail.com

DGCI understands that Supplier may enter into commercial agreements with the following fuel suppliers and traders:

**RONIN CO. FOR GENERAL TRADING & SALES OF PETROLEUM PRODUCTS LTD**
Hawre Riwandizi
Villa #186, Italian Village #1,100-meters Road, Erbil, Kurdistan Region, Republic of Iraq
POC Email: hriwandizi@roninpet.com

Any new fuel sub-suppliers must be approved in writing by DGCI prior to use on any PO. Supplier shall allow DGCI to review the wire transfers to its subcontractors and suppliers to ensure compliance with this paragraph.

**5.3**   Compliance of Agents.  Supplier shall enable DGCI to confirm that Supplier's agents and subcontractors of every tier are in compliance with local and U.S. legal requirements by ensuring that the following requirements are flowed down in all subcontracts:

(a)   Subcontractor shall provide DGCI, prior to the period of performance under a PO and upon any renewals during performance of a PO, original and certified English copies of all permits, licenses, agreements, tax clearances, and authorizations necessary or appropriate to enable performance of subcontractor's duties in the Territory;

(b)     Subcontractor shall permit DGCI to audit the subcontractor's supply chain to ensure that no portion of a PO has been performed, and no portion of any PO funds have been received, by a contractor or supplier that is not authorized to perform U.S. Government contracts or permitted to receive funds from a U.S. Government contract.

(c)     To enable each subcontractor or supplier who obtains or transports fuel for performance of a PO issued under this Agreement to obtain PMNOC approval, Supplier shall provide the subcontractor or supplier with either (a) an generic Basic Ordering Agreement (BOA) and generic PO issued by DGCI to the subcontractor or supplier, or (b) an effective, fully defined PO issued by DGCI jointly to Supplier and the subcontractor or supplier. Subcontractor or supplier shall agree not to use the BOA or PO for any purpose other than to obtain PMNOC approval for performance of a PO issued under this Agreement.

**5.4**     <u>Ethical Business Practices</u>. Supplier shall use only legitimate and ethical business practices in connection with the activities contemplated by this Agreement. During the Term, Supplier will conduct its business in a manner consistent with, and no less strict than, DGCI's Supplier Code of Ethics. Supplier shall not violate any applicable laws and regulations of the United States or any other applicable jurisdiction, including but not limited to laws relating to anti-bribery and the offering of inducements (in any form to include entertainment, gifts or otherwise), such as the U.S. Foreign Corrupt Practices Act, the U.S. Anti-Kickback Act and comparable legal requirements relating to its performance of its obligations under this Agreement. Supplier shall not disclose any information, or transfer any services or goods, furnished hereunder in any manner contrary to U.S. export control requirements. Supplier shall not engage in any transaction or activity that would violate any economic sanctions laws applicable to the Parties, including those administered by the U.S. Office of Foreign Assets Control, or employ, use, or do business with any person or entity identified in the U.S. Specially Designated Nationals List in connection with the performance of this Agreement. Consistent with the Supplier Code of Conduct, from time to time DGCI may require training to be conducted at the Supplier's expense for contract compliance purposes and Supplier will be notified accordingly.

**5.5**     <u>No Inducements</u>. Supplier shall not unlawfully offer, promise, or make any payments, loans, gifts, or anything of value that are not legally required to or for the benefit of: (a) a Government Official; (b) any relative of any Government Official; or (c) any other person if Supplier knows or has reason to believe that any part of the payment, loan or gift will be given directly, indirectly, or through a third party to or for the benefit of any of the persons or entities listed in clauses (a) or (b). "**Government Official**" means (a) an official or employee of any U.S or non-U.S. government agency; (b) an official or employee of an entity that Supplier knows or has reason to know is government-owned or controlled; (c) an official or employee of any political party; (d) a political candidate; or (e) an official or employee of a public international organization such as the United Nations, World Bank, or World Health Organization.

**5.6**     Conflicts of Interest. Supplier confirms that it is not aware of any perceived, potential or actual conflict of interest related to its performance of its obligations hereunder. Supplier acknowledges a continuing obligation to report to DGCI in a timely manner any perceived, potential or actual conflict of interest that may arise during the course of Supplier's performance of its obligations under this Agreement. In the event of any such perceived, potential or actual conflict of interest, DGCI may, at its discretion, require that Supplier execute an acceptable mitigation plan or terminate this Agreement.

**5.7**     Compliance Representations. Supplier represents and warrants that:

(a)     None of Supplier's agents, partners or employees, nor any immediate family members of Supplier's agents, partners or employees, is a Government Official, and Supplier is not aware of any current or prior violations of any applicable laws (including anti-corruption, anti-bribery, and anti-solicitation laws, and export controls and sanctions laws and regulations) in which Supplier has participated. Supplier further represents that neither Supplier nor any entity owned or controlled by Supplier is now, or has ever been, subject to an investigation by any government authority regarding alleged violations of any anti- corruption, anti-bribery or anti-solicitation laws, or export controls or sanctions laws and regulations, regardless of the outcome or findings of the investigation.

(b)     Neither Supplier nor any entity owned or controlled by Supplier is the target of any applicable sanction laws (e.g., designated on OFAC's Specially Designated Nationals and Blocked Persons list).

(c)     Supplier has established procedures and controls which Supplier reasonably believes are adequate (and otherwise comply with applicable law) to ensure that Supplier and any entity owned or controlled by Supplier is and will remain in compliance with all applicable laws (including anti-corruption, anti-bribery, and anti-solicitation laws, and export controls and sanctions laws and regulations).

(d)     Neither Supplier nor any of Supplier's principals (as defined in the Federal Acquisition Regulation to mean an officer, director, owner, partner, or a person having primary management or supervisory responsibilities within a business entity (e.g., general manager; plant manager; head of a division or business segment; and similar positions)) are debarred, suspended or proposed for debarment by the U.S. Government. Supplier agrees to notify DGCI immediately in writing upon discovery that Supplier or any of Supplier's principals may be subject to any such debarment or suspension proceedings.

**5.8**     Notice Requirement. The representations and warranties made in this Section 5 shall continue throughout the term of this Agreement.  If, during the term of this Agreement, there is a change in these representations and warranties, Supplier agrees to immediately disclose the change in writing to DGCI in accordance with the notice provisions in this

Agreement.

**5.9**  Certification. Supplier agrees to complete, upon request, a certification in a form acceptable to DGCI representing that Supplier is in compliance with all applicable laws (including anti‑ corruption, anti‑bribery, and anti‑solicitation laws, as well as export controls and sanctions laws and regulations).

**5.10**  Suspension Right. DGCI may suspend or withhold any payments to Supplier if, in good faith, DGCI believes that the payments may cause a violation of any applicable laws or may be related to illegal conduct, unethical business practices or violations of any applicable laws.

**5.11**  Termination Right. Notwithstanding any other termination provisions in this Agreement, DGCI may terminate this Agreement immediately by written notice for the following: (a) fraud or misrepresentation with respect to the entering into or performance of this Agreement; (b) violation of any provision of this Section 5; or (c) circumstances causing DGCI to believe, in good faith, that Supplier or anyone acting on Supplier's behalf has violated any applicable laws or regulations.

**5.12**  Records; Audits.  During the Term and for a period of three years thereafter (or such longer period of time required by applicable law or Supplier's own documentation retention policies), Supplier shall maintain accurate records relating to Supplier's performance of its obligations under this Agreement. Without limiting the generality of the foregoing, DGCI shall have the right, from time to time, at its own expense and upon reasonable notice to Supplier, to have an examination and audit conducted of those records to determine compliance with the terms of this Agreement. Such audit shall be conducted during regular business hours and in such manner as not to interfere unreasonably with Supplier's normal business activities.

## 6.  CONFIDENTIALITY.

**6.1**  Proprietary Information. As used herein, "**Proprietary Information**" means any information disclosed pursuant to this Agreement, whether in written, oral or visual form, which is identified by the disclosing Party at the time of disclosure as being proprietary or confidential or that due to its character and nature, or the circumstances of its disclosure, a reasonable person would recognize as being confidential or competitively sensitive. Proprietary Information shall not include any information that: (a) is already in the possession of the receiving Party without obligation of confidentiality at the time of receipt from the disclosing Party; (b) is independently developed by the receiving Party, as evidenced by appropriate documents; (c) is or becomes publicly available without breach of the Agreement by the receiving Party; (d) is rightfully received, free of restrictions and without breach of the Agreement, by the receiving Party from a third party; or (e) is approved for release by the prior written approval of the disclosing Party.

**6.2**  Legal Proceedings. In the event the receiving Party reasonably believes that disclosure of Proprietary Information of the other Party is required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil

investigative demand, or similar process), the receiving Party shall notify the other Party promptly of the requirement so that such other Party may seek an appropriate protective agreement. If disclosure is still required thereafter, the receiving Party shall limit its disclosure to the information that it is legally obligated to disclose.

      **6.3**    <u>Restricted Usage</u>. The receiving Party agrees that any Proprietary Information disclosed hereunder: (a) shall be used by it solely in furtherance of this Agreement, (b) shall only be disclosed to the receiving Party's personnel on a need-to-know basis, (c) shall not be distributed, disclosed or disseminated to any third party without the disclosing Party's prior written consent; and (d) shall be subjected by the receiving Party to the same care that the receiving Party uses to protect the confidentiality of its own proprietary information, but not less than reasonable care. Either Party shall be allowed to make copies of any Proprietary Information disclosed by the other Party provided that the markings on the original Proprietary Information are affixed to all copies (including partial copies). The receiving Party shall return to the disclosing Party, or provide written certification of the destruction of, any Proprietary Information it has received hereunder, immediately upon request made at any time by disclosing Party in its sole and absolute discretion, and in any event upon the termination of this Agreement; provided that the receiving Party may retain copies of the Confidential Information as required by any (A) applicable law or regulation or bona fide policies and procedures established for legal, compliance or regulatory purposes, or (B) automatic data back-up system in accordance with the receiving Party's security and/or disaster recovery procedures in the ordinary course of business; provided further that any such retained copies of the Proprietary Information shall be kept confidential in accordance with, and shall otherwise remain subject to, the provisions hereof and shall not be accessed or used for any purpose other than the purposes for which retention is hereby permitted, in each case for as long as they are retained (notwithstanding any prior termination hereof). The receiving Party shall notify the disclosing Party in writing immediately upon the occurrence of any unauthorized release of Proprietary Information, whether inadvertent or otherwise, and shall use reasonable efforts to prevent or limit any further dissemination of such Proprietary Information.

      **6.4**    <u>Duration</u>. Proprietary Information hereunder shall be protected by the receiving Party during the Term and for a period of three (3) years thereafter, except that non-disclosure obligations relating to trade secrets shall survive until such information ceases to be a trade secret as a matter of law.

      **6.5**    <u>Facility Access</u>. To the extent a Supplier may be required to have onsite or remote access to any DGCI (or DGCI customer) work facility or computer network, Supplier shall limit such access to the extent strictly necessary for performance thereunder. Supplier personnel shall observe all policies and procedures governing physical or remote access, including those relating to safety, security and general standards of conduct. Supplier shall cooperate fully with DGCI in investigating any alleged breach of any of those requirements.

      **6.6**    <u>No IP Rights</u>. Supplier acknowledges that it is not being granted any license, right, or title in or to any patent, copyright, trademark or other proprietary rights under this Agreement. All information and property furnished by DGCI shall remain the exclusive property of DGCI. Supplier agrees that such information and property will be used for no

purpose other than in connection with the performance of its obligations under this Agreement, and shall be returned promptly to DGCI upon its request. Supplier assigns, and will require its personnel to assign, to DGCI copyright ownership for original written material originated and prepared for DGCI under this Agreement. Supplier, at DGCI's direction and expense, will take reasonable steps necessary to preserve and enforce these copyrights.

**7.    NON-SOLICITATION**. During the term of this Agreement and for a period of six months thereafter, neither Party shall, directly or indirectly, recruit, solicit, or hire, or assist in the recruitment, solicitation or hiring, for employment or engagement as a consultant, any employee of the other Party who participated in the performance of the other Party's obligations under this Agreement or who otherwise became known to the hiring Party as a result of such performance.  The foregoing shall not prohibit a hiring Party from (a) placing mass media advertisements, utilizing non-targeted third party recruiting efforts, or conducting job fairs for the purpose of recruiting employees generally or from otherwise hiring any person who independently seeks employment without solicitation by the hiring Party or (b) soliciting any employee whose employment has been terminated by the other Party prior to the commencement of discussions regarding employment.

**8.    CUSTOMER CONTACT**. Unless approved in advance by DGCI, Supplier shall not communicate with, or take any direction from, any DGCI customer relating to this Agreement or any PO, and any customer-initiated contact shall be referred by Supplier to DGCI for resolution. This paragraph shall not apply to any disclosure required by applicable law.

**9.    FAR CLAUSES.**  For the benefit of DGCI's Government customers, a PO may expressly incorporate by reference applicable "flow down" clauses required by the customer's procurement regulations such as the Federal Acquisition Regulation (FAR) and the Defense Federal Acquisition Regulation Supplement (DFARS), including applicable flow down clauses for commercial item acquisitions for which an exemption is not available.

**10.    INSURANCE.** Except as otherwise specified in a PO or as otherwise agreed in writing between the Parties, Supplier and its suppliers shall carry the following types of insurance and shall maintain them in the minimum amounts shown during the term of this Agreement:

| Insurance Type | Minimum Insurance Coverage |
|---|---|
| Commercial General Liability Insurance | $5,000,000 combined single limit per occurrence (including products/completed operations and contractual liability coverage). |
| Automobile Insurance | $2,000,000 combined single limit for bodily injury and/or property damage per person per occurrence; policy shall apply to all owned, leased, hired and non-owned vehicles used in connection with the work under this Agreement. |

| | |
|---|---|
| Workers' Compensation Insurance (including DBA insurance for personnel performing services overseas) | Insurance for statutory obligations imposed by law including, where applicable: (i) coverage under United States Longshoremen's and Harbor Workers' Act and Jones Act, (ii) Defense Base Act (DBA) workers' compensation insurance as specified under FAR Clause 52.228-3 for personnel performing services overseas and (iii) foreign voluntary workers' compensation insurance (if not covered by DBA workers' compensation insurance) based on the benefits of the state of hire. |
| Foreign Liability Insurance | $1,000,000 foreign general liability insurance (if not included in Commercial General Liability Insurance above), including products/completed operations, contractual liability and personal injury, bodily injury and property damage liability; and $1,000,000 foreign auto liability insurance to include coverage for all owned, leased, hired and non-owned vehicles used in connection with the work under this Agreement. |
| Employer's Liability Insurance | $1,000,000 per occurrence, unless higher amounts are required by applicable law including, if applicable, maritime coverage endorsement. This coverage requirement applies to all workers' compensation policies to include domestic workers' compensation, DBA workers' compensation, foreign voluntary workers' compensation and locally placed workers' compensation coverage outside of the United States. |
| Umbrella or Excess Insurance | Umbrella and/or excess liability insurance covering all domestic and foreign general liability, automobile liability, and employer's liability policies, to include coverage for bodily injury and property damage. The insurance provided under this section must be in the amount of not less than $5,000,000 per occurrence and be excess over all underlying insurance policies listed above. |
| Professional Liability Insurance | Reserved. |

Supplier shall have all policies, except Workers' Compensation and Employer's Liability, endorsed to name DGCI as an additional insured with respect to the work to be performed by Supplier. All such insurance must be primary and non-contributory and required to respond and pay prior to any other insurance or self-insurance available. Any other coverage available to DGCI shall apply on an excess basis. Supplier shall promptly deliver to DGCI a Certificate of Insurance attesting to the above coverage. The certificate shall state that all policies have been endorsed to waive subrogation in favor of DGCI. The certificate shall indicate that DGCI will be notified thirty (30) days prior to the modification or cancellation of any such insurance policies. Supplier shall comply with any federal, state, foreign, local and any other applicable law and local and/or site specific insurance requirements even if not stated herein or in a PO.

**11. TERM AND TERMINATION.**

    **11.1**    <u>Term</u>.  This Agreement shall commence on the Effective Date and remain in effect through 1st of May 2022, the base period (the '**Term**"), or the termination of the term of any PO issued hereunder, whichever is later, unless earlier terminated in accordance with this Agreement. Each PO may specify a term applicable to it.

    **11.2**    <u>Stop Work</u>. DGCI reserves the right to issue a written stop work notice at any time during the performance of this Agreement in the event that Supplier's Deliverables are no longer needed due to a change in DGCI's requirements. In the event of a stop work notice, Supplier shall be entitled to compensation to the same extent as DGCI is entitled to compensation from the U.S. Government.  Upon receipt of any such stop work notice Supplier shall immediately stop work and incur no further costs during the period of time such stop work notice remains in effect, until and unless either the stop work notice is lifted or a termination of this Agreement occurs.

    **11.3**    <u>Excusable Delays</u>. Supplier shall not be in default under this Agreement for the failure to timely deliver Deliverables if the failure arises from unforeseen causes beyond the control and without the fault or negligence of the Supplier or its approved subcontractors. Supplier shall give prompt written notice to DGCI stating the period of time the occurrence is expected to continue and use commercially reasonable efforts to end the failure or delay and minimize the effects of such event, including seeking alternative available sourcing for Deliverable items. Excusable delays shall only serve to prevent Supplier's default under this Agreement and then to the same extent as they prevent DGCI's default under DGCI's contract with the U.S. Government. DGCI may terminate this Agreement on written notice to Supplier if the excusable delay is reasonably likely to extend for a continuous period in excess of one calendar month or such other time period as may be mutually agreed upon by the Parties. In no event shall DGCI be responsible to pay for Deliverables that are unable to be provided due to excusable delays.

    **11.4**    <u>Termination.</u> In addition to any other express termination right set forth elsewhere in this Agreement:

    (a)    DGCI may terminate this Agreement and/or any PO without cause by providing at least thirty (30) calendar days' written notice to Supplier, in which case DGCI will only be liable to Supplier for unpaid compensation owed to Supplier for work performed by Supplier in accordance with the PO requirements and accepted by DGCI prior to the effective date of termination.

    (b)    Either Party may terminate this Agreement immediately upon giving notice of a material breach of this Agreement or a PO to the other Party if the breach cannot be remedied or, if capable of remedy, the breaching party fails to do so within five (5) business days following written notice (or such other period of time as may be mutually agreed upon by the Parties). The non-breaching Party shall reasonably cooperate with the breaching Party to facilitate a remedy of a material breach within the applicable cure period. In the event DGCI terminates

this Agreement in whole or in part due to Supplier's default, DGCI may procure, upon such terms and in such manner as DGCI may deem appropriate, supplies or services similar to those so terminated, and Supplier shall be liable to DGCI for any excess costs and for any damages for which DGCI may be liable to the U.S. Government if Supplier's default causes DGCI to default on its contract.

(c)      Either Party may terminate this Agreement effective immediately upon written notice to the other Party, if the other Party: (i) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (ii) files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency Law; (iii) makes or seeks to make a general assignment for the benefit of its creditors; or (iv) applies for or has a receiver, trustee, custodian or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

**11.5**   Effect of Expiration or Termination. Termination of this Agreement and any PO does not release either Party from any liability which, at the time of termination, has accrued to the other Party, or which may accrue in respect of any act or omission before termination or expiration, or from any obligation which is expressly stated to survive the termination or expiration.

## 12. INDEMNIFICATION.

**12.1.**   Indemnity. Each Party (as an "**Indemnifying Party**") shall indemnify and hold harmless the other Party and its applicable affiliates (as an "**Indemnified Party**") against any liability, loss, damage, cost, claim or expense (collectively, "**Damages**") the Indemnified Party suffers or incurs as a result of any claim, suit, action or other proceeding (a "**Claim**") brought against the Indemnified Party by a third party arising under or relating to the Indemnifying Party's performance (or non-performance) of its obligations under this Agreement; provided, however, that this indemnity obligation shall not apply to the extent that such Damages are attributable to the fraud, gross negligence or willful misconduct of an Indemnified Party. In the event the Damages are found to be caused by the joint or concurrent fault of the Parties, the Damages shall be borne by each Party in proportion to such Party's degree of fault.

**12.2.**   Procedures. The Parties agree that the preceding indemnification obligations shall be conditioned upon the Indemnified Party (i) promptly notifying the Indemnifying Party of such Claim, (ii) providing the Indemnifying Party with the sole right to defend or settle such Claim, including selection of defense counsel, and (iii) providing the Indemnifying Party with good faith assistance in the defense or settlement of such Claim, at the Indemnifying Party's expense. The Indemnifying Party shall not settle or compromise any such Claim in any manner which would impose an injunction or other equitable relief on the Indemnified Party or that does not include a full release of the Indemnified Party with respect to such Claim, without the prior written consent of the Indemnified Party. If (i) the Indemnifying Party does not promptly assume the defense of any Claim following notice of its election to do so, or (ii) the Indemnified

Party reasonably concludes that there may be defenses available to it which are different from or additional to those available to the Indemnifying Party and which could reasonably be expected to result in a conflict of interest or prejudice to the Indemnified Party if both Parties were represented by the same counsel, then the Indemnified Party will have the right to undertake the defense of such Claim with counsel of its own choosing, with the reasonable costs thereof for the account of the Indemnifying Party.

**12.3.** <u>Damages</u>. Except with respect to indemnification obligations hereunder, neither Party will be liable to the other for any incidental, special, consequential, indirect, punitive or exemplary damages (including lost revenues, lost profits, lost data or business interruption losses) arising from or related to this Agreement, regardless of the type of claim, whether in contract, tort, negligence, strict liability or otherwise, and regardless of the cause of such damages even if such damages were foreseeable.

## 13.    GOVERNING LAW AND JURISDICTION.

**13.1.** <u>Governing Law</u>. This Agreement, the rights and obligations of the Parties and any claims or disputes relating to this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without giving effect to its principles of conflict of laws. The U.N. Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

**13.2.** <u>Specific Performance</u>. In the event of a breach of this Agreement, in addition to any other remedies the non-breaching Party may have at law or in equity, the non-breaching Party shall be entitled to seek enforcement of this Agreement in a court of competent jurisdiction by means of a decree of specific performance, an injunction without the posting of a bond or the requirement of any other guarantee, and any other form of equitable relief.

**13.3.** <u>Disputes</u>. The Parties shall make a good faith effort to settle amicably any claim, controversy or dispute arising under or relating to this Agreement. Absent a mutual resolution, any such claim, controversy or dispute shall be resolved exclusively at the U.S. Federal District Court for the Eastern District of Virginia, or if such court does not have subject matter jurisdiction over the dispute, any other federal or state court of competent subject matter jurisdiction located in the Commonwealth of Virginia. Each Party irrevocably and unconditionally consents to such personal jurisdiction and to waive its right to a jury trial in any action arising under this Agreement. The prevailing Party in any action to enforce this Agreement shall be entitled to reimbursement of reasonable, documented costs and attorneys' fees incurred in connection with such enforcement.

## 14.    MISCELLANEOUS.

**14.1.** <u>Prior Agreements; Modifications and Waivers</u>. This Agreement and the executed POs constitute the final, complete and integrated understanding of the Parties with respect to the subject matter hereof and supersede all prior understandings and agreements, whether written or oral, with respect to the same subject matter. Any changes to this Agreement

or a PO must be approved in writing by both Parties. The failure of a Party to exercise any right or remedy will not be deemed or constitute a waiver of such right or remedy in the future. No waiver of any of the provisions of this Agreement will be deemed or will constitute a waiver of any other provision hereof, nor will any such waiver constitute a continuing waiver unless otherwise expressly provided.

**14.2.** Publicity**.** No news release, public announcement, denial or confirmation of any part of the subject matter of this Agreement shall be made without the prior written consent of DGCI, such consent not to be unreasonably withheld.

**14.3.** Notices. All notices required or permitted to be given hereunder shall be deemed properly given if delivered by email or by personal delivery to the authorized individuals listed on the signature page to this Agreement or as otherwise specified in writing by the Parties.

**14.4.** Assignment. Supplier shall not assign or transfer its rights relating to this Agreement or any PO in whole or in part or, consistent with Section 5.2, delegate any of Supplier's obligations under this Agreement or any PO, without DGCI's prior written consent, such consent not to be unreasonably withheld.

**14.5.** Severability. Should any provision of this Agreement be held to be invalid, void, or otherwise unenforceable by a court of competent jurisdiction, the remaining provisions contained herein shall continue to remain in full force and effect, and shall not be impaired or otherwise invalidated in any way. To the extent permitted and possible, the invalid or unenforceable term shall be deemed replaced by a term that is valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable term.

**14.6.** Advice of Counsel and Construction. Each Party acknowledges that it has had the opportunity to be represented by counsel.  Accordingly the rule of construction of contract language against the drafting party is hereby waived. Unless the context otherwise requires, (i) each reference in this Agreement to a designated "Section" or "Exhibit" is to the corresponding Section or Exhibit of or to this Agreement; (ii) the word "or" shall not be applied in its exclusive sense; (iii) "including" shall mean "including, without limitation"; and (iv) "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section or other subdivision.

**14.7.** Survival. This Section 14 and Sections 6, 7, 11.5, 12 and 13 of this Agreement, and any other provision whose survival is necessary to give this Agreement its intended effect, shall survive the expiration or termination of this Agreement.

**14.8.** Further Assurances. Supplier shall provide such further documents or instruments as may be reasonably necessary or desirable to give effect to this Agreement and to carry out Supplier's obligations hereunder and under each PO.

**14.9.** Third Party Beneficiaries. There are no third-party beneficiaries to this Agreement.

**14.10.** <u>Counterparts; Headings</u>. This Agreement may be executed in counterparts, all of which together shall constitute one and the same document. Further, this Agreement may be executed by transfer of an originally signed document, including by electronic signature, by e-mail in PDF format, each of which will be as fully binding as an original document. Headings are inserted for convenience of reference only.

*[Signatures appear on the next page.]*

**IN WITNESS WHEREOF,** the duly authorized representatives of the Parties have signed this Agreement as of the Effective Date.

**DGCI Corporation**                                **SUPPLIER**

Mohammed Faisal bradosti (Jun 27, 2020 20:02 GMT+2)

Ian Galloway                                        Mohammed Faisal bradosti

Jun 28, 2020                                        Jun 27, 2020

**Address for Notices:**                            **Address for Notices:**

7950 Jones Branch Dr. 601N                          MRF, Building C,40-meters Road, Erbil,
McLean, VA 22102                                    Kurdistan Region, Republic of Iraq
USA

Attention: Ian Galloway                             Attention: Mohammed Faisal
Telephone: 240-461-8074                             Telephone: +964 770 445 5980
Email: Igalloway@dgci.com                           Email: mohammedbradosti@gmail.com

**APPENDIX A – FLOWDOWN PROVISIONS AND CLAUSES INCORPORATED
BELOW AND ATTACHED
130 - SPE607-20-D-0026 - Iraq Into-Plane
131 - SPE605-20-D-9518 - Iraq & Syria DDF
105 - Iraq and Syria OTBs
114 - SOSI SubK Camp Taji Fuel**

52.203-13, Contractor Code of Business Ethics and Conduct (Oct 2015) (41 U.S.C. 3509).

52.203-19, Prohibition on Requiring Certain Internal Confidentiality Agreements or Statements (Jan 2017) (section 743 of Division E, Title VII, of the Consolidated and Further Continuing Appropriations Act, 2015 (Pub. L. 113-235) and its successor provisions in subsequent appropriations acts (and as extended in continuing resolutions)).

52.204-23, Prohibition on Contracting for Hardware, Software, and Services Developed or Provided by Kaspersky Lab and Other Covered Entities (Jul 2018) (Section 1634 of Pub. L. 115-91).

52.203-6, Restrictions on Subcontractor Sales to the Government (Sep 2016) (if Vendor engages sub-tier vendors in the performance of this Agreement)

52.204-25 Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment (Aug 2019) (if Vendor provides telecommunications and video surveillance services under this Agreement)

52.209-10 Prohibition on Contracting with Inverted Domestic Corporations (Nov 2015) (if Vendor meets definition under 6 U.S.C. 395(b)or plans to engage sub-tier vendors meeting definition under 6 U.S.C. 395(b))

52.222-17 Nondisplacement of Qualified Workers (May 2014) (if this Agreement exceeds $250,000)

52.222-50 Combating Trafficking in Persons (Dec 2018) (if at least $500,000 of the value of this Agreement may be performed outside the United States and items supplied are not commercially available off-the-shelf items)

52.224-3 Privacy Training (Jan 2017) (if Vendor employees will have access to DGC International systems of records containing personally identifiable information))

52.225-26 Contractors Performing Private Security Functions Outside the United States (Oct 2016) (if vendor will be performing security functions under this Agreement)

52.233-3 Protest After Award (Aug 1996) (if this Agreement value exceeds $250,000)

252.225-7975 ADDITIONAL ACCESS TO CONTRACTOR AND SUBCONTRACTOR RECORDS (DEVIATION 2020-O0001) (NOV 2019)

(a) In addition to any other existing examination-of-records authority, the Government is authorized to examine any records of the Contractor and its subcontractors to the extent necessary to ensure that funds, including supplies and services, available under this contract are not provided, directly or indirectly, to a person or entity that is actively opposing United States or coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities.

(b) The substance of this clause, including this paragraph (b), is required to be included in subcontracts, including subcontracts for commercial items, under this contract that have an estimated value over $50,000 and will be performed outside the United States and its outlying areas.

252.225-7993 Prohibition on Providing Funds to the Enemy (DEVIATION 2020-O0001) (NOV 2019)

(a) The Contractor shall—
(1) Exercise due diligence to ensure that none of the funds, including supplies and services, received under this contract are provided directly or indirectly (including through subcontracts) to a person or entity who is actively opposing United States or Coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities;

(2) Check the list of prohibited/restricted sources in the System for Award Management (SAM) at www.sam.gov—
(i) Prior to subcontract award; and
(ii) At least on a monthly basis; and prohibited or restricted source pursuant to section 841 of the National Defense Authorization Act for Fiscal Year 2015 (Pub. L. 113-291), as amended, unless the Contracting Officer provides to the Contractor written approval of the head of the contracting activity to continue the subcontract.

(b) The Head of the Contracting Activity has the authority to—
(1) Terminate this contract for default, in whole or in part, if the Head of the Contracting Activity determines in writing that the contractor failed to exercise due diligence, as required by paragraph (a) of this clause; or

(2)(i) Void this contract, in whole or in part, if the Head of the Contracting Activity determines in writing that any funds received under this contract have been provided directly or indirectly to a person or entity who is actively opposing United States or Coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities.
(ii) When voided in whole or in part, a contract is unenforceable as contrary to public policy, either in its entirety or with regard to a segregable task or effort under the contract, respectively.
(c) The Contractor shall include the substance of this clause, including this paragraph (c), in subcontracts, including subcontracts for commercial items, under this contract that have an estimated value over $50,000 and will be performed outside the United States and its outlying areas.

# DGCI TA MSA - Final

Final Audit Report                                                          2020-06-28

| | |
|---|---|
| Created: | 2020-06-16 |
| By: | Ian Galloway (contracts@dgci.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAmYPLMM07dwJHOWYb8-U0IPfu1ejHcFVo |

## "DGCI TA MSA - Final" History

Document created by Ian Galloway (contracts@dgci.com)
2020-06-16 - 1:24:42 PM GMT- IP address: 108.18.229.178

Document emailed to Mohammed Faisal bradosti (mohammedbradosti@gmail.com) for signature
2020-06-16 - 1:27:12 PM GMT

Email viewed by Mohammed Faisal bradosti (mohammedbradosti@gmail.com)
2020-06-16 - 7:32:30 PM GMT- IP address: 66.102.9.154

Document e-signed by Mohammed Faisal bradosti (mohammedbradosti@gmail.com)
Signature Date: 2020-06-27 - 6:02:03 PM GMT - Time Source: server- IP address: 85.228.155.235

Document emailed to Ian Galloway (igalloway@dgci.com) for signature
2020-06-27 - 6:02:04 PM GMT

Email viewed by Ian Galloway (igalloway@dgci.com)
2020-06-28 - 12:39:22 PM GMT- IP address: 66.102.8.210

Document e-signed by Ian Galloway (igalloway@dgci.com)
Signature Date: 2020-06-28 - 12:39:41 PM GMT - Time Source: server- IP address: 173.66.191.43

Signed document emailed to Mohammed Faisal bradosti (mohammedbradosti@gmail.com), Ian Galloway (igalloway@dgci.com) and Ian Galloway (contracts@dgci.com)
2020-06-28 - 12:39:41 PM GMT



POWERED BY
Adobe Sign

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

**DGCI CORPORATION,**
7950 Jones Branch Drive
# 601N
McLean, Virginia 22102

          **Plaintiff,**

**v.**

No.:  1:21-cv-1174

**TRIPLE ARROW COMPANY FOR
GENERAL TRADING CO. LTD.,**
MRF, Building C
40-meteres Road
Erbil, Kurdistan Region, Republic or Iraq

          **Defendant.**

## COMPLAINT

DGCI Corporation ("DGCI"), by its undersigned counsel, sets forth the following as its

Complaint against Triple Arrow Company for General Trading Co. Ltd. ("Triple Arrow"):

## PRELIMINARY STATEMENT

1.      This lawsuit arises under a Master Service Agreement ("MSA") between DGCI

and Triple Arrow, which was negotiated and in pertinent part performed in this District.  The

MSA explicitly provides that any disputes between the parties are to be resolved by application

of Virginia law.  Moreover, the MSA contains a mandatory forum selection clause to govern any

disputes between the parties.  The forum selection clause provides, in the first instance, that suits

concerning any disputes are to be filed in this Court (any dispute "shall be resolved exclusively

at the U.S. Federal District Court for the Eastern District of Virginia, or if such court does not

have subject matter jurisdiction over the dispute, any other federal or state court of competent subject matter jurisdiction located in the Commonwealth of Virginia.") (Ex A. (MSA), at 13.3).

2.      As alleged in this Complaint, a real and actual dispute exists between the parties under the MSA.  Rather than comply with the clear terms of the MSA, however, Triple Arrow has brazenly violated the MSA by initiating improper legal proceedings under Iraqi law against DGCI in Iraq.  A hearing in that litigation has been scheduled by an Iraqi judge for November 8, 2021.

3.      The real risk of harm to DGCI here is immediate and irreparable.  This is not a situation in which hypothetical or "advisory" determinations are sought.  In addition to initiating the lawsuit against DGCI in Iraq instead of Virginia as the parties contractually agreed, Triple Arrow has made various extortionate threats against DGCI property and personnel in Iraq to compel DGCI to pay monies Triple Arrow claims to be owed under the MSA.  These improper threats to DGCI equipment and property, as well as the harassment and threats towards DGCI personnel, have and continue to put at risk DGCI's ability to continue to fulfil its ongoing contractual obligations to U.S. Government entities (including the U.S. Armed Forces) in Iraq. Allowing Triple Arrow to seek disputed monies it claims to be owed under the MSA in Iraq (ignoring the clear provisions of the MSA that require Triple Arrow to file suit in this Court) substantially and materially changes the contract negotiated between the parties and render that contract a nullity.

4.      DGCI's efforts to resolve Triple Arrow's claims over the last several months have been unavailing.  Triple Arrow has utterly ignored DGCI's repeated reminders that the MSA explicitly requires that litigation of any disputed claims (DGCI denies the amounts Triple Arrow claims to be owed under the MSA) must be filed in this Court for resolution pursuant to Virginia

law.  As a result, DGCI is forced to file this declaratory judgment action to establish the rights and obligations of the parties under the MSA.  There exists an actual and substantial controversy between the parties under the MSA which is required to be litigated in this Court.  Triple Arrow's professed belief that it has claims for monies owed by DGCI pursuant to the MSA requires that any litigation over such claims must be brought in this Court for resolution in accordance with Virginia law, not by a court in Iraq applying Iraqi law.  In addition to the declaratory relief, DGCI seeks and is entitled to an order enjoining Triple Arrow from proceeding with its improper suit in Iraq or other legal proceedings against DGCI in Iraq.

## **THE PARTIES**

5.      Plaintiff DGCI is a company duly incorporated in the Commonwealth of Virginia and having its principal place of business at 7950 Jones Branch Drive # 601N, McLean, Virginia 22102.

6.      DGCI is a premier provider of global defense solutions to the U.S. Government and its partners worldwide.

7.      DGCI has a long history of operating in Iraq and is one of the few U.S. fuel providers with strong relationships in the region.

8.      Defendant Triple Arrow is a company duly established under the laws of Iraq, with registration number 11721/Kurdistan Region, and having its principal place of business at MRF, Building C, 40-meters Road, Erbil, Kurdistan Region, Republic of Iraq.

## **JURISDICTION AND VENUE**

9.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of costs.

10.     The Court has personal jurisdiction over the parties to this action as DGCI is registered to transact business, and regularly transacts business, in Virginia. Triple Arrow has purposefully availed itself of the marketplace available in Virginia and has the necessary minimum contacts with Virginia to justify personal jurisdiction in this Court.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391. This Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 22 U.S.C. § 2201, et seq., and has the inherent authority to grant injunctive relief.

## FACTUAL ALLEGATIONS

### A.     The Relationship Between DGCI and Triple Arrow

12.     DGCI has been awarded multiple contracts to deliver fuel in Iraq for the U.S. Armed Forces by the Defense Logistics Agency-Energy ("DLA-E").

13.     DLA-E, which is the nation's combat logistics support agency, is headquartered at Ft. Belvoir in Virginia.

14.     As one example, DGCI entered into Contract No. SPE600-16-D-9518 with DLA-E to provide fuel to DLA-E in Iraq (the "DLA-E Contract"). This contract was awarded on or about July 29, 2016.

15.     In order to fulfill the DLA-E Contract, DGCI, as a U.S. company and a responsible government contractor, needed to enter into agreements with local Iraqi companies to assist with, among other things, logistics for the transport and delivery of fuel in-country to Erbil International Airport ("EIA") in Iraq, where the fuel delivered to DLA-E was for use by the U.S. Armed Forces.

16.     DGCI has worked with a number of local Iraq subcontractors, including with an Iraqi company called the Zozik Group, which is generally engaged in the business of transportation and fuel supply in Iraq, among other things.

4

17. Upon information and belief, at relevant times, the Zozik Group's Managing Director in the U.S. was a U.S. resident, Ghalib Bradosti.

18. Through this relationship with Zozik and Mr. Bradosti, DGCI was introduced to Defendant Triple Arrow, which, upon information and belief, is affiliated with the Zozik Group and Mr. Bradosti.

19. DGCI and Mr. Bradosti, on behalf of Triple Arrow, negotiated terms for fuel purchases, discussed logistics for the delivery of the fuel for use by the U.S. Armed Forces in Iraq, discussed additional business opportunities, and addressed issues with the ongoing operations on-ground in Iraq, among other things. These actions in furtherance of DGCI's commercial relationship with Triple Arrow took place in both Virginia and Iraq.

20. Among other things, Triple Arrow provided the following services to DGCI in furtherance of DGCI's contract with DLA-E: managing tier-two subcontractors for fuel supply, storage, and transport; truck registrations and leasing at Erbil International Airport; base access support; local staffing support; and obtaining local licenses.

21. For a number of years, DGCI and Triple Arrow engaged in business dealings related to the DLA-E Contract under various agreements between the parties, for which Triple Arrow issued invoices to DGCI that DGCI paid.

22. DGCI initially made payments for Triple Arrow on its fuel invoices to DGCI to a U.S. bank account in the name of Ghalib Bradosti, although later, as instructed, DGCI wired funds for invoiced services to a Triple Arrow account abroad.

23. Mr. Bradosti attended in-person meetings with DGCI personnel at DGCI's offices in Virginia regarding Triple Arrow's performance on behalf of DGCI for the DLA-E Contract and other contracts for the provision of fuels in Iraq.

24.     DGCI and Mr. Bradosti considered other business ventures in Virginia.   For example, in or around 2014, DGCI and the Zozik Group, acting through Mr. Bradosti, created a joint venture that was registered in Virginia called Triple Arrow LLC.

25.     Triple Arrow LLC was created for the purpose of bidding on government contracts to provide construction services, logistics, procurement, and base support operations. This joint venture did not perform work on the DLA-E Contract at issue in this litigation and became inactive in 2020.

### B.     DGCI and Triple Arrow Enter Into the Master Service Agreement

26.     DGCI and Triple Arrow formalized their contractual relationship under a Master Services Agreement ("MSA"), effective as of May 1, 2020, to govern the terms by which Triple Arrow had supplied and would supply goods to DGCI in Iraq.   A true and correct copy of the MSA is annexed to the Complaint as Exhibit A.

27.     This MSA was negotiated in good faith and at arms-length between two sophisticated contracting parties with access to legal counsel and who had a long-standing business relationship.

28.     The MSA contains the following choice of law and forum selection clauses:

> 13.1 <u>Governing Law</u>  This Agreement, the rights and obligations of the Parties and any claims or disputes relating to this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without giving effect to its principles of conflicts of laws.  The U.N. Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.
> . . . .
>
> 13.3. <u>Disputes</u>. The Parties shall make a good faith effort to settle amicably any claim, controversy or dispute arising under or relating to this Agreement. Absent a mutual resolution, any such claim, controversy or dispute shall be resolved exclusively at the U.S. Federal District Court for the Eastern District of Virginia, or if such court does not have subject matter jurisdiction over the dispute, any other federal or state court of competent subject matter jurisdiction located in the Commonwealth of Virginia. Each Party irrevocably and unconditionally consents to such personal jurisdiction and to waive its right to a jury trial in any action

arising under this Agreement. The prevailing Party in any action to enforce this Agreement shall be entitled to reimbursement of reasonable, documented costs and attorneys' fees incurred in connection with such enforcement.

29.     The choice of law and forum selection provisions explicitly survive any termination of the MSA.  (Ex. A, at 14.7 (Survival)).

30.     The MSA provides that all Notices under the MSA shall be "deemed properly given if delivered by email or by personal delivery to the authorized individuals" on the signature page.  (Ex. A, at 14.3 (Notices)).  For Triple Arrow, the authorized individual is Mohammed Faisal Bradosti at mohammedbradosti@gmail.com.  Upon information and belief, Mohammed Faisal Bradosti is the nephew of Ghalib Bradosti.

### C.     The U.S. Department of Defense Deems Triple Arrow a Force Protection Threat in October 2020 Resulting in Termination of the MSA

31.     On October 12, 2020, the U.S. Department of Defense ("DOD") issued an Unclassified Memorandum to deny Triple Arrow access ("Barment") to all United States Forces installations and property in Iraq because DOD assessed that Triple Arrow "poses an unacceptable risk to U.S. national interests, missions, personnel, and facilities."

32.     Triple Arrow was deemed by the DOD to be a force protection threat and, as a result, Triple Arrow received a negative force protection rating from the U.S. Government via the Joint Contingency Contracting System ("JCCS").

33.     On October 19, 2020, DLA-E notified DGCI by email that "Triple Arrow has been denied Installation Base Access from All United States Forces Installations and Property in Iraq."  Prior to this notification, DGCI was unaware of any conduct by Triple Arrow that would have resulted in the negative force protection rating.

34.     On October 20, 2020, DGCI notified Triple Arrow that the MSA was terminated as an ongoing matter effective immediately due to Triple Arrow's breach of Section 3.1(c) of the MSA, under which Triple Arrow warrants that it "will be, and shall remain . . . registered and approved in the Joint Contingency Contracting System (JCCS). . . ."  (Ex. A, at 3.1(c)).

35.     Triple Arrow failed to satisfactorily maintain its force protection rating, which was a material condition precedent for it to be a vendor for DGCI in DGCI's performance on behalf of the U.S. Government.

36.     In addition, under the MSA, Triple Arrow was obligated to use only legitimate and ethical business practices in connection with the activities contemplated by the MSA (Ex. A, at 5.4 (Ethical Business Practices)).

37.     Following Triple Arrow's failed force protection determination and the resulting termination of the MSA as an ongoing matter, DGCI initiated an audit of Triple Arrow's invoices and conduct pursuant to its right to do so under the MSA to determine whether the monies invoiced were actually owed (Ex. A, at 5.12 (Records; Audits)).

38.     DGCI's audit of pre-October 2020 invoices continues, notwithstanding the complete lack of cooperation by Triple Arrow.

**D.     DGCI Obtains Approval from the U.S. Government to Purchase Triple Arrow's Remaining Fuel Inventory**

39.     Following the termination of the MSA in October 2020, DGCI received DLA-E approval to purchase Triple Arrow's remaining jet fuel and diesel fuel inventory to offset any financial burden associated with the excess stocks occurring as a result of the negative JCCS rating.

40.     By the end of August 2021, DGCI completed the purchase and drawdown of all remaining fuel stocks owned by Triple Arrow in Iraq associated with DGCI's DLA-E contracts.

41.     DGCI notified Triple Arrow via a letter sent by email on August 27, 2021 (as authorized by the MSA for notices) that DGCI would pay Triple Arrow for all invoices associated with those remaining fuel stock purchases since October 21, 2020.  Further, DGCI informed Triple Arrow that DGCI was attempting to audit all transactions between DGCI and Triple Arrow between July 29, 2016 and October 20, 2020 in light of Triple Arrow's negative force protecting rating.

### E.     The Dispute Under the MSA Between DGCI and Triple Arrow Arises

42.     Since August 2021, Triple Arrow and its Iraqi counsel have been engaged in active email correspondence with DGCI and DGCI's U.S. counsel regarding Triple Arrow's disputed claims for monies still owed under the MSA.

43.     On September 1, 2021, Triple Arrow emailed a letter to DGCI which alleged that Triple Arrow had issued invoices prior to the termination of the MSA in October 2020 that had not yet been settled.  Triple Arrow further indicated that it disagrees with DGCI's audit to the extent that the audit may reduce any amounts allegedly owed to Triple Arrow by DGCI.  Triple Arrow concluded its letter by demanding all payments allegedly owed by DGCI, including for the period prior to termination.  Upon information and belief, contemporaneously with this letter, Triple Arrow initiated its campaign of interference with DGCI property and engaged in threats to DGCI personnel in Iraq.

44.     On September 8, 2021, DGCI emailed Triple Arrow in response, stating that DGCI "simply cannot tolerate interference or threats of interference in performing our mission for the US Government."  DGCI specifically advised Triple Arrow that it will not capitulate to demands for payment of disputed amounts of money made in conjunction with illegal and improper threats of duress.

9

45.    DGCI's September 8, 2021 email attached a letter from DGCI's U.S. counsel to Triple Arrow which demanded on behalf of DGCI that Triple Arrow cease and desist from taking any unlawful and improper actions directed at DGCI personnel or property wheresoever located.  The letter further reminded Triple Arrow of its obligation to litigate any disputes against DGCI in the United States under the MSA:  "Should you believe for whatever reason that you have legitimate grievance with DGCI, the MSA requires you to take action in the US courts in Virginia, as appropriate.  We look forward to actively contesting any such claim you may make."

46.    On September 15, 2021, Triple Arrow's Iraqi counsel emailed a letter to DGCI and its U.S. counsel, in which Triple Arrow rejected its clear obligation under the MSA to pursue any litigation in this Court and, indeed, acknowledged that it intended to pursue claims under the MSA in Iraq.

47.    In that letter, Triple Arrow further alleged that DGCI owes Triple Arrow USD 9,443,111.24 pursuant to an alleged "oral agreement" between Triple Arrow and DGCI under which Triple Arrow could and would seek "enforcement" in the Iraqi courts.

48.    There is no such oral agreement between Triple Arrow and DGCI.  Under the MSA, any changes to the MSA "must be approved in writing by both Parties."  (Ex. A., at 14.1 (Prior Agreements; Modifications and Waivers)).  There is no such required writing.

49.    Upon information and belief, Triple Arrow's Iraqi counsel appeared in person at DGCI's office at EIA in Iraq and threatened to seize four refueler trucks owned by DGCI.

50.    On September 22, 2021, DGCI's U.S. counsel emailed a letter to Triple Arrow's Iraq counsel, in which DGCI rejected Triple Arrow's erroneous analysis of the terms of the MSA:

> Your analysis in your letter of the jurisdictional requirements under the MSA for any disputes between the parties is legally deficient and is rejected.  The terms of

the Disputes provisions in Section 13 of the MSA, which govern "any claim, controversy or dispute arising under or relating to this Agreement," are clear, and do indeed require that United States courts in Virginia adjudicate any questions related to any payments allegedly owed by DGCI to Triple Arrow for invoices issued prior to October 2020. These provisions survive the termintion of the MSA (Section 14.7 (Survival)), and in addition, DGCI's audit rights explicitly apply throughout the term of the MSA and "for a period of three years thereafter." (Section 5.12). Accordingly, DGCI is at all times comporting itself in compliance with the MSA, and expects Triple Arrow to do so as well. Your reliance on a fictious and so-called "October Agreement" is misplaced and invalid. The only legal agreement that applies to the relationship between DGCI and Triple Arrow is the MSA.

51. This letter also provided Triple Arrow with DGCI's analysis of the amounts invoiced by Triple Arrow and paid by DGCI for the post-October 2020 time frame. In that time, Triple Arrow issued invoices to DGCI in the amount of USD 10,692,882, and DGCI made payments to Triple Arrow in the amount of USD 11,885,241, resulting in a surplus in favor of Triple Arrow of USD 1,192,359.

52. In light of the ongoing questions raised by Triple Arrow's force protection rating, DGCI's letter of September 22, 2021 reiterated that not only were the audits authorized by the MSA, but that they were required in this situation "because DGCI cannot – and will not – remit payment to Triple Arrow of monies from the United States Government absent assurance that those monies are properly owed." DGCI's audits continue, albeit without cooperation from Triple Arrow, as also required by the MSA.

**F.    Triple Arrow Initiates Legal Proceedings in Iraq**

53. On or about September 23, 2021, Triple Arrow served DGCI's representative in Iraq with a "Legal Notification."

54. An English translation of the Legal Notification states, in pertinent part:

Through this notification, you will have to refund the aforementioned amount [USD 11,093,076] to my client (the company) [Triple Arrow]; otherwise, the legal measures will be taken against your company, such as (registering a law case at the competent courts, banning travel, stopping all services, putting a

11

seizure sign on all your properties, and withdrawing the vehicles of filling aircraft gasoline). (If someone notifies you, don't blame him – an adage).

55.     This Legal Notification, which threatens both DGCI assets and personnel, was issued by Triple Arrow's Iraq counsel, and served upon a DGCI representative in Iraq.

56.     On September 27, 2021, Triple Arrow's Iraqi counsel emailed a letter to DGCI and DGCI's U.S. counsel which, among other things, stated that "there is nothing preventing Triple Arrow from protecting its rights by seeking conservatory and/or provisional measures before the competent Iraqi courts."

57.     Triple Arrow has initiated legal proceedings against DGCI in Iraq seeking USD 11,093,076 in damages related to the purchase of fuel from Triple Arrow, together with Triple Arrow's legal fees.

58.     On September 21, 2021, Judge Qubad Sh. Noori of the Erbil Court of First Instance issued a Legal Notification setting a court hearing in this Iraqi litigation at 9:00 a.m. on November 8, 2021.

59.     Upon information and belief, DGCI was threatened by a Triple Arrow representative in Iraq that the "Asayish" would come to EIA prior to this hearing to remove all DGCI equipment and vehicles from the site. Upon information and belief, the "Asayish" is the Kurdish security organization and intelligence service for the Kurdistan Regional Government, which has control over EIA.

60.     To date, DGCI, working with DLA-E and the DOD, has been able to prevent the confiscation of its personnel and equipment in Iraq by Triple Arrow or others working on behalf of Triple Arrow.

61.     Upon information and belief, it is unclear whether the Iraqi court would enforce the contractual terms of the MSA, including the forum and choice of law selection provisions.

## COUNT 1 – DECLARATORY JUDGMENT

62.     DGCI incorporates the allegations in paragraphs 1 – 61 of the Complaint as set forth fully herein.

63.     Pursuant to 22 U.S.C. § 2201, the Court "may declare the rights and other legal relationship of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

64.     The MSA is a valid and enforceable contract between DGCI and Triple Arrow.

65.     Under the MSA, the rights and obligations of the parties and any claims or disputes relating to the MSA shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, and any claim, controversy or dispute shall be resolved exclusively at the U.S. Federal District Court for the Eastern District of Virginia, or if such court does not have subject matter jurisdiction over the dispute, any other federal or state court of competent subject matter jurisdiction located in the Commonwealth of Virginia.

66.     Under the MSA, several provisions of the MSA explicitly survive the termination of the MSA, including the choice of law and forum selection provisions.

67.     The MSA was terminated because Triple Arrow failed to satisfactorily maintain its force protection rating, which was a material condition precedent for it to be a vendor for DGCI in DGCI's performance on behalf of the DOD.

68.     Pursuant to its terms, the MSA remains a fully enforceable agreement that defines the relationship between the parties notwithstanding Triple Arrow's failure to maintain its force protection rating and the subsequent termination of the MSA.

69.     Triple Arrow has informed DGCI that it intends to "protect its rights" by seeking "seeking conservatory and/or provisional measures" including seizure of DGCI property to secure disputed monies Triple Arrow claims to be owing under the MSA before the Iraqi courts.

70.     Upon information and belief, representatives of Triple Arrow in Iraq have made threats to representatives of DGCI in Iraq regarding DGCI property and personnel in Iraq.

71.     In contravention of the explicit requirements of the MSA, Triple Arrow has followed through on its threats by initiating legal proceedings against DGCI regarding the MSA in the courts of Iraq.

72.     The Iraqi court has scheduled a court hearing on Triple Arrow's lawsuit on November 8, 2021.

73.     Triple Arrow's actions are unlawful and improper and are in direct violation of the material terms of the MSA.

74.     As a result of Triple Arrow's wrongful conduct, a real, substantial, justiciable and actual controversy exists between two parties having adverse legal interests, and which threatens immediate harm to DGCI.

75.     A judicial declaration of the parties' rights is needed with regard to: (1) the continued validity and enforceability of the MSA following termination; (2) the mandatory requirements of the MSA's forum selection and choice of law provisions requiring resolution of any disputes between the parties arising under the MSA to be litigated in this Court in accordance with Virginia law; and (3) that Triple Arrow's actions in Iraq, including initiating litigation in Iraqi courts, are improper and invalid.

WHEREFORE, DGCI respectfully requests that the Court enter judgment in favor of DGCI as follows:

A)    For Count 1 in the form of an order for declaratory relief, pursuant to 28 U.S.C. § 2201, et seq., declaring that: (1) the MSA continues to be valid and enforceable following termination; (2) the requirements of the MSA's forum selection and choice of law provisions requiring resolution of any disputes between the parties arising under the MSA to be litigated in this Court under Virginia law are mandatory and enforceable; and (3) Triple Arrow's actions in Iraq, including initiating litigation in Iraqi courts, are improper and invalid;

B)    For a temporary restraining order and a preliminary foreign anti-suit injunction under Federal Rule of Civil Procedure 65, prohibiting Triple Arrow from proceeding with any lawsuits or other legal proceedings against DGCI in Iraq;

C)    For reasonable attorneys' fees, costs, and expenses; and

D)    For such other relief as the Court deems just and proper.

Dated: October 19, 2021

Respectfully submitted,

/s/ Joseph N. Frost
Michael A. Branca (VSB No. 36108)
Michael C. Zisa (VSB No. 76397)
Joseph N. Frost (VSB No. 92239)
PECKAR & ABRAMSON, P.C.
2055 L Street, N.W., Suite 750
Washington, DC 20036
Telephone:  (202) 293-8815
Facsimile:   (202) 293-7994
mbranca@pecklaw.com
mzisa@pecklaw.com
jfrost@pecklaw.com

Thomas J. Curran (*pro hac vice* forthcoming)
tcurran@pecklaw.com
Doris D. Short (*pro hac vice* forthcoming)
dshort@pecklaw.com
Robert H. Bell (*pro hac vice* forthcoming*)*
rbell@pecklaw.com
PECKAR & ABRAMSON, P.C.
1325 Avenue of the Americas
10th Floor
New York, NY 10019
Telephone:  (212) 382-0909
Facsimile:   (212) 382-3456

*Attorneys for DGCI Corporation*

# EXHIBIT C



October 20, 2020

Triple Arrow Company for General Trading LTD
NAZ City Building C
Floor 11, Office 40
Erbil, Iraq

To Whom It May Concern:

You are hereby notified that our Master Service Agreement (MSA) with Triple Arrow for General Trading LTD is terminated effective immediately.  Based on information received in the attached Memorandum for Installation Access Denial (Barment), you are in breach of paragraph 3.1(c) of the MSA.

Triple Arrow for General Trading LTD has not remained eligible for installation access during the contract, as required for all subcontractors by prime contract clause C-JTSCC 5152.225-5916, Mandatory Eligibility for Installation Access (OCT 2015).  Access eligibility is required regardless of whether performance will be on or off an installation.

Under paragraph 11.4(b) of DGCI's Master Service Agreement with Triple Arrow for General Trading, Triple Arrow is liable for any excess costs if DGCI must re-procure supplies and services affected by the MSA termination.

Under the MSA's Termination clause, paragraph 11.4(b), Triple Arrow has a five-business day cure period.

Furthermore, per paragraph 2 of the Memorandum for Installation Access Denial (Barment), you have 5 days from receipt of that Memorandum to request the order contained therein be reconsidered.

Pending such reconsideration, prohibitions contained in that Memorandum are effective immediately.

Thank you for your assistance in this matter.

Joseph M. Yorio
Chief Executive Officer



UNCLASSIFIED



**DEPARTMENT OF DEFENSE**
**COMBINED JOINT TASK FORCE – OPERATION INHERENT RESOLVE**
**CAMP ARIFJAN, KUWAIT**
**APO AE 09306**

IRCS                                                                                         ) ᒪ   October 2020

MEMORANDUM FOR Triple Arrow for General Trading

SUBJECT:  Installation Access Denial (Barment) from All United States Forces Installations and Property in Iraq

1.  References:

    a. 18 U.S.C. § 1382, Entering Military, Naval, or Coast Guard Property

    b. 50 U.S.C. § 797, Penalty for Violation of Security Regulation and Orders

    c. 48 C.F.R. 252.225-7040, Contractor personnel authorized to accompany U.S. Armed Forces deployed outside the United States.

    d. Department of Defense Instruction (DoDI) 5200.08, Security of DoD Installations and Resources.

    e. Department of Defense Manual 5200.08 Volume 3, Section 1, para 1.2.a, Physical Security Program: Access to DoD Installations.

    f.  United States v. May, 622 F.2d 1000 (1980)

    g. Army Regulation (AR) 600-20, Army Command Policy, dated 24 July 2020.

    h.  CJTF Memorandum Dated 12 August 2019: SUBJECT:  Delegation of Authority to Approve Risk Mitigation Plans Within the Combined Joint Task Force-Operation INHERENT RESOLVE Area of Operations.

2.  Pursuant to the above references and the authority delegated to me by the Commander of Combined Joint Task Force – OPERATION INHERENT RESOLVE, effective immediately, Triple Arrow for General Trading (Triple Arrow), its officers, and employees are hereby barred from entering, remaining on, or otherwise accessing all United States Forces installations and property (including vehicles, aircraft and equipment) in Iraq.  Violation of this order may result in criminal prosecution for trespassing under Ref (a) and/or (b).  You may request, within five (5) days of receipt of this notice, that this order be reconsidered.  If you choose to do so, you must offer your justification for such a request.  If your location is unknown and you cannot otherwise be contacted, I will deny your request.

3.  The continued access of Triple Arrow to United States Forces installations and property in Iraq is detrimental to good order and discipline and a threat to force protection for the following reason:

    a.  Information was brought to my attention, which indicates that Triple Arrow poses an unacceptable risk to U.S. national interests, missions, personnel, and facilities.

UNCLASSIFIED

UNCLASSIFIED

IRCS
SUBJECT: Installation Access Denial (Barment) from All United States Forces Installations and Property in Iraq


4.  If any of your employees have been issued an installation access badge, you will direct all such personnel to immediately surrender their badges to appropriate installation authorities.

5.  The point of contact for this memorandum is CPT Sara L. Raxter, DLA LNO to CJTF-OIR at DSN 318-480-2304 or sara.l.raxter.mil@mail.mil.


CHRISTOPHER J. NIEMI
Brig Gen, U.S. Air Force
Chief of Staff

2

UNCLASSIFIED

# EXHIBIT D



Ian Galloway <igalloway@dgci.com>

---

**Barber, Pamela W CIV DLA ENERGY (USA)** <Pamela.Barber@dla.mil>     Mon, Oct 19, 2020 at 9:27 AM
To: Ian Galloway <igalloway@dgci.com>
Cc: "adoraney@dgci.com" <adoraney@dgci.com>, "Pineda, Kierra L CIV DLA ENERGY (USA)" <Kierra.Pineda@dla.mil>

Ian,

See attached letter informing DGCI that Triple Arrow has been denied Installation Base Access from All United States Forces Installations and Property in Iraq.

Please advise how this will impact your current contracts with DLA Energy.

Regards,

Pamela Barber

Contract Officer

DLA Energy-FEPDA

Office Phone: 571-767-8481

E-mail: Pamela.Barber@dla.mil

**This E-Mail [or attachments] may contain FOR OFFICIAL USE ONLY [FOUO] information which must be protected under the Privacy Act and AFE 33-332 **OR**Source Selection Information -See FAR 2.101 and 3.104.**

 **0393 Triple Arrow.pdf**
905K

# EXHIBIT E

| | |
|---|---|
| **From:** | Ketan Fichadia <kfichadia@dgci.com> |
| **Sent:** | Friday, August 27, 2021 4:25 PM |
| **To:** | mohammedbradosti@gmail.com |
| **Cc:** | faisalhamo@triplearrow.com; zhyar.mawlood@triplearrow.com; 'Danielle Esposito'; 'Ian Galloway'; 'Aziz Doraney'; 'Stef De Bruyn' |
| **Subject:** | Letter for Triple Arrow |
| **Attachments:** | DGC International Notice to Triple Arrow_ Final.pdf |

Good Morning Mr. Bardosti,

We appreciate your business partnership since June 2016 and strengthening our relationship with you.
Please find attached here with letter to assure your outstanding payments with our organization, along with timeline of future payment strategy.

Feel free to reach out to me or any of our team member for further clarification.

Thanks



### Ketan Fichadia, CPA
### Chief Financial Officer
Office +1-703-652-6056
7950 Jones Branch Dr
McLean, VA 22102
www.dgci.com

CONFIDENTIALITY NOTICE: The information in this message is confidential and may be legally privileged. It is intended solely for the addressee. If you are not the intended recipient, any disclosure, copying, or distribution of the message, or any action or omission taken by you in reliance on it, is prohibited and may be unlawful. Please immediately contact the sender if you have received this message in error. The typewritten signature included with this e-mail is not an electronic signature within the meaning of Electronic Signatures in Global and National Commerce Act or any other law of similar import, including without limitation, the Uniform Electronic Transactions Act, as the same may be enacted in any State.

CONFIDENTIALITY NOTICE: The information in this message is confidential and may be legally privileged. It is intended solely for the addressee. If you are not the intended recipient, any disclosure, copying, or distribution of the message, or any action or omission taken by you in reliance on it, is prohibited and may be unlawful. You are not responsible for the delivery of this email message to the addressee, do not keep, copy or deliver this email message to anyone. Please immediately contact the sender if you have received this message in error by reply email and then destroy this email in its entirety.  Your cooperation is appreciated. The typewritten signature included with this e-mail is not an electronic signature within the meaning of Electronic Signatures in Global and National Commerce Act or any other law of similar import, including without limitation, the Uniform Electronic Transactions Act, as the same may be enacted in any State.

1



August 26, 2021

Mohammad Faisal
Triple Arrow for General Trading Co. LTD
MRF, Building C,40-meters Road
Erbil, Kurdistan Region, Republic of Iraq

CC Faisal Hamo
CC Zhyar Mawlood

Dear Mr. Mohammad Faisal,

I am writing to you on behalf of DGCI Corporation (DGCI) in regards to DGCI's Defense Logistics Agency (DLA-E) fuel contracts in Iraq. Last October, Triple Arrow for General Trading Co. LTD received a negative force protection rating from the United States Government via the Joint Contingency Contracting System (JCCS) making it ineligible to access US Military installations in Iraq. As a result, DGCI terminated its subcontracts with Triple Arrow effective October 20, 2020. Subsequently, DGCI received DLA-E approval to purchase Triple Arrow's remaining jet fuel and diesel fuel inventory to offset any financial burden associated with the excess stocks occurring as a result of the negative JCCS rating.

By the end of August 2021, DGCI will have completed the purchase and drawdown of all remaining fuel stocks owned by Triple Arrow in Iraq associated with DGCI's DLA-E contracts. DGCI will pay Triple Arrow for all invoices associated with those remaining fuel stock purchases since October 21, 2020, minus any payments already made to Triple Arrow since October 21, 2020. Any payment made to, or received by, Triple Arrow after October 20, 2020 will be applied to fuel purchased since that date. A breakdown of these purchases, invoices, and payments will be provided to Triple Arrow by the end of August 2021. After that time, and based on the direction of the United States Government, no further DGCI purchase orders will be issued to Triple Arrow.

DGCI is endeavoring to reconcile, audit, and review all transactions between DGCI and Triple Arrow between July 29, 2016 and October 20, 2020. As a result, all other accounts payable and the note payable (which has now matured) will be held until completion of said audit.

Additionally, DGCI received United States, Department of Justice inquiries related to business activities associated with Triple Arrow and no further payments can be made until those inquires and investigations have been resolved.

I hope you can understand the complexity and nature of such an undertaking and we appreciate your patience in this matter.

Sincerely,

Ketan Fichadia
Chief Financial Officer
DGCI Corporation.

# EXHIBIT F



Danielle Esposito <desposito@dgci.com>

---

## RE: Letter for Triple Arrow
1 message

---

**Faisal Hamo** <faisalhamo@triplearrow.com>                                    Wed, Sep 1, 2021 at 7:47 AM
To: Ketan Fichadia <kfichadia@dgci.com>, mohammedbradosti@gmail.com
Cc: zhyar.mawlood@triplearrow.com, Danielle Esposito <desposito@dgci.com>, Ian Galloway <igalloway@dgci.com>, Aziz
Doraney <adoraney@dgci.com>, Stef De Bruyn <psdebruyn@dgci.com>

Dear Fichadia,


Please find attached respond to your letter .

Regards,

---

**From:** Ketan Fichadia <kfichadia@dgci.com>
**Sent:** 27/08/2021 11:25 PM
**To:** mohammedbradosti@gmail.com
**Cc:** faisalhamo@triplearrow.com; zhyar.mawlood@triplearrow.com; 'Danielle Esposito' <desposito@dgci.com>; 'Ian
Galloway' <igalloway@dgci.com>; 'Aziz Doraney' <adoraney@dgci.com>; 'Stef De Bruyn' <psdebruyn@dgci.com>
**Subject:** Letter for Triple Arrow


Good Morning Mr. Bardosti,


We appreciate your business partnership since June 2016 and strengthening our relationship with you.

Please find attached here with letter to assure your outstanding payments with our organization, along with timeline of
future payment strategy.


Feel free to reach out to me or any of our team member for further clarification.


Thanks




Ketan Fichadia, CPA

Chief Financial Officer
**Office** +1-703-652-6056
7950 Jones Branch Dr
McLean, VA 22102


www.dgci.com

CONFIDENTIALITY NOTICE: The information in this message is confidential and may be legally privileged. It is intended solely for the addressee. If you are not the intended recipient, any disclosure, copying, or distribution of the message, or any action or omission taken by you in reliance on it, is prohibited and may be unlawful. Please immediately contact the sender if you have received this message in error. The typewritten signature included with this e-mail is not an electronic signature within the meaning of Electronic Signatures in Global and National Commerce Act or any other law of similar import, including without limitation, the Uniform Electronic Transactions Act, as the same may be enacted in any State.

CONFIDENTIALITY NOTICE: The information in this message is confidential and may be legally privileged. It is intended solely for the addressee. If you are not the intended recipient, any disclosure, copying, or distribution of the message, or any action or omission taken by you in reliance on it, is prohibited and may be unlawful. You are not responsible for the delivery of this email message to the addressee, do not keep, copy or deliver this email message to anyone. Please immediately contact the sender if you have received this message in error by reply email and then destroy this email in its entirety.  Your cooperation is appreciated. The typewritten signature included with this e-mail is not an electronic signature within the meaning of Electronic Signatures in Global and National Commerce Act or any other law of similar import, including without limitation, the Uniform Electronic Transactions Act, as the same may be enacted in any State.


**T.A_Respond.pdf**
701K



# Triple Arrow

# General Trading Ltd.

**Triple Arrow For General Trading**

Mr. Kean Fichadia

Chief Financial Officer

DGCI Corporation

7950 Jones Branch Drive, Mc Lean, VA 22102

September 01, 2021

Dear Mr. Fichadia,

We write in reference to your letter dated 26 August 2021, concerning the remaining payments due by DGCI Corporation (hereafter "**DGCI**") to Triple Arrow for General Trading Co. LTD (hereafter "**Triple Arrow**"), before and after the termination of the fuel contracts between DGCI's Defense Logistics Agency (hereafter the "**Contracts**") on October 20, 2021.

As mentioned in your letter, these payments are divided as follows:

1. _Payments associated with the remaining fuel stock purchases after the termination of the Contracts_:

We acknowledge your undertaking to settle all invoices associated with the remaining fuel stock purchases since the termination of the Contracts and look forward to receiving the corresponding payments.

We also acknowledge that no further DGCI purchase order will be issued to Triple Arrow based on the direction of the United States Government.

2. _Payments associated with the other purchases made by DGCI under the Contracts_:

We understand from your letter of August 26, 2021 that any payments made after this date will only be affected to the settlement of the invoices associated with the remaining fuel stock purchases since the termination of the Contracts. However, as also mentioned in your above-mentioned letter, Triple Arrow has also issued several invoices prior to the termination of the Contracts which are due and which have not been settled to this date.

Nonetheless, it appears from your above-mentioned letter that DGCI intends to withhold the settlement of the sums due prior to termination of the Contracts on the basis of reasons that are foreign to the commercial relationship between DGCI and Triple Arrow.

_First_, in the above-mentioned letter, you state that DGCI is conducting an internal audit to "_reconcile, audit and review all transactions between DGCI and Triple Arrow between July 29, 2016 and October 20, 2020_" and that "[a]_s a result, all other accounts payable and the note payable (which has now matured)_ **will be held until completion of said audit**" (emphasis



# Triple Arrow    General Trading Ltd.

## Triple Arrow For General Trading

added). However, an internal audit is strictly related to DGCI and thus cannot have any repercussions on Triple Arrow. In particular, given that the audit is the result of the unilateral decision of DGCI, it cannot constitute a valid reason to justify delaying any payments due to Triple Arrow.

_Second_, you also mention that no further payments can be made until the inquiries of the United States, Department of Justice, received by DGCI in relation to the business activities associated with Triple Arrow are resolved. It should be noted that Triple Arrow has not received any official notification of such inquiries, and thus remains a third party to this process which is strictly related to the Department of Justice and DGCI. Therefore, those inquiries cannot constitute a valid reason to justify withholding any payment due to Triple Arrow.

On the basis of the above, Triple Arrow looks forward to receiving all payments due by DGCI in a timely manner, including those related to the trade's operations that were executed between DGCI Triple Arrow prior to termination of their commercial relationships.

Triple Arrow reserves all its right in this regard.

Yours faithfully,

CEO

Mohammed Faisal

# EXHIBIT G

| | |
|---|---|
| **From:** | John Alexander <jalexander@dgci.com> |
| **Sent:** | Wednesday, September 8, 2021 5:02 PM |
| **To:** | faisalhamo@triplearrow.com |
| **Cc:** | zhyar.mawlood@triplearrow.com; mohammedbradosti@gmail.com; Danielle Esposito; Joe Yorio; Ketan Fichadia; Brandon Davis; Curran, Thomas J. |
| **Subject:** | Response to TA letter dated 1 September 2021 |
| **Attachments:** | Letter to Mr Mohammed Faisal_Sept 8 2021.pdf; MSA-DGCI-Triple Arrow-Fully Executed.pdf |

Dear Mr. Faisal,

My name is John Alexander. I am the new Chief Executive Officer for DGCI.  It is unfortunate we are not able to meet under more favorable circumstances, but hopefully, once we pass through this turbulent period we can reset and focus on mutually beneficial business.

We are in receipt of your 1 September letter and, in kind, are providing the attached response. As a courtesy, we are also attaching a copy of the Master Services Agreement that Triple Arrow signed and executed in June of 2020.

I reviewed our August 26 communication to Triple Arrow.  It was our intent to make a good faith effort to resolve issues with you and receive clarity into the amounts you are claiming.  Based on your response I'm concerned we may not agree on the transparency required to mutually accept those claims. In the event you choose to litigate, it is important to note Triple Arrow has already agreed in writing that it must be done in Virginia courts.  However, I believe it is in all of our best interests not to do that.

Regarding our current operations, DGCI simply cannot tolerate interference or threats of interference in performing our mission for the US Government. While I might understand your frustration, DGCI will not capitulate to demands made under threat or duress particularly when the legality of doing so is in question.  It remains my sincere wish we might resolve our current dispute amicably with an eye toward the future. I hope you see it the same way.

Respectfully,

John Alexander.


--



**John S. Alexander**
Chief Executive Officer

Mobile 703-403-5496
Office 703-652-6056
7950 Jones Branch Dr
McLean, VA 22102
www.dgci.com

CONFIDENTIALITY NOTICE: The information in this message is confidential and may be legally privileged. It is intended solely for the addressee. If you are not the intended recipient, any disclosure, copying, or distribution of the message, or any action or omission taken by you in reliance on it, is prohibited and may be unlawful. You are not responsible for the delivery of this email message to the addressee, do not keep, copy or deliver this email message to anyone. Please immediately contact the sender if you have received this message in error by reply email and then destroy this email in its entirety.  Your cooperation is appreciated. The typewritten signature included

with this e-mail is not an electronic signature within the meaning of Electronic Signatures in Global and National Commerce Act or any other law of similar import, including without limitation, the Uniform Electronic Transactions Act, as the same may be enacted in any State.

CONFIDENTIALITY NOTICE: The information in this message is confidential and may be legally privileged. It is intended solely for the addressee. If you are not the intended recipient, any disclosure, copying, or distribution of the message, or any action or omission taken by you in reliance on it, is prohibited and may be unlawful. You are not responsible for the delivery of this email message to the addressee, do not keep, copy or deliver this email message to anyone. Please immediately contact the sender if you have received this message in error by reply email and then destroy this email in its entirety.  Your cooperation is appreciated. The typewritten signature included with this e-mail is not an electronic signature within the meaning of Electronic Signatures in Global and National Commerce Act or any other law of similar import, including without limitation, the Uniform Electronic Transactions Act, as the same may be enacted in any State.



# Peckar & Abramson

A Professional Corporation · Attorneys & Counselors at Law

**www.pecklaw.com**

1325 Avenue of the Americas
10th Floor
New York, NY  10019
tel. 212.382.0909
fax 212.382.3456

New York, NY
Los Angeles, CA
Oakland, CA
Washington, D.C.
Miami, FL
Chicago, IL
Boston, MA
River Edge, NJ
Austin, TX
Dallas, TX
Houston, TX

**International
Alliances**

Argentina
Brazil
Canada
Chile
Colombia
El Salvador
England
France
Germany
Guatemala
India
Mexico
Panama
Peru
Uruguay





**BY ELECTRONIC MAIL**

September 8, 2021

Mohammad Faisal
Triple Arrow for General Trading Co., LTD
MRF, Building C, 40 meters Road
Erbil, Kurdistan Region
Republic of Iraq

Re:     Notice to Cease and Desist in Illegal Actions

Dear Mr. Mohammad Faisal:

We write on behalf of our client, DGC International Corporation ("DGCI").

We specifically incorporate our client's prior letter to you dated August 26, 2021.  Moreover, reference is made to your letter dated September 1, 2021 in response to DGCI's letter.  Finally, reference is made to an improper "notice" provided to DGCI through an Iraqi attorney named "Sami S Sultan" in which certain baseless action is threatened.

DGCI's letter to you/Triple Arrow for General Trading Co. LTD ("Triple Arrow") was entirely legal and proper and founded in the Master Services Agreement between DGCI and Triple Arrow.  For your convenience, a copy of the MSA – which while terminated as an ongoing matter as a result of Triple Arrow's conduct remains governing – is attached for your reference.  Your particular attention is drawn to the following provisions of the MSA:

  1.  "5.4 Ethical Business Practices," by which Triple Arrow was obligated to use only legitimate and ethical business practices in connection with the activities contemplated by the MSA;

  2.  "5.11 Termination Rights," by which DGCI was empowered to terminate upon good faith belief that Triple Arrow has violated applicable laws or regulations, including laws and regulations of the United States;

  3.  "5.12 Records; Audits," by which Triple Arrow was obligated to keep and maintain (for at least three years from termination) records relating to its performance of its obligations to DGCI and which DGCI was to have access in order to conduct necessary audits of Triple Arrow's conduct under the MSA; and

# Peckar & Abramson

A Professional Corporation • Attorneys & Counselors at Law

Mr. Mohammed Faisal
September 8, 2021
Page 2

4. "13 Governing Law and Jurisdiction," by which any legal disputes between DGCI and Triple Arrow are exclusively to be resolved pursuant to the application of the laws of the Commonwealth of Virginia before the United States District Court for the Eastern District of Virginia (or, if such court does not have subject matter jurisdiction over the dispute, any other federal or state court of competent subject matter jurisdiction located in the Commonwealth of Virginia).

Triple Arrow's negative force protection rating from the United States Government via the Joint Contingency Contracting System (JCCS) and resulting bar imposed by the United States Department of Defense ("USDOD") reasonably raise serious questions as to the manner in which Triple Arrow has comported itself generally, and specifically as regards to its performance under the MSA. Whether Triple Arrow conducted itself under the MSA in accordance with the required legitimate ethical business practices is an ongoing issue and, contrary to the assertion in your letter, the audits DGCI is entitled to perform of Triple Arrow are required. DGCI cannot – and will not – remit payment of monies from the United States Government absent assurance that those monies are properly owed.

As to the ongoing inquiries by the United States Department of Justice ("USDOJ") relating to Triple Arrow, whether you have received "official" notice of them or not is irrelevant. The *fact* is that DGCI has received specific requests relating to Triple Arrow from the USDOJ. As is the case regarding concerns over Triple Arrow's conduct that caused the USDOD to bar Triple Arrow from its facilities, the concerns about Triple Arrow inherent in the USDOD inquiries must be resolved prior to DGCI remitting US Government funds to Triple Arrow.

As for the "notice" received from Mr. Sultan in Iraq, and its myriad threats of illegal action directed at DGCI property and personnel, we understand that you are already in the process of illicitly impinging upon DGCI's legal interests. We demand that you cease from taking any action directed at DGCI personnel or property whatsoever, wherever located. Should you believe for whatever reason that you have legitimate grievance with DGCI, the MSA requires you to take action in the US courts in Virginia, as appropriate. We look forward to actively contesting any such claim you may make.

Please do not hesitate to have your US legal counsel contact me. Until such time, on behalf of DGCI and all its personnel, we demand that you cease any actions that in any manner interfere with DGCI and its personnel. In any case, we reserve all rights and remedies available to redress

# Peckar & Abramson

A Professional Corporation • Attorneys & Counselors at Law

Mr. Mohammed Faisal
September 8, 2021
Page 3

your/Triple Arrow's current efforts to wrongfully and illegally interfere with DGCI's property and personnel.

Very truly yours,

Thomas J. Curran
Email: TCurran@pecklaw.com

cc:     Sami S Sultan, Attorney
        United States Department of Defense
        United States Department of State
        United States Department of Justice

## MASTER SERVICE AGREEMENT

This Master Service Agreement ("**Agreement**") is made effective as of May 1, 2020 (the "**Effective Date**") by and between DGCI Corporation, a company duly established in the Commonwealth of Virginia and having its principal place of business at 7950 Jones Branch Dr. 601N, McLean, VA 22102, ("**DGCI**") and Triple Arrow Company for General Trading Co Ltd, a company duly established under the laws of Iraq, with registration number 11721/Kurdistan Region, and having its principal place of business at MRF, Building C,40-meters Road, Erbil, Kurdistan Region, Republic of Iraq ("**Supplier**"). DGCI and Supplier are sometimes referred to individually as a "**Party**" and together as the "**Parties**".

### W I T N E S S E T H:

**WHEREAS**, DGCI desires to engage Supplier as an independent commercial contractor to provide certain goods and/or services (the "**Deliverables**"), and Supplier is willing to provide those Deliverables, all on the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the mutual promises set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **RELATIONSHIP OF THE PARTIES**.

    **1.1**   Scope of Agreement. This Agreement shall govern the provision of the Deliverables by Supplier to DGCI in the Territory during the Term. "**Territory**" refers to any geographical location specified in a PO. "**Term**" has the meaning set forth further below in this Agreement. All Deliverables shall be implemented only through one or more purchase orders duly executed by an authorized representative of each Party (each, a "**PO**"). The Parties agree that the PO's in existence at the time of signing this Agreement that shall be subject to this Agreement are specified in Appendix A hereto. New PO's entered into by the Parties during the Term shall be subject to this Agreement. In the event of any conflict between this Agreement and a particular PO, the terms of this Agreement shall govern. Supplier acknowledges and agrees that any additional or different terms contained in any purchase order confirmation, invoice, acknowledgement, release, acceptance or other written correspondence, irrespective of the timing, shall be of no force or effect against DGCI.

    **1.2**   Independent Service Provider. Supplier acknowledges and agrees that Supplier is an independent contractor and nothing in this Agreement shall be deemed to constitute, create, give effect to or otherwise recognize a joint venture, employment, principal or agency relationship or other joint relationship. Supplier is doing business hereunder at Supplier's own risk and for Supplier's own profit. Supplier is not authorized to make any binding commitments on behalf of DGCI, and acknowledges and agrees that Supplier will not (i) make representations, warranties, guarantees or covenants, or execute agreements, on DGCI's behalf or (ii) represent that DGCI is responsible for Supplier's acts or omissions.

**1.3**  Exclusivity. Subject to the next sentence, this is an exclusive relationship and the Supplier may not enter into agreements with third parties for the marketing and sale of the same or similar products within the territories specified in any PO. Supplier will refrain from any activity and will not enter into any agreement or make any commitment that is inconsistent, incompatible, or otherwise in conflict with Supplier's obligations under this Agreement, including Supplier's ability to perform each PO and Supplier's obligations hereunder to comply with all applicable laws and to maintain the confidentiality of DGCI and procurement-related proprietary information. Except if Supplier is in violation of this Agreement or any PO issued hereunder, Supplier is subject to any of the conditions in paragraph 11.4(c) hereof, or Supplier is in DGCI's sole discretion deemed unlikely to be able to successfully perform the work, DGCI agrees to exclusively work with the Supplier to provide the Deliverables identified in any PO's to be performed within the Territory.

**1.4**  Mutual Representations and Warranties. Each Party represents and warrants to the other that: (a) it has the full power to enter into this Agreement and to perform its obligations hereunder, (b) this Agreement constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, and (c) this Agreement does not contravene, violate or conflict with any other agreement of such Party. Except as expressly set forth in this Agreement or a particular PO, neither Party makes, and each expressly disclaims, any representations or warranties in connection with this Agreement, whether express, implied, statutory or otherwise.

## 2.  DELIVERABLES.

**2.1**  Delivery; Acceptance. Any shipment of goods, performance of services, or commencement of work on supplies by Supplier shall be deemed to be only upon the terms and conditions contained in this Agreement and the corresponding PO, except to the extent that DGCI may otherwise expressly consent in writing.  Supplier agrees that DGCI's acceptance or payment for any shipment of goods or similar act of DGCI shall not be claimed or construed to constitute such consent. Deliverables shall be made by Supplier at such times and places and of such items and quantities as may from time to time be specified in the PO.  Supplier acknowledges and agrees that time is of the essence with respect to Supplier's performance of its obligations. Supplier shall be liable for handling charges and return shipment costs for excess quantities. Title and risk of loss shall remain with Supplier until goods are delivered and accepted to the F.O.B. point specified by DGCI. Notwithstanding such delivery, Supplier shall bear risk of loss or damage to goods purchased hereunder from the time that DGCI gives notice of rejection of goods pursuant to the inspection provisions of this Agreement.

**2.2**  Packaging and Shipping.  Packaging and packing of items to be delivered by Supplier shall insure safe arrival at their destination, conform to requirements of common carriers and, in any event, comply with DGCI's minimum specifications set forth in a PO. Supplier shall be responsible for any additional charges resulting from deviation from DGCI's delivery instructions.

**2.3**  Inspection. DGCI shall have the right to inspect Deliverables supplied

hereunder at any time at Supplier's facilities or elsewhere. Final inspection and acceptance shall be after delivery to the delivery point designated by DGCI. If any inspection or test is made by DGCI at Supplier's facility or elsewhere, Supplier shall provide reasonable facilities and assistance for the inspection personnel. DGCI may reject all Deliverables which are found to be defective. No inspection, examination or test, regardless of extensiveness or type, and no approval given in connection with any such inspection, examination or test, shall relieve Supplier, or be claimed by Supplier to relieve it, of any obligation to comply fully with this Agreement and the corresponding PO. Payment for Deliverables or the failure to inspect goods or to discover defects shall not constitute acceptance or limit any of DGCI's rights.

3.     **PERFORMANCE.**

   **3.1** Warranties. Supplier represents and warrants that:

   (a)   All work hereunder will be performed in a good, workmanlike manner satisfying at least generally accepted industry standards, and all work hereunder and Deliverables shall conform to the applicable requirements of this Agreement and the corresponding PO;

   (b)   Supplier has, or prior to the period of performance under a PO will have, and shall maintain and renew, at no additional cost to DGCI, all permits, licenses, agreements, tax clearances, and authorizations necessary or appropriate to enable performance of Supplier's duties in the Territory, and shall provide DGCI with original and certified English copies thereof;

   (c)   Supplier is, or prior to the period of performance under a PO will be, and shall remain, at no additional cost to DGCI, registered and approved in the Joint Contingency Contracting System (JCCS) and shall require that its subcontractors or any tier also be so timely registered and approved in JCCS;

   (d)   Personnel provided to perform services are suitable, competent and appropriately trained for the tasks to be performed and have all necessary licenses, certifications and other authorizations to perform the services in the Territory; and

   (e)   No Deliverable or other work performed or provided hereunder will infringe any copyright, trade secret, patent, or other proprietary rights of a third party, and Supplier is the sole owner of, or otherwise has (or, prior to time of performance, will have) obtained all rights necessary for its performance hereunder.

   **3.2**     Survival and Remedies. The preceding warranties, together with Supplier's service warranties and guarantees, if applicable, shall survive inspection, test, acceptance of, and payment for the Deliverables. In the event of defective or nonconforming Deliverables,

and in addition to other remedies available hereunder or at law, DGCI may, at its option, (i) require prompt correction or replacement by Supplier, (ii) return them to Supplier for credit, (iii) have them corrected or replaced by a third party at Supplier's expense and deduct the cost thereof from any monies due Supplier, or (iv) exercise as to Supplier any remedy that is legally exercised by the U.S. Government or Prime Contractor as to DGCI. The return to Supplier of any defective or nonconforming Deliverables and delivery to DGCI of any corrected or replaced Deliverables shall be at Supplier's expense. Deliverables required to be corrected or replaced shall be subject to the provisions of this paragraph and to the inspection provisions of this Agreement in the same manner and to the same extent as Deliverables originally delivered hereunder. In addition to correcting or replacing any defective or nonconforming Deliverables, Supplier shall also reimburse DGCI for all costs and expenses incurred by DGCI in connection with inspection and discovery of the defects, identifying and correcting the cause of such defects and all other activities reasonably undertaken by DGCI to obtain conforming Deliverables.

## 4.  FUNDING; PAYMENT TERMS.

    **4.1**    <u>Contract Value</u>.  This Agreement, in and of itself, is unfunded and has no dollar value. The total dollar value of this Agreement shall be determined by the sum of all POs issued hereunder. Each PO will specify its own funded value. DGCI will not pay Supplier, and Supplier shall not claim, any amount greater than the limitations specified in the individual PO, unless DGCI has issued a modification to the PO increasing the funded value.

    **4.2**    <u>Pricing</u>. To the extent DGCI is required to provide the U.S. Government with certified cost or pricing data, then, absent a valid exemption, Supplier agrees to provide its certified cost or pricing data in a timely manner and in the requested format, either to DGCI in a sealed package for submission to the U.S. Government or directly to the U.S. Government.

    **4.3**    <u>Taxes</u>. Unless otherwise specified in a PO, the price for Deliverables includes, and Supplier is liable for and shall pay, all taxes, impositions, charges and exactions imposed on or measured by the corresponding PO and this Agreement, except for applicable value added or sales and use taxes that are separately stated on Supplier's invoice. Prices shall not include any taxes, impositions, charges or exactions for which a valid exemption exists, as evidenced by suitable documentation. DGCI may withhold from any amounts payable under this Agreement such federal, state, local or foreign taxes as shall be required to be withheld by the cognizant taxing authority. In that case, the Parties will cooperate reasonably to seek relief under any applicable double taxation agreement or treaty, but if there is no such agreement or treaty in effect, or if an applicable double taxation agreement or treaty reduces but does not eliminate such withholding or similar tax, DGCI shall make the required withholdings from amounts otherwise payable hereunder and remit them to the cognizant tax authority as and when directed. DGCI will cooperate with Supplier to provide available documentation, such as payment receipts, made available by the taxing authority. Similarly, the Parties shall cooperate with one another in providing information which may be reasonably required to fulfill each Party's tax filing requirements or any audit information request or to mitigate the tax obligations of either Party. Such requested information may include, for example, applicable tax clearance/non-objection letters, payroll tax receipts and other data requests from

the cognizant tax authority relating to the Agreement and PO activities.

**4.4**     <u>Invoicing</u>. Invoices must comply with all applicable provisions of this Agreement and each PO, and shall be submitted to DGCI in accordance with the following general instructions:

(a)     Unless otherwise specified in each PO, supplier shall invoice DGCI in arrears and shall submit all invoices by the 15th day of the month for Deliverables provided during the preceding month.

(b)     Invoices must be submitted electronically to accounting@dgci.com and shall reference this Agreement and include the PO number, any relevant PO line item number corresponding to a Deliverable, the period of performance for the Deliverables being invoiced, the remittance name and address, the Supplier's Taxpayer Identification Number and such other information as may be reasonably requested by DGCI.

(c)     Invoices shall be submitted on official company letterhead with costs sufficiently detailed and accompanied by all required supporting documentation. All invoices must be certified as true and accurate and contain the following statement dated and signed by an authorized Supplier representative:

*"This is to certify that to the best of my knowledge: (i) the above invoice is accurate, complete and conforms to the specifications and terms set forth in the Master Purchase Agreement and the corresponding PO, (ii) the invoiced Deliverables were accepted by DGCI during the period stated, (iii) payment for the Deliverables has not been previously received, and (iv) Supplier has in its possession records for all direct and indirect costs expended to substantiate the invoice."*

Additional required certifications may be specified in the PO.

(d)     Invoices shall be in U.S. dollars and, unless otherwise specified in a PO, payable net forty-five (45) days after receipt of a proper invoice.

(e)     DGCI may, at any time, set-off any amounts Supplier owes DGCI against any amounts DGCI owes to Supplier or any of its affiliated companies. Any adjustments in Supplier's invoice due to Supplier's failure to comply with this Agreement may be made by DGCI before payment.

**4.5**     <u>Alternate Payment to Ultimate Solutions</u>. In the event DGCI has attempted to pay Supplier for work performed under this MSA and subsequent PO's but the payment process has not been successfully completed for any reason other than DGCI's own fault, DGCI shall be entitled but not required to make such payment to Ultimate Solutions upon

written notice to Supplier. Supplier hereby acknowledges and agrees that such payment to Ultimate Solutions shall be deemed to be a payment to Supplier pursuant to this Agreement or any PO issued hereunder.  Nothing in this paragraph shall give Ultimate Solutions any rights to any payment under this Agreement or any PO issued hereunder, and Supplier agrees to indemnify, hold harmless, and defend DGCI against any claim brought by Ultimate Solutions pursuant to any such payment of any claim for payment under this paragraph. Supplier shall provide DGCI with the necessary bank transfer information for Ultimate Solutions.

     **4.6**    <u>Alternate Payment Instructions.</u> Separate and apart from DGCI's right under paragraph 4.5, Supplier may request DGCI to pay a Third Party (such as a sub-supplier) in lieu of paying Supplier.  Such payments shall be subject to the following terms:

    (a)    Supplier shall provide written instructions in a formal notification letter, stating that the proceeds of the outstanding invoice shall be paid to the designated Third Party.

    (b)    The notification letter must be sent in writing at least 30 days prior to issuing an invoice.

    (c)    The invoice itself should state: "Please remit to: "ABC" company" and shall be signed by Supplier.

    (d)    Supplier hereby acknowledges and agrees that payment to a Third Party pursuant to this paragraph shall be deemed to be a payment to Supplier pursuant to this Agreement or any PO issued hereunder.

    (e)    Nothing in this paragraph shall give such Third Party any rights to any payment under this Agreement or any PO issued hereunder, and Supplier agrees to indemnify, hold harmless, and defend DGCI against any claim brought by such Third Party pursuant to any such payment of any claim for payment under this paragraph.

    (f)    DGCI shall not be obligated to pay any Third Party who is not eligible to receive funds under a U.S. Government contract or to pay any Third Party in violation of any other law, regulation, or treaty.

     **4.7**    <u>Closeout</u>. Supplier shall cooperate with DGCI's customary closeout procedures for an agreement of this type, including, as required, executing a supplier release form in connection with payment of the final invoice following the end of the Term.

## 5.     COMPLIANCE WITH LAWS.

     **5.1**    <u>Competitive Advantage</u>. DGCI does not seek by this Agreement to secure an unauthorized competitive advantage, and Supplier acknowledges that it is not authorized to take any action on behalf of DGCI that would confer such an advantage. In particular, Supplier shall not, directly or indirectly, wrongfully solicit, obtain, use or disclose any information of any other person, association, corporation, government or other entity, including information which is a trade secret, confidential, company proprietary, government security classified, or government procurement sensitive, including but not limited to documents or information that are source selection sensitive and any other information that offers or may offer the Parties an illegal or improper competitive advantage.

**5.2**     Limitation on the Use of Agents. Supplier agrees that all services to be performed in connection with this Agreement will be conducted exclusively by Supplier and/or one of the approved subcontractors listed below, subject to revision at DGCI's sole discretion. Notwithstanding the below list, the Supplier will not retain any agents, subcontractors, or other third parties to perform any of the Deliverables without DGCI's prior written consent, such consent not to be unreasonably withheld. Any such agent, subcontractor or other third party shall be subject to DGCI's customary vetting process for new vendors.

   **AL MUASHIRAT CO. FOR GENERAL TRADING. CO. LTD**
   Bashar Naseer Tawfeeq
   JCCS: 89918
   +964 770 005 5579 NA 89918
   Arasat Al Hindya-Karada Kharig, Near BBAC Bank. Baghdad-Iraq
   POC Email: info@almuashirat.com

   **ALFADHIL CO. FOR GENERAL TRADING, LTD**
   Fadhl Jameel Juma'a
   JCCS: 89921
   +964 750 460 8759
   Italian Village, House 275, Erbil, Iraq
   POC Email: fjjcompany@gmail.com

DGCI understands that Supplier may enter into commercial agreements with the following fuel suppliers and traders:

   **RONIN CO. FOR GENERAL TRADING & SALES OF PETROLEUM PRODUCTS LTD**
   Hawre Riwandizi
   Villa #186, Italian Village #1,100-meters Road, Erbil, Kurdistan Region, Republic of Iraq
   POC Email: hriwandizi@roninpet.com

Any new fuel sub-suppliers must be approved in writing by DGCI prior to use on any PO. Supplier shall allow DGCI to review the wire transfers to its subcontractors and suppliers to ensure compliance with this paragraph.

   **5.3**     Compliance of Agents.  Supplier shall enable DGCI to confirm that Supplier's agents and subcontractors of every tier are in compliance with local and U.S. legal requirements by ensuring that the following requirements are flowed down in all subcontracts:

   (a)     Subcontractor shall provide DGCI, prior to the period of performance under a PO and upon any renewals during performance of a PO, original and certified English copies of all permits, licenses, agreements, tax clearances, and authorizations necessary or appropriate to enable performance of subcontractor's duties in the Territory;

(b)     Subcontractor shall permit DGCI to audit the subcontractor's supply chain to ensure that no portion of a PO has been performed, and no portion of any PO funds have been received, by a contractor or supplier that is not authorized to perform U.S. Government contracts or permitted to receive funds from a U.S. Government contract.

(c)     To enable each subcontractor or supplier who obtains or transports fuel for performance of a PO issued under this Agreement to obtain PMNOC approval, Supplier shall provide the subcontractor or supplier with either (a) an generic Basic Ordering Agreement (BOA) and generic PO issued by DGCI to the subcontractor or supplier, or (b) an effective, fully defined PO issued by DGCI jointly to Supplier and the subcontractor or supplier.  Subcontractor or supplier shall agree not to use the BOA or PO for any purpose other than to obtain PMNOC approval for performance of a PO issued under this Agreement.

**5.4**     <u>Ethical Business Practices</u>.  Supplier shall use only legitimate and ethical business practices in connection with the activities contemplated by this Agreement. During the Term, Supplier will conduct its business in a manner consistent with, and no less strict than, DGCI's Supplier Code of Ethics. Supplier shall not violate any applicable laws and regulations of the United States or any other applicable jurisdiction, including but not limited to laws relating to anti-bribery and the offering of inducements (in any form to include entertainment, gifts or otherwise), such as the U.S. Foreign Corrupt Practices Act, the U.S. Anti-Kickback Act and comparable legal requirements relating to its performance of its obligations under this Agreement. Supplier shall not disclose any information, or transfer any services or goods, furnished hereunder in any manner contrary to U.S. export control requirements. Supplier shall not engage in any transaction or activity that would violate any economic sanctions laws applicable to the Parties, including those administered by the U.S. Office of Foreign Assets Control, or employ, use, or do business with any person or entity identified in the U.S. Specially Designated Nationals List in connection with the performance of this Agreement. Consistent with the Supplier Code of Conduct, from time to time DGCI may require training to be conducted at the Supplier's expense for contract compliance purposes and Supplier will be notified accordingly.

**5.5**     <u>No Inducements</u>. Supplier shall not unlawfully offer, promise, or make any payments, loans, gifts, or anything of value that are not legally required to or for the benefit of: (a) a Government Official; (b) any relative of any Government Official; or (c) any other person if Supplier knows or has reason to believe that any part of the payment, loan or gift will be given directly, indirectly, or through a third party to or for the benefit of any of the persons or entities listed in clauses (a) or (b). "**Government Official**" means (a) an official or employee of any U.S or non-U.S. government agency; (b) an official or employee of an entity that Supplier knows or has reason to know is government-owned or controlled; (c) an official or employee of any political party; (d) a political candidate; or (e) an official or employee of a public international organization such as the United Nations, World Bank, or World Health Organization.

**5.6**     Conflicts of Interest. Supplier confirms that it is not aware of any perceived, potential or actual conflict of interest related to its performance of its obligations hereunder. Supplier acknowledges a continuing obligation to report to DGCI in a timely manner any perceived, potential or actual conflict of interest that may arise during the course of Supplier's performance of its obligations under this Agreement. In the event of any such perceived, potential or actual conflict of interest, DGCI may, at its discretion, require that Supplier execute an acceptable mitigation plan or terminate this Agreement.

**5.7**     Compliance Representations. Supplier represents and warrants that:

(a)     None of Supplier's agents, partners or employees, nor any immediate family members of Supplier's agents, partners or employees, is a Government Official, and Supplier is not aware of any current or prior violations of any applicable laws (including anti-corruption, anti-bribery, and anti-solicitation laws, and export controls and sanctions laws and regulations) in which Supplier has participated. Supplier further represents that neither Supplier nor any entity owned or controlled by Supplier is now, or has ever been, subject to an investigation by any government authority regarding alleged violations of any anti- corruption, anti-bribery or anti-solicitation laws, or export controls or sanctions laws and regulations, regardless of the outcome or findings of the investigation.

(b)     Neither Supplier nor any entity owned or controlled by Supplier is the target of any applicable sanction laws (e.g., designated on OFAC's Specially Designated Nationals and Blocked Persons list).

(c)     Supplier has established procedures and controls which Supplier reasonably believes are adequate (and otherwise comply with applicable law) to ensure that Supplier and any entity owned or controlled by Supplier is and will remain in compliance with all applicable laws (including anti-corruption, anti-bribery, and anti-solicitation laws, and export controls and sanctions laws and regulations).

(d)     Neither Supplier nor any of Supplier's principals (as defined in the Federal Acquisition Regulation to mean an officer, director, owner, partner, or a person having primary management or supervisory responsibilities within a business entity (e.g., general manager; plant manager; head of a division or business segment; and similar positions)) are debarred, suspended or proposed for debarment by the U.S. Government. Supplier agrees to notify DGCI immediately in writing upon discovery that Supplier or any of Supplier's principals may be subject to any such debarment or suspension proceedings.

**5.8**     Notice Requirement. The representations and warranties made in this Section 5 shall continue throughout the term of this Agreement.  If, during the term of this Agreement, there is a change in these representations and warranties, Supplier agrees to immediately disclose the change in writing to DGCI in accordance with the notice provisions in this

Agreement.

**5.9**    Certification. Supplier agrees to complete, upon request, a certification in a form acceptable to DGCI representing that Supplier is in compliance with all applicable laws (including anti- corruption, anti-bribery, and anti-solicitation laws, as well as export controls and sanctions laws and regulations).

**5.10**    Suspension Right. DGCI may suspend or withhold any payments to Supplier if, in good faith, DGCI believes that the payments may cause a violation of any applicable laws or may be related to illegal conduct, unethical business practices or violations of any applicable laws.

**5.11**    Termination Right. Notwithstanding any other termination provisions in this Agreement, DGCI may terminate this Agreement immediately by written notice for the following: (a) fraud or misrepresentation with respect to the entering into or performance of this Agreement; (b) violation of any provision of this Section 5; or (c) circumstances causing DGCI to believe, in good faith, that Supplier or anyone acting on Supplier's behalf has violated any applicable laws or regulations.

**5.12**    Records; Audits.  During the Term and for a period of three years thereafter (or such longer period of time required by applicable law or Supplier's own documentation retention policies), Supplier shall maintain accurate records relating to Supplier's performance of its obligations under this Agreement. Without limiting the generality of the foregoing, DGCI shall have the right, from time to time, at its own expense and upon reasonable notice to Supplier, to have an examination and audit conducted of those records to determine compliance with the terms of this Agreement. Such audit shall be conducted during regular business hours and in such manner as not to interfere unreasonably with Supplier's normal business activities.

## 6.    CONFIDENTIALITY.

**6.1**    Proprietary Information. As used herein, "**Proprietary Information**" means any information disclosed pursuant to this Agreement, whether in written, oral or visual form, which is identified by the disclosing Party at the time of disclosure as being proprietary or confidential or that due to its character and nature, or the circumstances of its disclosure, a reasonable person would recognize as being confidential or competitively sensitive. Proprietary Information shall not include any information that: (a) is already in the possession of the receiving Party without obligation of confidentiality at the time of receipt from the disclosing Party; (b) is independently developed by the receiving Party, as evidenced by appropriate documents; (c) is or becomes publicly available without breach of the Agreement by the receiving Party; (d) is rightfully received, free of restrictions and without breach of the Agreement, by the receiving Party from a third party; or (e) is approved for release by the prior written approval of the disclosing Party.

**6.2**    Legal Proceedings. In the event the receiving Party reasonably believes that disclosure of Proprietary Information of the other Party is required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil

investigative demand, or similar process), the receiving Party shall notify the other Party promptly of the requirement so that such other Party may seek an appropriate protective agreement. If disclosure is still required thereafter, the receiving Party shall limit its disclosure to the information that it is legally obligated to disclose.

**6.3**     Restricted Usage. The receiving Party agrees that any Proprietary Information disclosed hereunder: (a) shall be used by it solely in furtherance of this Agreement, (b) shall only be disclosed to the receiving Party's personnel on a need-to-know basis, (c) shall not be distributed, disclosed or disseminated to any third party without the disclosing Party's prior written consent; and (d) shall be subjected by the receiving Party to the same care that the receiving Party uses to protect the confidentiality of its own proprietary information, but not less than reasonable care. Either Party shall be allowed to make copies of any Proprietary Information disclosed by the other Party provided that the markings on the original Proprietary Information are affixed to all copies (including partial copies).  The receiving Party shall return to the disclosing Party, or provide written certification of the destruction of, any Proprietary Information it has received hereunder, immediately upon request made at any time by disclosing Party in its sole and absolute discretion, and in any event upon the termination of this Agreement; provided that the receiving Party may retain copies of the Confidential Information as required by any (A) applicable law or regulation or bona fide policies and procedures established for legal, compliance or regulatory purposes, or (B) automatic data back-up system in accordance with the receiving Party's security and/or disaster recovery procedures in the ordinary course of business; provided further that any such retained copies of the Proprietary Information shall be kept confidential in accordance with, and shall otherwise remain subject to, the provisions hereof and shall not be accessed or used for any purpose other than the purposes for which retention is hereby permitted, in each case for as long as they are retained (notwithstanding any prior termination hereof). The receiving Party shall notify the disclosing Party in writing immediately upon the occurrence of any unauthorized release of Proprietary Information, whether inadvertent or otherwise, and shall use reasonable efforts to prevent or limit any further dissemination of such Proprietary Information.

**6.4**     Duration. Proprietary Information hereunder shall be protected by the receiving Party during the Term and for a period of three (3) years thereafter, except that non-disclosure obligations relating to trade secrets shall survive until such information ceases to be a trade secret as a matter of law.

**6.5**     Facility Access. To the extent a Supplier may be required to have onsite or remote access to any DGCI (or DGCI customer) work facility or computer network, Supplier shall limit such access to the extent strictly necessary for performance thereunder. Supplier personnel shall observe all policies and procedures governing physical or remote access, including those relating to safety, security and general standards of conduct. Supplier shall cooperate fully with DGCI in investigating any alleged breach of any of those requirements.

**6.6**     No IP Rights. Supplier acknowledges that it is not being granted any license, right, or title in or to any patent, copyright, trademark or other proprietary rights under this Agreement. All information and property furnished by DGCI shall remain the exclusive property of DGCI. Supplier agrees that such information and property will be used for no

purpose other than in connection with the performance of its obligations under this Agreement, and shall be returned promptly to DGCI upon its request. Supplier assigns, and will require its personnel to assign, to DGCI copyright ownership for original written material originated and prepared for DGCI under this Agreement. Supplier, at DGCI's direction and expense, will take reasonable steps necessary to preserve and enforce these copyrights.

**7.    NON-SOLICITATION**. During the term of this Agreement and for a period of six months thereafter, neither Party shall, directly or indirectly, recruit, solicit, or hire, or assist in the recruitment, solicitation or hiring, for employment or engagement as a consultant, any employee of the other Party who participated in the performance of the other Party's obligations under this Agreement or who otherwise became known to the hiring Party as a result of such performance.  The foregoing shall not prohibit a hiring Party from (a) placing mass media advertisements, utilizing non-targeted third party recruiting efforts, or conducting job fairs for the purpose of recruiting employees generally or from otherwise hiring any person who independently seeks employment without solicitation by the hiring Party or (b) soliciting any employee whose employment has been terminated by the other Party prior to the commencement of discussions regarding employment.

**8.    CUSTOMER CONTACT**. Unless approved in advance by DGCI, Supplier shall not communicate with, or take any direction from, any DGCI customer relating to this Agreement or any PO, and any customer-initiated contact shall be referred by Supplier to DGCI for resolution. This paragraph shall not apply to any disclosure required by applicable law.

**9.    FAR CLAUSES.**  For the benefit of DGCI's Government customers, a PO may expressly incorporate by reference applicable "flow down" clauses required by the customer's procurement regulations such as the Federal Acquisition Regulation (FAR) and the Defense Federal Acquisition Regulation Supplement (DFARS), including applicable flow down clauses for commercial item acquisitions for which an exemption is not available.

**10.   INSURANCE.** Except as otherwise specified in a PO or as otherwise agreed in writing between the Parties, Supplier and its suppliers shall carry the following types of insurance and shall maintain them in the minimum amounts shown during the term of this Agreement:

| Insurance Type | Minimum Insurance Coverage |
| --- | --- |
| Commercial General Liability Insurance | $5,000,000 combined single limit per occurrence (including products/completed operations and contractual liability coverage). |
| Automobile Insurance | $2,000,000 combined single limit for bodily injury and/or property damage per person per occurrence; policy shall apply to all owned, leased, hired and non-owned vehicles used in connection with the work under this Agreement. |

| Workers' Compensation Insurance (including DBA insurance for personnel performing services overseas) | Insurance for statutory obligations imposed by law including, where applicable: (i) coverage under United States Longshoremen's and Harbor Workers' Act and Jones Act, (ii) Defense Base Act (DBA) workers' compensation insurance as specified under FAR Clause 52.228-3 for personnel performing services overseas and (iii) foreign voluntary workers' compensation insurance (if not covered by DBA workers' compensation insurance) based on the benefits of the state of hire. |
|---|---|
| Foreign Liability Insurance | $1,000,000 foreign general liability insurance (if not included in Commercial General Liability Insurance above), including products/completed operations, contractual liability and personal injury, bodily injury and property damage liability; and $1,000,000 foreign auto liability insurance to include coverage for all owned, leased, hired and non-owned vehicles used in connection with the work under this Agreement. |
| Employer's Liability Insurance | $1,000,000 per occurrence, unless higher amounts are required by applicable law including, if applicable, maritime coverage endorsement. This coverage requirement applies to all workers' compensation policies to include domestic workers' compensation, DBA workers' compensation, foreign voluntary workers' compensation and locally placed workers' compensation coverage outside of the United States. |
| Umbrella or Excess Insurance | Umbrella and/or excess liability insurance covering all domestic and foreign general liability, automobile liability, and employer's liability policies, to include coverage for bodily injury and property damage. The insurance provided under this section must be in the amount of not less than $5,000,000 per occurrence and be excess over all underlying insurance policies listed above. |
| Professional Liability Insurance | Reserved. |

Supplier shall have all policies, except Workers' Compensation and Employer's Liability, endorsed to name DGCI as an additional insured with respect to the work to be performed by Supplier. All such insurance must be primary and non-contributory and required to respond and pay prior to any other insurance or self-insurance available. Any other coverage available to DGCI shall apply on an excess basis. Supplier shall promptly deliver to DGCI a Certificate of Insurance attesting to the above coverage. The certificate shall state that all policies have been endorsed to waive subrogation in favor of DGCI. The certificate shall indicate that DGCI will be notified thirty (30) days prior to the modification or cancellation of any such insurance policies. Supplier shall comply with any federal, state, foreign, local and any other applicable law and local and/or site specific insurance requirements even if not stated herein or in a PO.

## 11. TERM AND TERMINATION.

    **11.1**    <u>Term</u>.  This Agreement shall commence on the Effective Date and remain in effect through 1st of May 2022, the base period (the '**Term**"), or the termination of the term of any PO issued hereunder, whichever is later, unless earlier terminated in accordance with this Agreement. Each PO may specify a term applicable to it.

    **11.2**    <u>Stop Work</u>. DGCI reserves the right to issue a written stop work notice at any time during the performance of this Agreement in the event that Supplier's Deliverables are no longer needed due to a change in DGCI's requirements. In the event of a stop work notice, Supplier shall be entitled to compensation to the same extent as DGCI is entitled to compensation from the U.S. Government.  Upon receipt of any such stop work notice Supplier shall immediately stop work and incur no further costs during the period of time such stop work notice remains in effect, until and unless either the stop work notice is lifted or a termination of this Agreement occurs.

    **11.3**    <u>Excusable Delays</u>. Supplier shall not be in default under this Agreement for the failure to timely deliver Deliverables if the failure arises from unforeseen causes beyond the control and without the fault or negligence of the Supplier or its approved subcontractors. Supplier shall give prompt written notice to DGCI stating the period of time the occurrence is expected to continue and use commercially reasonable efforts to end the failure or delay and minimize the effects of such event, including seeking alternative available sourcing for Deliverable items. Excusable delays shall only serve to prevent Supplier's default under this Agreement and then to the same extent as they prevent DGCI's default under DGCI's contract with the U.S. Government. DGCI may terminate this Agreement on written notice to Supplier if the excusable delay is reasonably likely to extend for a continuous period in excess of one calendar month or such other time period as may be mutually agreed upon by the Parties. In no event shall DGCI be responsible to pay for Deliverables that are unable to be provided due to excusable delays.

    **11.4**    <u>Termination.</u> In addition to any other express termination right set forth elsewhere in this Agreement:

    (a)    DGCI may terminate this Agreement and/or any PO without cause by providing at least thirty (30) calendar days' written notice to Supplier, in which case DGCI will only be liable to Supplier for unpaid compensation owed to Supplier for work performed by Supplier in accordance with the PO requirements and accepted by DGCI prior to the effective date of termination.

    (b)    Either Party may terminate this Agreement immediately upon giving notice of a material breach of this Agreement or a PO to the other Party if the breach cannot be remedied or, if capable of remedy, the breaching party fails to do so within five (5) business days following written notice (or such other period of time as may be mutually agreed upon by the Parties). The non-breaching Party shall reasonably cooperate with the breaching Party to facilitate a remedy of a material breach within the applicable cure period. In the event DGCI terminates

this Agreement in whole or in part due to Supplier's default, DGCI may procure, upon such terms and in such manner as DGCI may deem appropriate, supplies or services similar to those so terminated, and Supplier shall be liable to DGCI for any excess costs and for any damages for which DGCI may be liable to the U.S. Government if Supplier's default causes DGCI to default on its contract.

(c)     Either Party may terminate this Agreement effective immediately upon written notice to the other Party, if the other Party: (i) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (ii) files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency Law; (iii) makes or seeks to make a general assignment for the benefit of its creditors; or (iv) applies for or has a receiver, trustee, custodian or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

**11.5**   Effect of Expiration or Termination. Termination of this Agreement and any PO does not release either Party from any liability which, at the time of termination, has accrued to the other Party, or which may accrue in respect of any act or omission before termination or expiration, or from any obligation which is expressly stated to survive the termination or expiration.

## 12. INDEMNIFICATION.

**12.1.**   Indemnity. Each Party (as an "**Indemnifying Party**") shall indemnify and hold harmless the other Party and its applicable affiliates (as an "**Indemnified Party**") against any liability, loss, damage, cost, claim or expense (collectively, "**Damages**") the Indemnified Party suffers or incurs as a result of any claim, suit, action or other proceeding (a "**Claim**") brought against the Indemnified Party by a third party arising under or relating to the Indemnifying Party's performance (or non-performance) of its obligations under this Agreement; provided, however, that this indemnity obligation shall not apply to the extent that such Damages are attributable to the fraud, gross negligence or willful misconduct of an Indemnified Party. In the event the Damages are found to be caused by the joint or concurrent fault of the Parties, the Damages shall be borne by each Party in proportion to such Party's degree of fault.

**12.2.**   Procedures. The Parties agree that the preceding indemnification obligations shall be conditioned upon the Indemnified Party (i) promptly notifying the Indemnifying Party of such Claim, (ii) providing the Indemnifying Party with the sole right to defend or settle such Claim, including selection of defense counsel, and (iii) providing the Indemnifying Party with good faith assistance in the defense or settlement of such Claim, at the Indemnifying Party's expense. The Indemnifying Party shall not settle or compromise any such Claim in any manner which would impose an injunction or other equitable relief on the Indemnified Party or that does not include a full release of the Indemnified Party with respect to such Claim, without the prior written consent of the Indemnified Party. If (i) the Indemnifying Party does not promptly assume the defense of any Claim following notice of its election to do so, or (ii) the Indemnified

Party reasonably concludes that there may be defenses available to it which are different from or additional to those available to the Indemnifying Party and which could reasonably be expected to result in a conflict of interest or prejudice to the Indemnified Party if both Parties were represented by the same counsel, then the Indemnified Party will have the right to undertake the defense of such Claim with counsel of its own choosing, with the reasonable costs thereof for the account of the Indemnifying Party.

**12.3.**   <u>Damages.</u>  Except with respect to indemnification obligations hereunder, neither Party will be liable to the other for any incidental, special, consequential, indirect, punitive or exemplary damages (including lost revenues, lost profits, lost data or business interruption losses) arising from or related to this Agreement, regardless of the type of claim, whether in contract, tort, negligence, strict liability or otherwise, and regardless of the cause of such damages even if such damages were foreseeable.

## 13.   GOVERNING LAW AND JURISDICTION.

**13.1.**   <u>Governing Law</u>. This Agreement, the rights and obligations of the Parties and any claims or disputes relating to this Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without giving effect to its principles of conflict of laws. The U.N. Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

**13.2.**   <u>Specific Performance</u>. In the event of a breach of this Agreement, in addition to any other remedies the non-breaching Party may have at law or in equity, the non-breaching Party shall be entitled to seek enforcement of this Agreement in a court of competent jurisdiction by means of a decree of specific performance, an injunction without the posting of a bond or the requirement of any other guarantee, and any other form of equitable relief.

**13.3.**   <u>Disputes</u>. The Parties shall make a good faith effort to settle amicably any claim, controversy or dispute arising under or relating to this Agreement. Absent a mutual resolution, any such claim, controversy or dispute shall be resolved exclusively at the U.S. Federal District Court for the Eastern District of Virginia, or if such court does not have subject matter jurisdiction over the dispute, any other federal or state court of competent subject matter jurisdiction located in the Commonwealth of Virginia. Each Party irrevocably and unconditionally consents to such personal jurisdiction and to waive its right to a jury trial in any action arising under this Agreement. The prevailing Party in any action to enforce this Agreement shall be entitled to reimbursement of reasonable, documented costs and attorneys' fees incurred in connection with such enforcement.

## 14.   MISCELLANEOUS.

**14.1.**   <u>Prior Agreements; Modifications and Waivers</u>. This Agreement and the executed POs constitute the final, complete and integrated understanding of the Parties with respect to the subject matter hereof and supersede all prior understandings and agreements, whether written or oral, with respect to the same subject matter. Any changes to this Agreement

or a PO must be approved in writing by both Parties. The failure of a Party to exercise any right or remedy will not be deemed or constitute a waiver of such right or remedy in the future. No waiver of any of the provisions of this Agreement will be deemed or will constitute a waiver of any other provision hereof, nor will any such waiver constitute a continuing waiver unless otherwise expressly provided.

**14.2.**  Publicity. No news release, public announcement, denial or confirmation of any part of the subject matter of this Agreement shall be made without the prior written consent of DGCI, such consent not to be unreasonably withheld.

**14.3.**  Notices. All notices required or permitted to be given hereunder shall be deemed properly given if delivered by email or by personal delivery to the authorized individuals listed on the signature page to this Agreement or as otherwise specified in writing by the Parties.

**14.4.**  Assignment. Supplier shall not assign or transfer its rights relating to this Agreement or any PO in whole or in part or, consistent with Section 5.2, delegate any of Supplier's obligations under this Agreement or any PO, without DGCI's prior written consent, such consent not to be unreasonably withheld.

**14.5.**  Severability. Should any provision of this Agreement be held to be invalid, void, or otherwise unenforceable by a court of competent jurisdiction, the remaining provisions contained herein shall continue to remain in full force and effect, and shall not be impaired or otherwise invalidated in any way. To the extent permitted and possible, the invalid or unenforceable term shall be deemed replaced by a term that is valid and enforceable and that comes closest to expressing the intention of such invalid or unenforceable term.

**14.6.**  Advice of Counsel and Construction. Each Party acknowledges that it has had the opportunity to be represented by counsel.  Accordingly the rule of construction of contract language against the drafting party is hereby waived. Unless the context otherwise requires, (i) each reference in this Agreement to a designated "Section" or "Exhibit" is to the corresponding Section or Exhibit of or to this Agreement; (ii) the word "or" shall not be applied in its exclusive sense; (iii) "including" shall mean "including, without limitation"; and (iv) "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section or other subdivision.

**14.7.**  Survival. This Section 14 and Sections 6, 7, 11.5, 12 and 13 of this Agreement, and any other provision whose survival is necessary to give this Agreement its intended effect, shall survive the expiration or termination of this Agreement.

**14.8.**  Further Assurances. Supplier shall provide such further documents or instruments as may be reasonably necessary or desirable to give effect to this Agreement and to carry out Supplier's obligations hereunder and under each PO.

**14.9.**  Third Party Beneficiaries. There are no third-party beneficiaries to this Agreement.

**14.10.** <u>Counterparts; Headings</u>. This Agreement may be executed in counterparts, all of which together shall constitute one and the same document. Further, this Agreement may be executed by transfer of an originally signed document, including by electronic signature, by e-mail in PDF format, each of which will be as fully binding as an original document. Headings are inserted for convenience of reference only.

*[Signatures appear on the next page.]*

**IN WITNESS WHEREOF,** the duly authorized representatives of the Parties have signed this Agreement as of the Effective Date.

**DGCI Corporation**                                   **SUPPLIER**

Mohammed Faisal bradosti (Jun 27, 2020 20:02 GMT+2)

Ian Galloway                                           Mohammed Faisal bradosti

Jun 28, 2020                                           Jun 27, 2020

**Address for Notices:**                               **Address for Notices:**

7950 Jones Branch Dr. 601N                             MRF, Building C,40-meters Road, Erbil,
McLean, VA 22102                                        Kurdistan Region, Republic of Iraq
USA

Attention: Ian Galloway                                Attention: Mohammed Faisal
Telephone: 240-461-8074                                Telephone: +964 770 445 5980
Email: Igalloway@dgci.com                              Email: mohammedbradosti@gmail.com

## APPENDIX A – FLOWDOWN PROVISIONS AND CLAUSES INCORPORATED BELOW AND ATTACHED
### 130 - SPE607-20-D-0026 - Iraq Into-Plane
### 131 - SPE605-20-D-9518 - Iraq & Syria DDF
### 105 - Iraq and Syria OTBs
### 114 - SOSI SubK Camp Taji Fuel

52.203-13, Contractor Code of Business Ethics and Conduct (Oct 2015) (41 U.S.C. 3509).

52.203-19, Prohibition on Requiring Certain Internal Confidentiality Agreements or Statements (Jan 2017) (section 743 of Division E, Title VII, of the Consolidated and Further Continuing Appropriations Act, 2015 (Pub. L. 113-235) and its successor provisions in subsequent appropriations acts (and as extended in continuing resolutions)).

52.204-23, Prohibition on Contracting for Hardware, Software, and Services Developed or Provided by Kaspersky Lab and Other Covered Entities (Jul 2018) (Section 1634 of Pub. L. 115-91).

52.203-6, Restrictions on Subcontractor Sales to the Government (Sep 2016) (if Vendor engages sub-tier vendors in the performance of this Agreement)

52.204-25 Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment (Aug 2019) (if Vendor provides telecommunications and video surveillance services under this Agreement)

52.209-10 Prohibition on Contracting with Inverted Domestic Corporations (Nov 2015) (if Vendor meets definition under 6 U.S.C. 395(b)or plans to engage sub-tier vendors meeting definition under 6 U.S.C. 395(b))

52.222-17 Nondisplacement of Qualified Workers (May 2014) (if this Agreement exceeds $250,000)

52.222-50 Combating Trafficking in Persons (Dec 2018) (if at least $500,000 of the value of this Agreement may be performed outside the United States and items supplied are not commercially available off-the-shelf items)

52.224-3 Privacy Training (Jan 2017) (if Vendor employees will have access to DGC International systems of records containing personally identifiable information))

52.225-26 Contractors Performing Private Security Functions Outside the United States (Oct 2016) (if vendor will be performing security functions under this Agreement)

52.233-3 Protest After Award (Aug 1996) (if this Agreement value exceeds $250,000)

252.225-7975 ADDITIONAL ACCESS TO CONTRACTOR AND SUBCONTRACTOR RECORDS (DEVIATION 2020-O0001) (NOV 2019)

(a) In addition to any other existing examination-of-records authority, the Government is authorized to examine any records of the Contractor and its subcontractors to the extent necessary to ensure that funds, including supplies and services, available under this contract are not provided, directly or indirectly, to a person or entity that is actively opposing United States or coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities.

(b) The substance of this clause, including this paragraph (b), is required to be included in subcontracts, including subcontracts for commercial items, under this contract that have an estimated value over $50,000 and will be performed outside the United States and its outlying areas.

252.225-7993 Prohibition on Providing Funds to the Enemy (DEVIATION 2020-O0001) (NOV 2019)

(a) The Contractor shall—
(1) Exercise due diligence to ensure that none of the funds, including supplies and services, received under this contract are provided directly or indirectly (including through subcontracts) to a person or entity who is actively opposing United States or Coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities;

(2) Check the list of prohibited/restricted sources in the System for Award Management (SAM) at www.sam.gov—
(i) Prior to subcontract award; and
(ii) At least on a monthly basis; and prohibited or restricted source pursuant to section 841 of the National Defense Authorization Act for Fiscal Year 2015 (Pub. L. 113-291), as amended, unless the Contracting Officer provides to the Contractor written approval of the head of the contracting activity to continue the subcontract.

(b) The Head of the Contracting Activity has the authority to—
(1) Terminate this contract for default, in whole or in part, if the Head of the Contracting Activity determines in writing that the contractor failed to exercise due diligence, as required by paragraph (a) of this clause; or

(2)(i) Void this contract, in whole or in part, if the Head of the Contracting Activity determines in writing that any funds received under this contract have been provided directly or indirectly to a person or entity who is actively opposing United States or Coalition forces involved in a contingency operation in which members of the Armed Forces are actively engaged in hostilities.
(ii) When voided in whole or in part, a contract is unenforceable as contrary to public policy, either in its entirety or with regard to a segregable task or effort under the contract, respectively.
(c) The Contractor shall include the substance of this clause, including this paragraph (c), in subcontracts, including subcontracts for commercial items, under this contract that have an estimated value over $50,000 and will be performed outside the United States and its outlying areas.

# DGCI TA MSA - Final

Final Audit Report                                                        2020-06-28

| | |
|---|---|
| Created: | 2020-06-16 |
| By: | Ian Galloway (contracts@dgci.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAmYPLMM07dwJHOWYb8-U0IPfu1ejHcFVo |

## "DGCI TA MSA - Final" History

Document created by Ian Galloway (contracts@dgci.com)
2020-06-16 - 1:24:42 PM GMT- IP address: 108.18.229.178

Document emailed to Mohammed Faisal bradosti (mohammedbradosti@gmail.com) for signature
2020-06-16 - 1:27:12 PM GMT

Email viewed by Mohammed Faisal bradosti (mohammedbradosti@gmail.com)
2020-06-16 - 7:32:30 PM GMT- IP address: 66.102.9.154

Document e-signed by Mohammed Faisal bradosti (mohammedbradosti@gmail.com)
Signature Date: 2020-06-27 - 6:02:03 PM GMT - Time Source: server- IP address: 85.228.155.235

Document emailed to Ian Galloway (igalloway@dgci.com) for signature
2020-06-27 - 6:02:04 PM GMT

Email viewed by Ian Galloway (igalloway@dgci.com)
2020-06-28 - 12:39:22 PM GMT- IP address: 66.102.8.210

Document e-signed by Ian Galloway (igalloway@dgci.com)
Signature Date: 2020-06-28 - 12:39:41 PM GMT - Time Source: server- IP address: 173.66.191.43

Signed document emailed to Mohammed Faisal bradosti (mohammedbradosti@gmail.com), Ian Galloway (igalloway@dgci.com) and Ian Galloway (contracts@dgci.com)
2020-06-28 - 12:39:41 PM GMT



POWERED BY
Adobe Sign

# EXHIBIT H

---------- Forwarded message ---------
From: **TA- Legal Consultant** <sami.sultan@triplearrow.com>
Date: Wed, Sep 15, 2021 at 7:20 PM
Subject: RE: Response to TA letter dated 1 September 2021
To: John Alexander <jalexander@dgci.com>
CC: <faisalhamo@triplearrow.com>, <info@triplearrow.com>, <zhyar.mawlood@triplearrow.com>,
<mohammedbradosti@triplearrow.com>, <mohammedbradosti@gmail.com>, Danielle Esposito <desposito@dgci.com>,
Joe Yorio <jyorio@dgci.com>, Ketan Fichadia <kfichadia@dgci.com>, Brandon Davis <bdavis@dgci.com>,
<tcurran@pecklaw.com>


Dear John,


Please find attached in response to your email.


Best Regards,


Sami Sultan

Triple Arrow

Legal Consultant


---

**From:** Faisal Hamo <faisalhamo@triplearrow.com>
**To:** sami.sultan@triplearrow.com
**Subject:** FW: Response to TA letter dated 1 September 2021

Dear Sami,

Please for your action.

---

**From:** John Alexander <jalexander@dgci.com>
**Sent:** 09/09/2021 12:02 AM
**To:** faisalhamo@triplearrow.com
**Cc:** zhyar.mawlood@triplearrow.com; mohammedbradosti@gmail.com; Danielle Esposito <desposito@dgci.com>; Joe Yorio <jyorio@dgci.com>; Ketan Fichadia <kfichadia@dgci.com>; Brandon Davis <bdavis@dgci.com>; tcurran@pecklaw.com
**Subject:** Response to TA letter dated 1 September 2021

Dear Mr. Faisal,

My name is John Alexander. I am the new Chief Executive Officer for DGCI.  It is unfortunate we are not able to meet under more favorable circumstances, but hopefully, once we pass through this turbulent period we can reset and focus on mutually beneficial business.

We are in receipt of your 1 September letter and, in kind, are providing the attached response. As a courtesy, we are also attaching a copy of the Master Services Agreement that Triple Arrow signed and executed in June of 2020.

I reviewed our August 26 communication to Triple Arrow.  It was our intent to make a good faith effort to resolve issues with you and receive clarity into the amounts you are claiming.  Based on your response I'm concerned we may not agree on the transparency required to mutually accept those claims. In the event you choose to litigate, it is important to note Triple Arrow has already agreed in writing that it must be done in Virginia courts.  However, I believe it is in all of our best interests not to do that.

Regarding our current operations, DGCI simply cannot tolerate interference or threats of interference in performing our mission for the US Government. While I might understand your frustration, DGCI will not capitulate to demands made under threat or duress particularly when the legality of doing so is in question.  It remains my sincere wish we might resolve our current dispute amicably with an eye toward the future. I hope you see it the same way.

Respectfully,

John Alexander.

--



**John S. Alexander**
Chief Executive Officer

Mobile 703-403-5496
Office 703-652-6056
7950 Jones Branch Dr
McLean, VA 22102

www.dgci.com

CONFIDENTIALITY NOTICE: The information in this message is confidential and may be legally privileged. It is intended solely for the addressee. If you are not the intended recipient, any disclosure, copying, or distribution of the message, or any action or omission taken by you in reliance on it, is prohibited and may be unlawful. You are not responsible for the delivery of this email message to the addressee, do not keep, copy or deliver this email message to anyone. Please immediately contact the sender if you have received this message in error by reply email and then destroy this email in its entirety.  Your cooperation is appreciated. The typewritten signature included with this e-mail is not an electronic signature within the meaning of Electronic Signatures in Global and National Commerce Act or any other law of similar import, including without limitation, the Uniform Electronic Transactions Act, as the same may be enacted in any State.

CONFIDENTIALITY NOTICE: The information in this message is confidential and may be legally privileged. It is intended solely for the addressee. If you are not the intended recipient, any disclosure, copying, or distribution of the message, or any action or omission taken by you in reliance on it, is prohibited and may be unlawful. You are not responsible for the delivery of this email message to the addressee, do not keep, copy or deliver this email message to anyone. Please immediately contact the sender if you have received this message in error by reply email and then destroy this email in its entirety.  Your cooperation is appreciated. The typewritten signature included with this e-mail is not an electronic signature within the meaning of Electronic Signatures in Global and National Commerce Act or any other law of similar import, including without limitation, the Uniform Electronic Transactions Act, as the same may be enacted in any State.

**Legal consultant**

**Sami. S Sultan**

**Court Cases-Legal Consulting**



*By email*
**Pecker & Abramson**
Attn: Thomas J. Curran
1325 Avenue of the Americas
10th Floor
New York, NY 10019
Email: TCurran@pecklaw.com

September 15, 2021

Dear Mr. Curran,

We write in our capacity as legal representatives of Triple Arrow for General Trading Co. LTD (hereafter "**Triple Arrow**") and in reference to your "Notice to Cease and Desist in Illegal Actions" dated September 8, 2021 in which you "*demand that you cease from taking any action directed at DGCI personnel or property whatsoever, wherever located*" and in which you request from Triple Arrow to "*take action in the US courts in Virginia, as appropriate*".

On a preliminary basis, we would like to clarify that contrary to what is asserted in your letter, Triple Arrow has never meant to "threaten" DGCI with "certain baseless action". On the contrary, Triple Arrow is quite simply requesting from DGCI to honor its obligations under the Masters Services Agreement ("**MSA**"), and more importantly, under the oral agreement between Triple Arrow and DGCI for the sale of the remaining fuel stock after the termination of the MSA in October 2020 (the "**October Agreement**") and to settle Triple Arrow's legitimate dues.

It is precisely on the October Agreement that Triple Arrow relies to request the sums it is due, and which amount to USD 9,443,111.24. As explicitly acknowledged in DGCI's letter dated August 26, 2021, and as mentioned in Triple Arrow's letter dated September 1, 2021, the fact that DGCI should settle this amount to Triple Arrow is not disputed by DGCI. Therefore, Triple Arrow looks forward to receiving the above-mentioned amount without delay.

Given DGCI's express acknowledgment of its obligation to pay the amounts due under the October Agreement, the failure to abide by this obligation will leave Triple Arrow with no choice but to seek the enforcement of the October Agreement by any available legal means.

In particular, Triple Arrow is completely entitled to seek the enforcement of the October Agreement before Iraqi courts, contrary to what is stated in your letter. Indeed, while the MSA, which has already been terminated by DGCI in October 2020, does contain a clause granting jurisdiction to the US courts, the October Agreement which governs Triple Arrow's current claim does not. In any event, there is nothing preventing Triple Arrow from seeking provisional and conservatory measures on DGCI's assets in Iraq to protect its undisputed and legitimate rights, in particular since the October Agreement is executed in Iraq.

As for the amounts due under the MSA, i.e. prior to its termination in October 2020, as a gesture of goodwill towards DGCI, Triple Arrow will refrain from taking any legal measures for the moment to obtain these amounts, although they are substantial. Nonetheless, Triple Arrow insists on the fact that this gesture can in no way be considered as a waiver of its rights and reserves all its rights to obtain these amounts by any available legal means at a later date if DGCI fails to settle the amounts due.

Finally, Triple Arrow remains open to finding an amicable solution to the current matter.

All rights reserved.

Yours faithfully,

TA- Legal Consultant

Sami Saeed Sultan

# EXHIBIT I

| | |
|---|---|
| **From:** | Bell, Robert |
| **Sent:** | Wednesday, September 22, 2021 3:12 PM |
| **To:** | sami.sultan@triplearrow.com |
| **Cc:** | faisalhamo@triplearrow.com; info@triplearrow.com; Curran, Thomas J.; Bell, Robert; John Alexander; Danielle Esposito; Joe Yorio; kfichadia@dgci.com; bdavis@dgci.com |
| **Subject:** | RE: Response to TA letter |
| **Attachments:** | DGCI_Letter to Mr Sami Sultan_Sept 22 2021.pdf; Triple Arrow Debt Table.pdf |

Dear Mr. Sultan:

On behalf of DGCI, please see the attached letter.

Regards,

Robert H. Bell
Peckar & Abramson, P.C.
1325 Avenue of the Americas | 10th Floor | New York, NY  10019
office 212.382.0909
rbell@pecklaw.com | www.pecklaw.com

---------- Forwarded message ---------
From: **TA- Legal Consultant** <sami.sultan@triplearrow.com>
Date: Wed, Sep 15, 2021 at 7:20 PM
Subject: RE: Response to TA letter dated 1 September 2021
To: John Alexander <jalexander@dgci.com>
CC: <faisalhamo@triplearrow.com>, <info@triplearrow.com>, <zhyar.mawlood@triplearrow.com>, <mohammedbradosti@triplearrow.com>, <mohammedbradosti@gmail.com>, Danielle Esposito <desposito@dgci.com>, Joe Yorio <jyorio@dgci.com>, Ketan Fichadia <kfichadia@dgci.com>, Brandon Davis <bdavis@dgci.com>, <tcurran@pecklaw.com>

Dear John,

Please find attached in response to your email.

Best Regards,

Sami Sultan

Triple Arrow

Legal Consultant

1

**From:** Faisal Hamo <faisalhamo@triplearrow.com>
**To:** sami.sultan@triplearrow.com
**Subject:** FW: Response to TA letter dated 1 September 2021

Dear Sami,

Please for your action.

**From:** John Alexander <jalexander@dgci.com>
**Sent:** 09/09/2021 12:02 AM
**To:** faisalhamo@triplearrow.com
**Cc:** zhyar.mawlood@triplearrow.com; mohammedbradosti@gmail.com; Danielle Esposito <desposito@dgci.com>; Joe Yorio <jyorio@dgci.com>; Ketan Fichadia <kfichadia@dgci.com>; Brandon Davis <bdavis@dgci.com>; tcurran@pecklaw.com
**Subject:** Response to TA letter dated 1 September 2021

Dear Mr. Faisal,

My name is John Alexander. I am the new Chief Executive Officer for DGCI.  It is unfortunate we are not able to meet under more favorable circumstances, but hopefully, once we pass through this turbulent period we can reset and focus on mutually beneficial business.

We are in receipt of your 1 September letter and, in kind, are providing the attached response. As a courtesy, we are also attaching a copy of the Master Services Agreement that Triple Arrow signed and executed in June of 2020.

I reviewed our August 26 communication to Triple Arrow.  It was our intent to make a good faith effort to resolve issues with you and receive clarity into the amounts you are claiming.  Based on your response I'm concerned we may not agree on the transparency required to mutually accept those claims. In the event you choose to litigate, it is important to note Triple Arrow has already agreed in writing that it must be done in Virginia courts.  However, I believe it is in all of our best interests not to do that.

2

Regarding our current operations, DGCI simply cannot tolerate interference or threats of interference in performing our mission for the US Government. While I might understand your frustration, DGCI will not capitulate to demands made under threat or duress particularly when the legality of doing so is in question.  It remains my sincere wish we might resolve our current dispute amicably with an eye toward the future. I hope you see it the same way.


Respectfully,


John Alexander.



--





### John S. Alexander
Chief Executive Officer

Mobile 703-403-5496
Office 703-652-6056
7950 Jones Branch Dr
McLean, VA 22102


www.dgci.com

CONFIDENTIALITY NOTICE: The information in this message is confidential and may be legally privileged. It is intended solely for the addressee. If you are not the intended recipient, any disclosure, copying, or distribution of the message, or any action or omission taken by you in reliance on it, is prohibited and may be unlawful. You are not responsible for the delivery of this email message to the addressee, do not keep, copy or deliver this email message to anyone. Please immediately contact the sender if you have received this message in error by reply email and then destroy this email in its entirety.   Your cooperation is appreciated. The typewritten signature included with this e-mail is not an electronic signature within the meaning of Electronic Signatures in Global and National Commerce Act or any other law of similar import, including without limitation, the Uniform Electronic Transactions Act, as the same may be enacted in any State.



CONFIDENTIALITY NOTICE: The information in this message is confidential and may be legally privileged. It is intended solely for the addressee. If you are not the intended recipient, any disclosure, copying, or distribution of the message, or any action or omission taken by you in reliance on it, is prohibited and may be unlawful. You are not responsible for the delivery of this email message to the addressee, do not keep, copy or deliver this email message to anyone. Please immediately contact the sender if you have received this message in error by reply email and then destroy this email in its entirety.   Your cooperation is appreciated. The typewritten signature included with this e-mail is not an electronic signature within the meaning of Electronic Signatures in Global and National Commerce Act or any other law of similar import, including without limitation, the Uniform Electronic Transactions Act, as the same may be enacted in any State.


--



## Peckar & Abramson
A Professional Corporation · Attorneys & Counselors at Law

**www.pecklaw.com**

1325 Avenue of the Americas
10th Floor
New York, NY  10019
tel. 212.382.0909
fax 212.382.3456

New York, NY
Los Angeles, CA
Oakland, CA
Washington, D.C.
Miami, FL
Chicago, IL
Boston, MA
River Edge, NJ
Austin, TX
Dallas, TX
Houston, TX

**International
Alliances**

Argentina
Brazil
Canada
Chile
Colombia
El Salvador
England
France
Germany
Guatemala
India
Mexico
Panama
Peru
Uruguay





**BY ELECTRONIC MAIL**

September 22, 2021

Sami Saeed Sultan
Triple Arrow Legal Consultant

Re:      Notice to Cease and Desist in Illegal Actions

Dear Mr. Sultan:

We write on behalf of our client, DGC International Corporation ("DGCI").

We specifically incorporate our client's prior letter to Mr. Faisal dated August 26, 2021, and our letter to Mr. Faisal dated September 8, 2021.  Moreover, reference is made to your letter dated September 15, 2021 in response to our letter.

We are advised that you showed up in person at DGCI's office in Eribil this week to threaten to seize DGCI's four refueler trucks.  As you are no doubt aware, those four trucks are owned by DGCI and are DGCI property.  Any attempts by you and/or Triple Arrow to seize DGCI property in Iraq would be illegal, and we reiterate our demand that you cease from the taking of any actions directed at DGCI personnel or property whatsoever, wherever located.  You are advised that DGCI reserves all rights and remedies to redress your/Triple Arrow's current efforts to wrongfully and illegally interfere with DGCI property and personnel, and that DGCI will actively protect its rights and contest any improper claim you may make.

Your analysis in your letter of the jurisdictional requirements under the MSA for any disputes between the parties is legally deficient and is rejected.  The terms of the Disputes provisions in Section 13 of the MSA, which govern "any claim, controversy or dispute arising under or relating to this Agreement," are clear, and do indeed require that United States courts in Virginia adjudicate any questions related to any payments allegedly owed by DGCI to Triple Arrow for invoices issued prior to October 2020.  These provisions survive the termintion of the MSA (Section 14.7 (Survival)), and in addition, DGCI's audit rights explicitly apply throughout the term of the MSA and "for a period of three years thereafter." (Section 5.12).  Accordingly, DGCI is at all times comporting itself in compliance with the MSA, and expects Triple Arrow to do so as well.  Your reliance on a fictious and so-called "October Agreement" is misplaced and invalid.  The only legal agreement that applies to the relationship between DGCI and Triple Arrow is the MSA.

# Peckar & Abramson

A Professional Corporation • Attorneys & Counselors at Law

September 22, 2021
Page 2

DGCI has paid Triple Arrow for the purchase of Triple Arrow's fuel stock after October 2020, as set forth in the attached payment table.  In the post-October 2020 time frame, Triple Arrow issued invoices in the amount of USD$10,692,882, and DGCI has made payments to Triple Arrow in the amount of USD$11,885,241, resulting in a surplus in favor of Triple Arrow of USD$1,192,359.  Because of the ongoing inquiries by the United States Department of Justice ("USDOJ"), among other United States Government agencies, relating to the serious questions regarding the manner in which Triple Arrow has comported itself generally, and specifically as regards to its performance under the MSA, DGCI has currently paid to Triple Arrow all that it is authorized to do by the United States Government.

The ongoing audits being conducted by DGCI are not only allowed under the MSA, but they are required in this situation, because DGCI cannot – and will not – remit payment to Triple Arrow of monies from the United States Government absent assurance that those monies are properly owed.  The concerns about Triple Arrow inherent in the ongoing USDOJ inquiries must be resolved prior to DGCI remitting any United States Government funds to Triple Arrow for the pre-October 2020 time frame.  DGCI will continue to advise you as to any progress with respect to this process; however, as you know, any such progress is entirely dependent on Triple Arrow providing the proper and required back-up documentation to DGCI.  DGCI expects that Triple Arrow will abide by its ongoing contractual obligations under the MSA in this regard.

We remain available to speak directly with Triple Arrow's United States legal counsel.  Until such time, on behalf of DGCI and all its personnel, we continue to demand that you cease any actions that in any manner interfere with DGCI, its personnel, and its property.

DGCI reserves all rights.

Very truly yours,

Thomas J. Curran
Email: TCurran@pecklaw.com

cc:     United States Department of Defense
        United States Department of State
        United States Department of Justice

| DGCI/Triple Arrow Debt Overview | | |
|---|---|---|
| Pre-Oct. 2020 Estimated Debt | $ | 15,000,000 |
| Post-Oct. 2020 Invoices to DGCI | $ | 10,692,882 |
| Post-Oct. 2020 Payments from DGCI | $ | 11,885,241 |

| | | |
|---|---|---|
| Pre-October Balance | $ | 15,000,000 |
| Post October Balance (Surplus) | $ | (1,192,359) |

| Total Balance PRIOR to Reconciliation | $ | 13,807,641 |
|---|---|---|

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **TA to DGCI - Invoice Control** | | | | | | | |
| **Invoice Date** | **Invoice #** | **Inv. Amount USD** | **Payment** | **Balance** | **Project** | **Details** | **Month** |
| 10/29/2020 | 2011 | $ 108,295.44 | | $ 108,295.44 | purchase fuel | Purchase Fuel - JP8 -GZ from Oct.,15,2020 till Oct.,31,2021 | Oct.20 |
| 11/30/2020 | 2008 | $ 166,348.04 | | $ 274,643.48 | purchase fuel | Purchase Fuel - JP8 -GZ for Nov.2020 | Nov.20 |
| 12/30/2020 | 2180 | $ 258,481.19 | | $ 533,124.67 | purchase fuel | Purchase Fuel -JP8 - GZ for Dec.2020 | Dec.20 |
| 1/31/2021 | 2183 | $ 111,948.97 | | $ 645,073.64 | purchase fuel | Purchase Fuel -JP8 - GZ for Jan.2021 | Jan.21 |
| 2/28/2021 | 2186 | $ 137,757.67 | | $ 782,831.30 | purchase fuel | Purchase Fuel -JP8 - GZ for Feb.2021 | Feb.21 |
| 3/31/2021 | 2189 | $ 192,436.11 | | $ 975,267.42 | purchase fuel | Purchase Fuel -JP8 - GZ for March 2021 | March.21 |
| 5/18/2021 | | | $ 1,010,007.00 | $ (34,739.58) | Wire transportation | IPC -Inword payment order DEFFENSE GOVERNMENT CONTRACTING ISN 031695 OSN 049345 SSN 0318401 | |
| 11/30/2020 | 1970 | $ 270,017.58 | | $ 235,278.00 | purchase fuel | Purchase JP8 to Jaguar for Nov.2020 | Nov.20 |
| 12/30/2020 | 2197 | $ 275,383.04 | | $ 510,661.03 | purchase fuel | Purchase JP8 to Jaguar for Dec.2020 | Dec.20 |
| 1/31/2021 | 2200 | $ 273,927.29 | | $ 784,588.33 | purchase fuel | Purchase Fuel JP8 to Jaguar for Jan.2021 | Jan.21 |
| 2/28/2021 | 2203 | $ 553,303.44 | | $ 1,337,891.76 | purchase fuel | Purchase Fuel JP8 to Jaguar for Feb.2021 | Feb.21 |
| 3/31/2021 | 2206 | $ 275,754.14 | | $ 1,613,645.91 | purchase fuel | Purchase Fuel JP8 to Jaguar for March 2021 | March.21 |
| | | | | $ 1,613,645.91 | | | |
| 10/29/2020 | 1988 | $ 3,992.39 | | $ 1,617,638.30 | purchase fuel | Purchase fuel - Gasoline - GZ from Oct.,15,2020 till Oct.,31,2020 | Nov.20 |
| 11/30/2020 | 1992 | $ 104,281.98 | | $ 1,721,920.28 | purchase fuel | Purchase fuel - Gasoline - GZ for Nov.2020 | Dec.20 |
| | | | | $ 1,721,920.28 | | | |
| 10/29/2020 | 2014 | $ 78,136.28 | | $ 1,800,056.56 | purchase fuel | Purchase Fuel - DIESEL - GZ from Oct.,15,2020 till Oct.,31,2020 | Oct.20 |
| 11/30/2020 | 1995 | $ 321,208.11 | | $ 2,121,264.67 | purchase fuel | Purchase Fuel - DIESEL - GZ for Nov.2020 | Nov.20 |
| 12/30/2020 | 2017 | $ 377,400.98 | | $ 2,498,665.65 | purchase fuel | Purchase Fuel -DIESEL BASHUR ,M4 ,GV - GZ for Dec.2020 | Dec.20 |
| 1/31/2021 | 2032 | $ 291,324.02 | | $ 2,789,989.67 | purchase fuel | Purchase Fuel- DIESEL -GZ for Jan.2021 | Jan.21 |
| 2/28/2021 | 2035 | $ 254,207.59 | | $ 3,044,197.26 | purchase fuel | Purchase Fuel- DIESEL - GZ for Feb.2021 | Feb.21 |
| 3/31/2021 | 2038 | $ 269,666.00 | | $ 3,313,863.26 | purchase fuel | Purchase Fuel- DIESEL - GZ for March.2021 | March.21 |
| | | | | $ 3,313,863.26 | | | |
| 11/30/2020 | 1972 | $ 6,170.54 | | $ 3,320,033.81 | purchase fuel | Purchase DF2 to Jaguar  for Nov.2020 | Nov.20 |
| 12/30/2020 | 2162 | $ 5,753.28 | | $ 3,325,787.08 | purchase fuel | Purchase DF2 to Jaguar  for Dec.2020 | Dec.20 |
| 1/31/2021 | 2151 | $ 3,809.84 | | $ 3,329,596.93 | purchase fuel | Purchase DF2 to Jaguar  for Jan.2021 | Jan.21 |
| 2/28/2021 | 2154 | $ 3,393.23 | | $ 3,332,990.16 | purchase fuel | Purchase DF2 to Jaguar  for Feb.2021 | Feb.21 |
| 3/31/2021 | 2157 | $ 2,771.14 | | $ 3,335,761.30 | purchase fuel | Purchase DF2 to Jaguar for March 2021 | March.21 |
| | | | | $ 3,335,761.30 | | | |
| 10/29/2020 | 2173 | $ 229,274.48 | | $ 3,565,035.78 | purchase fuel | Purchase fuel - DIESEL - LION for Oct,15.2020 till Oct.31.2020 | Oct.20 |
| 11/30/2020 | 2133 | $ 103,263.32 | | $ 3,668,299.10 | purchase fuel | Purchase fuel - DIESEL - LION for Nov.2020 | Nov.20 |
| 12/30/2020 | 2136 | $ 35,943.75 | | $ 3,704,242.85 | purchase fuel | Purchase fuel - DIESEL - LION for Dec.2020 | Dec.20 |
| 1/31/2021 | 2139 | $ 52,331.33 | | $ 3,756,574.18 | purchase fuel | Purchase fuel - DIESEL - LION for Jan.2021 | Jan.21 |
| 2/28/2021 | 2142 | $ 53,814.78 | | $ 3,810,388.96 | purchase fuel | Purchase fuel - DIESEL - LION for Feb.2021 | Feb.21 |
| 3/31/2021 | 2145 | $ 54,382.20 | | $ 3,864,771.16 | purchase fuel | Purchase fuel - DIESEL - LION for march.2021 | March.21 |
| | | | | $ 3,864,771.16 | | | |
| 5/20/2021 | 2221 | $ 118,421.57 | | $ 3,983,192.73 | Stock fuel | BIAP-TIGER September 2020 part opening stock- JET& Freight In | Sep.20 |
| 5/20/2021 | 2224 | $ 642,505.92 | | $ 4,625,698.65 | Stock fuel | BIAP-LION August 2020 part opening stock- JET& Freight In | Aug.20 |
| 5/20/2021 | 2227 | $ 971,774.38 | | $ 5,597,473.03 | Stock fuel | BASRA -LION September 2020 part opening stock- JET& Freight In | Sep.20 |
| 5/20/2021 | 2230 | $ 15,277.68 | | $ 5,612,750.71 | Stock fuel | Great Zab - LION September SPE605-20-D-9518 GZ to Lion Mogas received | Sep.20 |
| 5/20/2021 | 2234 | $ 45,527.46 | | $ 5,658,278.17 | Stock fuel | Great Zab-LION October SPE605-20-D-9518 GZ to Lion Mogasreceived | Oct.20 |
| 5/25/2021 | 2251 | $ 679,780.48 | | $ 6,338,058.65 | Stock fuel | Jaguar Opening Inventory Turkey 11-Great Zab to Jaguar Jet Oct.2020 | Oct.20 |
| | | | | $ 6,338,058.65 | | | |
| 4/29/2021 | 2283 | $ 224,954.57 | | $ 6,563,013.22 | purchase fuel | Purchase Fuel- DIESEL for April.2021 | Apr-21 |
| 4/29/2021 | 2286 | $ 2,175.76 | | $ 6,565,188.98 | purchase fuel | Purchase DF2 to Jaguar  for April.2021 | Apr-21 |
| 4/29/2021 | 2290 | $ 5,078.60 | | $ 6,570,267.58 | purchase fuel | Purchase Fuel- DIESEL GZ to LSA for April.2021 | Apr-21 |
| 4/29/2021 | 2295 | $ 17,989.75 | | $ 6,588,257.33 | purchase fuel | Purchase Fuel - DIESEL - LION for April.2021 | Apr-21 |
| | | | | $ 6,588,257.33 | | | |
| 4/29/2021 | 2270 | $ 5,415.00 | | $ 6,593,672.33 | purchase fuel | Purchase Fuel JP8 to Tiger for April.2021 | Apr-21 |
| 4/29/2021 | 2267 | $ 227,374.16 | | $ 6,821,046.49 | purchase fuel | Purchase Fuel JP8 to GZ  for April.2021 | Apr-21 |

| Date | Num | Debit | Credit | Balance | Type | Description | Month |
|---|---|---|---|---|---|---|---|
| | | | | $ 6,821,046.49 | | | |
| 5/31/2021 | 2280 | $ 270,299.32 | | $ 7,091,345.81 | purchase fuel | Purchase Fuel JP8 to Jaguar for May 2021 **Part 1** | May-21 |
| 5/31/2021 | 2274 | $ 297,002.68 | | $ 7,388,348.49 | purchase fuel | Purchase Fuel JP8 to Jaguar for May 2021 **Part 2** | May-21 |
| 5/31/2021 | 2277 | $ 218,296.32 | | $ 7,606,644.81 | purchase fuel | Purchase Fuel -JP8 - GZ for May 2021 | May-21 |
| | | | | $ 7,606,644.81 | | | |
| 5/31/2021 | 2301 | $ 4,132.40 | | $ 7,610,777.21 | purchase fuel | Purchase DF2 to Jaguar for May 2021 | May-21 |
| 5/31/2021 | 2298 | $ 264,097.37 | | $ 7,874,874.58 | purchase fuel | Purchase Fuel- DIESEL -GZ for May 2021 | May-21 |
| 5/31/2021 | 2309 | $ 71,977.93 | | $ 7,946,852.51 | purchase fuel | Purchase fuel - DIESEL - LION for May 2021 | May-21 |
| | | | | $ 7,946,852.51 | | | |
| 6/6/2021 | 2257 | $ 21,636.00 | | $ 7,968,488.51 | Wear house | expenses and rent wearhouse | Jun-21 |
| 6/7/2021 | 2264 | $ 228,118.00 | | $ 8,196,606.51 | DGCI project | expenses project | Jun-21 |
| | | | | $ 8,196,606.51 | | | |
| 6/30/2021 | 2366 | $ 53,875.78 | | $ 8,250,482.29 | purchase fuel | Purchase Fuel -JP8 - GZ -ACEfor June 2021 | Jun-21 |
| 6/30/2021 | 2370 | $ 271,919.21 | | $ 8,522,401.50 | purchase fuel | Purchase Fuel -JP8 - GZ- Bashur for June 2021 | Jun-21 |
| 6/30/2021 | 2373 | $ 270,863.24 | | $ 8,793,264.74 | purchase fuel | Purchase Fuel JP8 to Jaguar for June 2021 | Jun-21 |
| 6/30/2021 | 2400 | $ 25,026.99 | | $ 8,818,291.73 | purchase fuel | Purchase Fuel- DIESEL -GZ for June 2021 | Jun-21 |
| | | | | $ 8,818,291.73 | | | |
| 7/29/2021 | 2409 | $ 108,355.48 | | $ 8,926,647.21 | purchase fuel | Purchase Fuel -JP8 - GZ- Bashur for July 2021 | Jul-21 |
| 7/29/2021 | 2412 | $ 349,716.28 | | $ 9,276,363.49 | purchase fuel | Purchase Fuel JP8 to Jaguar for July 2021 | Jul-21 |
| | | | | $ 9,276,363.49 | | | |
| | | | | $ 9,276,363.49 | | | |
| | | | | $ 9,276,363.49 | | | |
| | | | | $ 9,276,363.49 | | | |
| | | **10,286,370.49** | **1,010,007.00** | **(9,276,363.49)** | | | |

<u>DGCI Payment Schedule</u>

| Date | Amount |
|---|---|
| 11/5/2020 | $ 3,000,000 |
| 11/30/2020 | $ 300,000 |
| 12/2/2020 | $ 1,400,000 |
| 12/29/2020 | $ 1,500,000 |
| 12/30/2020 | $ 1,500,000 |
| 12/31/2020 | $ 185,241 |
| 1/18/2021 | $ 1,500,000 |
| 1/20/2021 | $ 800,000 |
| 1/21/2021 | $ 700,000 |
| 5/13/2021 | $ 1,000,000 |
| **Total** | **$ 11,885,241** |

# EXHIBIT J

هەرێمی کوردستان / عێراق

(شارستانی / ١٣   دادوەری)

ئەنجومەنی دادوەری

ژماره: ٢٥٢/ت/٢٠٢١    سەرۆکایەتی دادگای تێهەڵچوونەوەی ناوچەی ( ‏ )

ریکەوت : ١/ ٩ /٢٠٢١    دادگای ( ‏ )

ئازاینی

کوردی

Judicial council

_____

پێراگەیاندن نامه

داواکار: صحبی عقیل کریم عثمان / ب. ر. ر ٢٠٢٢٣ / TRIPLE AROW

داواکراو: ٢ـ گریشنی ـ گوماری باسی / DGCI / BRIAN THOMPSON ـ MRF. 46(b)

کاتژمێر ( ــ : ٩ )ی سەرلەبەیانی رۆژی ٢٠٢١ / ١١ / ٨  دیاریکراوه بۆ بینینی داوای ژماره ٢٥٢/ت/٢٠٢١

که له لایەن ( دلور لا ) لەسەرتان تۆمارکراوه، بۆیه خۆتان یا بریکارتان له کاتی دیارکراودا

له دادگا ئامادەبن ئەگەر نا دادبینەکه پاشملە و بەپێی یاسا دەرەهەقتان ئەنجام دەدرێت .... لەگەڵ رێزدا .

هاوپێچ:

١ـ                          ٣ـ

٢ـ                          ٤ـ                     دادوەر/

                                              ریکەوت: ١/ ٩ /٢٠

بەرێز/ دادوەری دادگای بەرایی ھەولێر

داواکار/ محمد فیصل کریم خان بەڕێوەبەری ڕێپێدراوی کۆمپانیای TRIPLE AROOW سەرەرای کارەکەی

بریکارەکەی/ پارێزەر: سامی سعید سلطان .

داواڵێکراو/BRIAN THOMPSON بەڕێوەبەری کۆمپانیای MRF.40M −DGCI / ژ.م: 07517865448 .

**ڕووی داوا:**

داوالێکراوی ســـەرەوە بە بەهای( 11.093.076 ) یانزە ملیون و نۆسەد وسی هەزار وحەوتاو شەش دۆلاری
ئەمریکی کەدەکاتە ( 16,362,286,000 )شازدە ملیـار وسێ سەد وشەست ودووملیۆن ودووسەد و هەشتاو
شەش هەزار دیناری عێراقی(بەنزینی فرۆکە JP8 )و(دیزل وبەنزینDF2) بە قەرزلە بریکاردارم کریوە بەڵام
داوالێکراو تاکو ئێستا قـــەرزەکەی نەداوەتەوە بە بریکاردارم سەرەرای چەندین جار داواکردنی بریکاردارم،
بۆیە داواکارم لە دادگــــای بەڕێز داوالێکراو بانگهێشتی دادبینی بکات و بڕیاریدات بە پابەندکردنی بە دانەوەی
قـــەرزی بریکاردارم بەبڕی (11.093.076)دۆلاری ئەمریکی کە دەکاتە بڕی(16,362,286,000) شازدە ملیـار
وسێ سەد وشەست ودووملیۆن ودووسەد و هەشتاو شەش هەزار دیناری عێراقی وەخەرجی داواو
مـــاندووبوونی پارێزەرایەتی بخرێتە ئەستۆی و بەمەبەستی دانی ڕەسمی یاسایی داوا داوای بریکـــــاردارم
بەبڕی(160000)سەد وشەست هەزار دینار دەخەملێنم و مافی بریکاردارم بە داوایـــەکی  نۆژەنی تێهەلکێش
یاخود سەربەخۆ (دعوی حادثة منظمة أو مستقلة) دەپارێزم .

لە گەڵ ڕێزماندا ...

ھاوپێچ
−  گشت بەلگەکان ڕۆژی دادبینی

ب/داواکار

پارێزەر: سامی سعید سلطان
بە پێی بریکارنامەی گشتی ژمارە 31/6387لە 11/ 6/ 2019
کە لە فەرمانگەی دادنوسی هەولێر یەکەم دەرچووە .

< ٠c\ / ٩ /c\

# **Fuad Translation Bureau**

**Kurdistan Regional Government- Iraq**
**Council of Ministers**
**Ministry of Justice**
**Gen. Dir. Of Notary Public Offices**
**1st Erbil Notary Public Office**

General No. : 80057
Registry No.:    401
Date:     05/09/2021

---

### **Legal Notification**

---

This legal notification was sent by the First Notary Public Office to the American (DGCI) Company, which its authorized manager in Iraq is Mr. (BRIAN THOMPSON).
**Address:** Erbil – (MRF) Compound, Apartment No. (D10-5) Mob. (07517865448).
Content of Notification:
Our company has made deal with your company for the purpose of supplying aircraft gasoline type of (JP8) and (DF2) diesel gasoline from Erbil International Airport to your company. Because of our dealings, your company owes us an amount of (11.093.076) Eleven Million Ninety-Three Thousand Seventy-Six USD.
As we are a company, we have implemented all the obligations towards you. Although we have informed you several times to refund the above-mentioned amount to our company, you did not refund it yet. Therefore, we notify you to refund the above-mentioned amount to my client (the company) within a period of (8) eight days as of the date of sending this notification to your company.
Through this notification, you will have to refund the aforementioned amount to my client (the company); otherwise, the legal measures will be taken against your company, such as (registering a law case at the competent courts, banning travel, stopping all services, putting a seizure sign on all your properties, and withdrawing the vehicles of filling aircraft gasoline). (If someone notifies you, don't blame him - an adage).
This notification has been done as per the (Power of Attorney) No. (6387), Record No. (31), which has been issued on 11/06/2019 from 1st Erbil Notary Public Office.
Notifier's signature: (signed)
**Full Name:** SAMI S. SULTAN- The Attorney/ MUHAMAD F.K. KHAN- the authorized manager of (TRIPLE ARROW) for general trading/ Ltd., in addition to his post.
**ID Card No.:**      8224, issued on16/07/2012
**Place of Issuance:** Kurdistan Bar Syndicate
**Address:**      Hall of Lawyers    Mobile No.:  0750 900 8889

This notification has been submitted by the Attorney (SAMI S. SULTAN), & MUHAMAD F.K. KHAN, the authorized manager of (TRIPLE ARROW) company for general trading/ Ltd., in addition to his post, who defined himself by the above ID Card. After signing this notification for purpose of notifying the American (DGCI) Company, which its authorized manager in Iraq is Mr. (BRIAN THOMPSON), the original copy has been filed in the archive, and the second one has been sent to the company on 05/09/2021.

(signed & sealed)
**Erbil Notary Public**
**MAHMUD M. AHMED**

*I, **FOUAD R. ABDULLAH**, Sworn Translator at the Ministry of Justice, Erbil, Iraq, (License No. 24-2007), make oath and say that I understand English Language well and that the document attached herein above is a true, full and faithful translation of the original document issued in Kurdish Language, a copy of which is attached hereto.*

*Fouad Translation Bureau – License No. (24-2007)- Erbil – Mob. No.+964 750 741 8312*

# EXHIBIT K

| | |
|---|---|
| **From:** | TA- Legal Consultant <sami.sultan@triplearrow.com> |
| **Sent:** | Monday, September 27, 2021 10:59 AM |
| **To:** | Bell, Robert |
| **Cc:** | faisalhamo@triplearrow.com; info@triplearrow.com; Curran, Thomas J.; 'John Alexander'; 'Danielle Esposito'; 'Joe Yorio'; kfichadia@dgci.com; bdavis@dgci.com; 'Aziz Doraney'; 'Todd Cheney'; 'Shilpa Fichadia'; 'Ian Galloway' |
| **Subject:** | RE: Response to TA letter |
| **Attachments:** | 2021.09.27._Letter_from_Triple_Arrow_to_DGCI.pdf |

Dear Robert,

Please find attached in response to your email.

Best Regards,

Sami Sultan
Triple Arrow
Legal Consultant

---

**From:** Bell, Robert <RBell@pecklaw.com>
**Sent:** 22/09/2021 10:12 PM
**To:** sami.sultan@triplearrow.com
**Cc:** faisalhamo@triplearrow.com; info@triplearrow.com; Curran, Thomas J. <TCurran@pecklaw.com>; Bell, Robert <RBell@pecklaw.com>; John Alexander <jalexander@dgci.com>; Danielle Esposito <desposito@dgci.com>; Joe Yorio <jyorio@dgci.com>; kfichadia@dgci.com; bdavis@dgci.com
**Subject:** RE: Response to TA letter

Dear Mr. Sultan:

On behalf of DGCI, please see the attached letter.

Regards,

Robert H. Bell
Peckar & Abramson, P.C.
1325 Avenue of the Americas | 10th Floor | New York, NY  10019
office 212.382.0909
rbell@pecklaw.com | www.pecklaw.com

---------- Forwarded message ---------
From: **TA- Legal Consultant** <sami.sultan@triplearrow.com>
Date: Wed, Sep 15, 2021 at 7:20 PM
Subject: RE: Response to TA letter dated 1 September 2021
To: John Alexander <jalexander@dgci.com>

1

CC: <faisalhamo@triplearrow.com>, <info@triplearrow.com>, <zhyar.mawlood@triplearrow.com>, <mohammedbradosti@triplearrow.com>, <mohammedbradosti@gmail.com>, Danielle Esposito <desposito@dgci.com>, Joe Yorio <jyorio@dgci.com>, Ketan Fichadia <kfichadia@dgci.com>, Brandon Davis <bdavis@dgci.com>, <tcurran@pecklaw.com>

Dear John,

Please find attached in response to your email.

Best Regards,

Sami Sultan

Triple Arrow

Legal Consultant

---

**From:** Faisal Hamo <faisalhamo@triplearrow.com>
**To:** sami.sultan@triplearrow.com
**Subject:** FW: Response to TA letter dated 1 September 2021

Dear Sami,

Please for your action.

---

**From:** John Alexander <jalexander@dgci.com>
**Sent:** 09/09/2021 12:02 AM
**To:** faisalhamo@triplearrow.com
**Cc:** zhyar.mawlood@triplearrow.com; mohammedbradosti@gmail.com; Danielle Esposito <desposito@dgci.com>; Joe Yorio <jyorio@dgci.com>; Ketan Fichadia <kfichadia@dgci.com>; Brandon Davis <bdavis@dgci.com>; tcurran@pecklaw.com
**Subject:** Response to TA letter dated 1 September 2021

2

Dear Mr. Faisal,

My name is John Alexander. I am the new Chief Executive Officer for DGCI.  It is unfortunate we are not able to meet under more favorable circumstances, but hopefully, once we pass through this turbulent period we can reset and focus on mutually beneficial business.

We are in receipt of your 1 September letter and, in kind, are providing the attached response. As a courtesy, we are also attaching a copy of the Master Services Agreement that Triple Arrow signed and executed in June of 2020.

I reviewed our August 26 communication to Triple Arrow.  It was our intent to make a good faith effort to resolve issues with you and receive clarity into the amounts you are claiming.  Based on your response I'm concerned we may not agree on the transparency required to mutually accept those claims. In the event you choose to litigate, it is important to note Triple Arrow has already agreed in writing that it must be done in Virginia courts.  However, I believe it is in all of our best interests not to do that.

Regarding our current operations, DGCI simply cannot tolerate interference or threats of interference in performing our mission for the US Government. While I might understand your frustration, DGCI will not capitulate to demands made under threat or duress particularly when the legality of doing so is in question.  It remains my sincere wish we might resolve our current dispute amicably with an eye toward the future. I hope you see it the same way.

Respectfully,

John Alexander.

--

3

**John S. Alexander**
Chief Executive Officer

Mobile 703-403-5496
Office 703-652-6056
7950 Jones Branch Dr
McLean, VA 22102

www.dgci.com

CONFIDENTIALITY NOTICE: The information in this message is confidential and may be legally privileged. It is intended solely for the addressee. If you are not the intended recipient, any disclosure, copying, or distribution of the message, or any action or omission taken by you in reliance on it, is prohibited and may be unlawful. You are not responsible for the delivery of this email message to the addressee, do not keep, copy or deliver this email message to anyone. Please immediately contact the sender if you have received this message in error by reply email and then destroy this email in its entirety.  Your cooperation is appreciated. The typewritten signature included with this e-mail is not an electronic signature within the meaning of Electronic Signatures in Global and National Commerce Act or any other law of similar import, including without limitation, the Uniform Electronic Transactions Act, as the same may be enacted in any State.

CONFIDENTIALITY NOTICE: The information in this message is confidential and may be legally privileged. It is intended solely for the addressee. If you are not the intended recipient, any disclosure, copying, or distribution of the message, or any action or omission taken by you in reliance on it, is prohibited and may be unlawful. You are not responsible for the delivery of this email message to the addressee, do not keep, copy or deliver this email message to anyone. Please immediately contact the sender if you have received this message in error by reply email and then destroy this email in its entirety.  Your cooperation is appreciated. The typewritten signature included with this e-mail is not an electronic signature within the meaning of Electronic Signatures in Global and National Commerce Act or any other law of similar import, including without limitation, the Uniform Electronic Transactions Act, as the same may be enacted in any State.



**Legal consultant**

**Sami. S Sultan**

**Court Cases-Legal Consulting**

---

*By email*
**Pecker & Abramson**
Attn: Thomas J. Curran
1325 Avenue of the Americas
10th Floor
New York, NY 10019
Email: TCurran@pecklaw.com

September 27, 2021

Dear Mr. Curran,

We write in our capacity as legal representatives of Triple Arrow for General Trading Co. LTD (hereafter **"Triple Arrow"**) and in reference to your letter dated 22 September 2021 in which you "continue to demand that you cease any actions that in any manner interfere with DGCI, its personnel, and its property". On the basis of what was stated in this letter, Triple Arrow would like to clarify the following:

First, as already stated in our letter dated 15 September 2021, DGCI owes Triple Arrow an amount of USD 9,443,111.24 for the remaining fuel stock after October 2020. In your letter of 22 September 2021, you state that "[i]n the post-October 2020 time frame, Triple Arrow issued invoices in the amount of USD$10,692,882, and DGCI has made payments to Triple Arrow in the amount of USD$11,885,241, resulting in a surplus in favor of Triple Arrow of USD$1,192,359". However, this statement is strongly rejected by Triple Arrow as it only derives from a discretionary allocation of funds by DGCI. Indeed, while it may be that DGCI has made some payments post October 2020,[1] they were made to settle invoices prior to the termination of the MSA and not for the remaining fuel stock after October 2020. This discretionary allocation of funds is in fact evident from the payment table attached to your letter of 22 September 2021: while the table shows that Triple Arrow invoiced an amount of USD 533,124.67 between October 2020 and December 2020, DGCI has made payments afterwards in the amount of USD 3,185,241 in December 2020. This substantial difference is a clear indication that the payments made in December 2020 did not correspond only to the post October 2020 purchases but are related invoices previous to October 2020. Therefore, it is clear that the basis for the above-mentioned statement is flawed, and that to this day the amount of USD 9,443,111.24 for the post October 2020 period remain due by DGCI to Triple Arrow.

It should be noted that all the payment allocations Triple Arrow relies upon are based on an excel sheet that has been prepared and approved by one of DGCI's own employees, Mr. Aziz Doraney, Vice President Logistics.

Second, you mention in your letter that "[w]e are advised that you showed up in person at DGCI's office in Eribil this week to threaten to seize DGCI's four refueler trucks. As you are no doubt aware, those four trucks are owned by DGCI and are DGCI property". Once again, Triple Arrow strongly rejects your statement. Indeed, the four refueler trucks are, in fact, registered in the name of Triple Arrow and not DGCI. Therefore, we were well within our rights to request that these trucks be returned to their rightful owner considering DGCI's continuous refusal to honor its engagements towards Triple Arrow. In any event, as already stated there is nothing preventing Triple Arrow from protecting its rights by seeking conservatory and/or provisional measures before the competent Iraqi courts.

Finally, Triple Arrow continues to insist on the fact that it has not waived its rights to obtain the amounts due in the pre-October 2020 area, which it will request in due time. Therefore, your allegations related to the ongoing audits conducted by the DGCI and the inquiries by the United States Department of Justice are irrelevant.

All rights reserved.

Yours faithfully,

TA- Legal Consultant

Sami Saeed Sultan

---
[1] Triple Arrow cannot confirm nor deny the amount stated in your letter of 22 September 2021 (USD$11,885,241) at this point and nothing in this letter shall be construed as any admission of receipt of payments.

# EXHIBIT L

# Fuad Translation Bureau

## Honorable, Judge of the Erbil Court of First Instance

**The Plaintiff**: (MUHAMAD F.K. KHAN), the authorized manager of (TRIPLE ARROW) Company, in addition to his post. His Lawyer (SAMI S. SULTAN).
**The Defendant**: (BRIAN THOMPSON) the authorized manager of (DGCI) Company. Address: (MRF) Compound, Apartment No. (40M) , Mob. (07517865448)

**Content of Lawsuit:**
The Defendant has previously purchased from my client aircraft gasoline type of (JP8) and (DF2) diesel gasoline with an amount of (11.093.076) Eleven Million Ninety-Three Thousand Seventy-Six USD, which is equivalent to (16.362.286.000) Sixteen Billion Three Hundred Sixty Two Million Two Hundred Eighty-Six Thousand Iraqi dinars in the form of debt, but he hasn't paid this debt (amount) so far, even though my clients demanded it several times.

Therefore, I ask your esteemed court to invite the Defendant to attend the pleading and issue a decision obligating him to pay the debt amounting to (11.093.076) Eleven Million Ninety-Three Thousand Seventy-Six USD, which is equivalent to (16.362.286.000) Sixteen Billion Three Hundred Sixty Two Million Two Hundred Eighty-Six Thousand Iraqi dinars, that he owed to my client and to charge him the expenses of the lawsuit and attorneys' fees.

For the purpose of paying the legal fees, I have estimated my client's lawsuit fees to an amount of (160.000) One Hundred Sixty Thousand Dinars, while I reserve the right for my client to file an annexed lawsuit or separate lawsuit.
Regards…

(signed)
**Attorney of Plaintiff**
**SAMI S. SULTAN**
**As per the general power of attorney No. (31/6387) dated**
**11/06/2019, issued from Erbil Notary Public Office-1**

Fouad Office For Translation
Mobile : 0750 741 83 12

*I, __FOUAD R. ABDULLAH__, Sworn Translator at the Ministry of Justice, Erbil, Iraq, (License No. 24/ 2007), make oath and say that I understand English Language well and that the document attached herein above is a true, full and faithful translation of the original document issued in Kurdish Language, a copy of which is attached hereto.*

*Fouad Translation Bureau – License No. (24-2007)- Erbil – Mob. No.+964 750 741 8312*

Kurdistan Regional - Iraq
Judicial Council
Court Of Appeals Presidency of Erbil Area
Erbil Court of First Instance

No.    2653/B2/2021
Date:  21/09/2021

## Legal Notification

<u>The Plaintiff</u>: (MUHAMAD F.K. KHAN), the authorized manager of (TRIPLE ARROW) Company, in addition to his post.

<u>The Defendant</u>: (BRIAN THOMPSON) the authorized manager of (DGCI) Company.

<u>Address</u>: Erbil – (MRF) Compound, Apartment No. (40M).

The time (9:00) a.m. of 11/08/2021 has been set as the day of pleading for the lawsuit No. (26/B2/2021), that has been filed against you by (the Plaintiff).

Therefore, you must present by yourself or whoever represents you; otherwise, the pleading will be conducted in absentia according to the law against you.

Regards…

Judge
QUBAD SH. NOORI
21/09/2021